**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Derek Don Chappell, | No. CV-15-00478-PHX-SPL |
| Petitioner, | **ORDER** |
| v. | <u>DEATH PENALTY CASE</u> |
| Ryan Thornell, et al., | |
| Respondents. | |

Petitioner Derek Don Chappell is an Arizona death row prisoner seeking habeas relief under 28 U.S.C. § 2254. Before the Court are Chappell's habeas petition and his request for evidentiary development. (Docs. 25, 105.)[1] Respondents oppose both. (Docs. 33, 87, 107–08.) The Court will deny Chappell's petition and request but will grant a certificate of appealability as to Claim 2(A)(4).

## FACTUAL BACKGROUND

In 2003, Chappell was engaged to Kristal Shackleford ("Kristal"). *State v. Chappell*, 236 P.3d 1176, 1180 (Ariz. 2010).[2] Kristal and her two-year old son, Devon, moved in with Chappell and his parents. *Id*. On December 10, 2003, Chappell babysat Devon while Kristal

---

[1] "Doc." refers to the document and page number generated by the Court's Case Management/Electronic Case Filing system.

[2] "[T]he facts as found by the Arizona Supreme Court are presumed correct." *Atwood v. Ryan*, 870 F.3d 1033, 1039 (9th Cir. 2017) (citing 28 U.S.C. § 2254(e)(1)). Chappell argues the presumption does not apply to findings of the trial court, the Arizona Supreme Court, and the postconviction-review (PCR) court. (Doc. 25 at 45–46.) Chappell does not challenge the facts found by the Arizona Supreme Court in this background section.

was at work. *Id.* As Chappell changed Devon's diaper, he "forcefully" pressed Devon's neck and shoulders until Devon's "face turned red." *Id*. Chappell then called Kristal and told her that he had "hurt" Devon and asked her to come home at once. *Id.* A pediatrician, who examined Devon later that day, found bruises on his face and neck, "consistent with choking." *Id.*

In subsequent statements to police, Chappell indicated that he was jealous of Devon's relationship with Kristal. *Id*. Following an investigation, Child Protective Services (CPS) told Chappell to have no further contact with Devon. *Id.* Kristal and Devon moved into a nearby apartment; she and Chappell broke their engagement but continued seeing each other. *Id.* On March 6, 2004, Chappell and Kristal told friends that they were again engaged. *Id*. At the same time, Chappell was increasingly worried that the CPS restrictions would force Kristal to choose between him and Devon. *Id.* And on March 10, 2004, Kristal told Chappell that if she had to choose, "she 'could not live without her son.'" *Id.*

Early the next day, Kristal called 9-1-1 to report Devon missing. *Id*. Police officers found Devon floating in the swimming pool of Kristal's apartment complex, and Devon was pronounced dead at a local hospital. *Id.* The subsequent autopsy found Devon had drowned. *Id*. "Chappell quickly became a suspect" and incriminated himself in Devon's death during police interviews. *Id*. 1180–81.

On March 22, 2004, a grand jury indicted Chappell for child abuse for the December 10, 2003 choking incident, and first-degree premeditated murder for killing Devon, and the State noticed its intent to seek a death sentence for the murder if Chappell was convicted of child abuse. (Record on Appeal, R.O.A., 10.) The jury found Chappell guilty as charged. *Chappell*, 236 P.3d at 1181.

At the ensuing aggravation phase, the jury found three aggravating circumstances under § 13-703(F)(2), (6), and (9) of the Arizona Revised Statutes: Chappell had a prior conviction of a serious offense, child abuse; Chappell committed the murder in an especially cruel manner; and Chappell was an adult, and the victim was under 15 years

old.[3] *Id*. At the penalty phase, the jury sentenced Chappell to death for the murder, *id*., and the trial court sentenced him to a term of years for child abuse (R.O.A. 603). On August 3, 2010, the Arizona Supreme Court affirmed the convictions and sentences, *Chappell*, 236 P.3d at 1190, and in February 2011, the United States Supreme Court denied Chappell's petition for a writ of certiorari, *Chappell v. Arizona*, 562 U.S. 1227 (2011) (Mem.). Chappell then sought relief, and an evidentiary hearing, on PCR. (Doc. 33, Ex. WWW.) On June 13, 2014, the PCR court denied both requests, and the Arizona Supreme Court denied review. (Doc. 33, Exs. OOOOO and KKKKK.)

In 2015, Chappell filed a notice of intent to pursue habeas relief in this Court. (Doc. 1.) Between February and November 2016, the parties briefed Chappell's petition (Docs. 33 and 87), and between April and May 2017, they briefed Chappell's request for evidentiary development (Docs. 105, 107, and 108).

## I.    APPLICABLE LAW

Chappell's habeas petition is governed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA).[4] The Court applies the following legal framework in considering Chappell's claims.

### A.    Exhaustion & Procedural Default

A writ of habeas corpus cannot be granted unless the petitioner has exhausted available state court remedies. 28 U.S.C. § 2254(b)(1); *see also Coleman v. Thompson*, 501 U.S. 722, 731 (1991). To exhaust state remedies, the petitioner must "fairly present" his claims to the state's highest court in a procedurally appropriate manner. *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999). A claim is "fairly presented" if the petitioner has described the operative facts and the federal legal theory on which the claim is based. *Anderson v. Harless*, 459 U.S. 4, 6 (1982). A petitioner must clearly alert the state

---

[3] The Arizona Supreme Court cited the statutes in effect in 2010, stating they did not materially differ from the ones in effect at the time of Devon's death. *Id*. at 1181 n.3.

[4] Chappell's challenge to the constitutionality of the AEDPA (Doc. 21 at 43) is meritless. *See Crater v. Galaza*, 491 F.3d 1119, 1125–26 (9th Cir. 2007) (holding that the AEDPA violates neither the Suspension Clause nor the separation of powers doctrine).

court that he is alleging a specific federal constitutional violation. *See Casey v. Moore*, 386 F.3d 896, 913 (9th Cir. 2004). He must make the federal basis of the claim explicit either by citing specific provisions of federal law—even if the federal basis of a claim is "self-evident," *Gatlin v. Madding*, 189 F.3d 882, 888 (9th Cir. 1999)—or by citing state cases that explicitly analyze the same federal constitutional claim, *Peterson v. Lampert*, 319 F.3d 1153, 1158 (9th Cir. 2003) (en banc).

A habeas claim is procedurally defaulted if it was raised in state court, but the state court found it precluded by an adequate and independent state procedural rule. *Dretke v. Haley*, 541 U.S. 386, 392 (2004). A state procedural rule is independent if it does not depend on the merits of a "federal constitutional ruling," *Stewart v. Smith*, 536 U.S. 856, 860 (2002), and a state procedural rule is adequate if it is "strictly or regularly followed," *Barr v. City of Columbia*, 378 U.S. 146, 149 (1964). A habeas claim is also procedurally defaulted if it was never presented to the state court, and "the court to which the petitioner would be required to present [the] claim[] in order to meet the exhaustion requirement would now find the claim[] procedurally barred." *Coleman,* 501 U.S. at 735 n.1. If no remedies are currently available, the claim is "technically" exhausted but procedurally defaulted. *Id.*; *Rodney v. Garrett*, 116 F. 4th 947, 954 (9th Cir. 2024) (citing *Coleman*, 501 U.S. at 729–32); *see also Gray v. Netherland*, 518 U.S. 152, 161–62 (1996).

In Arizona there are two avenues for a petitioner to exhaust federal constitutional claims: direct appeal and PCR proceedings. Rule 32 of the Arizona Rules of Criminal Procedure governs PCR proceedings. It provides that a petitioner is precluded from relief on any claim that could have been raised on appeal or in a prior PCR petition. Ariz. R. Crim. P. 32.2(a)(3). The preclusive effect of Rule 32.2(a)(3) may be avoided only if a claim falls within certain exceptions, and the petitioner can justify the claim's omission from a prior petition.[5] *See* Ariz. R. Crim. P. 32.1(b)–(h), 32.2(b), 32.4(b).

---

[5] The Court addresses exceptions to the preclusive effect of Rule 32.2(a)(3) to the extent raised by Chappell to justify a claim's omission from a direct appeal or a prior petition. *See Beaty v. Stewart,* 303 F.3d 975, 987 & n.5 (9th Cir. 2002) (finding no available state court remedies and noting that petitioner did not attempt to raise any

The United States Supreme Court has found that Rule 32.2(a)(3) is an independent state procedural rule. *Smith*, 536 U.S. at 860. And in *Ortiz v. Stewart*, the Ninth Circuit held that Arizona courts strictly and regularly enforce Rule 32.2(a)(3). 149 F.3d 923, 931 (9th Cir. 1998), *abrogated in part on other grounds by Martinez v. Ryan*, 566 U.S. 1 (2012). Further, in *Beaty v. Stewart*, the Ninth Circuit noted that if a petitioner had "*any* unexhausted claims, he [had] procedurally defaulted them, because [they were then] time-barred under Arizona law," i.e., Rule 32.2(a)(3), from returning to state court. 303 F.3d 975, 987 (9th Cir. 2002) (emphasis added).

### B.  Overcoming Procedural Default

A "prisoner may obtain federal review of a procedurally defaulted claim by showing cause for the default and prejudice from a violation of federal law." *Martinez v. Ryan*, 566 U.S. 1, 10 (2012). Generally, "cause" for a procedural default exists if a petitioner can demonstrate that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986); *Coleman*, 501 U.S. at 753. "Prejudice" is actual harm resulting from the alleged constitutional error. *Vickers v. Stewart*, 144 F.3d 613, 617 (9th Cir. 1998).

Ordinarily, the ineffective assistance of PCR counsel does not establish "cause" to excuse a procedural default because the Sixth Amendment right to the effective assistance of counsel does not apply to postconviction proceedings. *Coleman*, 501 U.S. at 752–54. But in *Martinez v. Ryan*, the United States Supreme Court recognized a "narrow exception" to the general rule:

> Where, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective.

566 U.S. 1, 17 (2012). Arizona state law requires that Sixth Amendment ineffective assistance of trial counsel claims be raised on PCR proceedings. *State v. Spreitz*, 39 P.3d

exceptions to Rule 32.2(a)).

~ 5 ~

525, 527, ¶ 9 (Ariz. 2002). Hence, under *Martinez*, an Arizona habeas petitioner may demonstrate cause and prejudice for the procedural default of an underlying claim of ineffective assistance of *trial* counsel by showing that

(1)     PCR counsel performed deficiently by failing to raise a *trial* IAC claim;

(2)     There is a "reasonable probability" that but for such deficient performance, the result on PCR would have differed; and

(3)     The ineffective assistance of trial counsel claim is "substantial," in that it had "some merit."

*Ramirez v. Ryan*, 937 F.3d 1230, 1242 (9th Cir. 2019) (citing *Martinez*, 566 U.S. at 14 and *Clabourne v. Ryan*, 745 F.3d 362, 377 (9th Cir. 2014), *overruled on other grounds by McKinney v. Ryan*, 813 F.3d 798, 819 (9th Cir. 2015)). Proof of the first two prongs establishes "cause," and proof of the third prong establishes "prejudice" as required by *Strickland v. Washington*, 466 U.S. 668 (1984). *Id.*

Indeed, under *Strickland*, a petitioner must show that counsel's representation fell below an objective standard of reasonableness and that counsel's deficient performance prejudiced the defense. *Id.* at 687–88. Deficient performance is established by "showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. To make this showing, a petitioner must overcome "the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* at 689 (quotation omitted). A petitioner must also affirmatively prove that he was prejudiced by counsel's deficient representation by "show[ing] that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. "The likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 112. *see Hooper*, 985 F.3d at 628. The petitioner "bears the highly demanding and heavy burden [of] establishing actual prejudice." *Allen v. Woodford*, 395 F.3d 979, 1000 (9th Cir. 2005) (quoting *Williams (Terry)*, 529 U.S. at 394). The strength of the prosecution's case

factors into the determination of prejudice. *See Strickland*, 466 U.S. at 696 ("[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support."); *Riley v. Payne*, 352 F.3d 1313, 1321 n.8 (9th Cir. 2003) ("[O]ur evaluation of *Strickland* prejudice must be considered in light of the strength of the government's case.")

The *Martinez* exception does not extend beyond underlying claims of ineffective assistance of *trial* counsel. *Martinez v. Ryan*, 926 F.3d 1215, 1225 (9th Cir. 2019); *Pizzuto v. Ramirez*, 783 F.3d 1171, 1177 (9th Cir. 2015) (declining "to substantially expand the scope of *Martinez* beyond the circumstances" there); *Hunton v. Sinclair*, 732 F.3d 1124, 1126–27 (9th Cir. 2013) (noting that only the Supreme Court can extend the application *Martinez*); *see also Davila v. Davis*, 582 U.S. 521, 529–31 (2017) (*Martinez* does not apply to claims of appellate IAC).

Finally, the United States Supreme Court has limited the evidence that may be considered by a federal court in determining whether PCR counsel rendered ineffective assistance for purposes of cause and prejudice under *Martinez*. In *Shinn v. Ramirez*, the Court held that with respect to IATC claims that were not adjudicated on the merits in state court, "a federal court may not hold an evidentiary hearing—or otherwise consider new evidence," unless the "stringent requirements" of 28 U.S.C. § 2254(e)(2) are met. 596 U.S. 366, 381 (2022). Under § 2254(e)(2), if a petitioner "failed to develop the factual basis of a claim in State court proceedings," a federal habeas court "shall not hold an evidentiary hearing on the claim" unless the petitioner shows that

(A)    the claim relies on—

(i)    a new rule of constitutional law made retroactive to cases on collateral review by the Supreme Court, which was previously unavailable; or

(ii)    a factual predicate that could not have been previously discovered through the exercise of due diligence; and

(B)    the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no

reasonable factfinder would have found the [petitioner] guilty of the underlying offense.

28 U.S.C. § 2254(e)(2).

"Diligence for purposes of [§ 2254(e)(2)'s] opening clause depends upon whether the prisoner made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court; it does not depend . . . upon whether those efforts could have been successful." *Williams* (*Michael*) *v. Taylor*, 529 U.S. 420, 435 (2000). "Diligence will require in the usual case that the prisoner, at a minimum, seek an evidentiary hearing in state court in the manner prescribed by state law." *Id*. at 437. "[C]omity is not served by saying a prisoner 'has failed to develop the factual basis of a claim,' where he was unable to develop his claim in state court despite diligent effort." *Id*.

## C.    Standard for Relief under the AEDPA

Under the AEDPA, a petitioner is not entitled to habeas relief on a claim adjudicated on the merits in state court unless the state court's ruling (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly-established federal law as determined by the Supreme Court or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in state court. 28 U.S.C. § 2254(d).

A state court decision on the merits is "contrary to" clearly-established federal law under § 2254(d)(1) if the decision applies a rule that contradicts the governing law set forth in Supreme Court precedent, thereby reaching a conclusion opposite to that reached by the Supreme Court on a matter of law, or if it confronts a set of facts that is materially indistinguishable from a Supreme Court decision but reaches a different result. *Williams* (*Terry*) *v. Taylor*, 529 U.S. 362, 405–406 (2000); *see, e.g.*, *Hooper v. Shinn*, 985 F.3d 594, 614 (9th Cir. 2021). The "unreasonable application" prong of § 2254(d)(1) describes a state court ruling on the merits that "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular . . . case" or "unreasonably extends a legal principle from [Supreme Court] precedent to a new

context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Terry*, 529 U.S. at 407; *see, e.g.*, *Murray* (*Robert*) v. *Schriro*, 745 F.3d 984, 997 (9th Cir. 2014).

The United States Supreme Court has emphasized that "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Terry*, 529 U.S. at 365 (emphasis by *Terry*) (citing *Wright v. West*, 505 U.S. 277, 305 (1992)). For a state court's decision to be an unreasonable application of clearly established federal law, "the ruling must be 'objectively unreasonable, not merely wrong; even clear error will not suffice.'" *Virginia v. LeBlanc*, 582 U.S. 91, 94 (2017) (quoting *Woods v. Donald*, 575 U.S. 312, 316 (2015) (per curiam)); *see Shinn v. Kayer*, 592 U.S. 111, 117 (2020); *Bolin v. Davis*, 13 F.4th 797, 805 (9th Cir. 2021). The burden is on the petitioner to demonstrate "there was no reasonable basis for the state court to deny relief." *Harrington v. Richter*, 562 U.S. 86, 98 (2011). He "must show that the state court's decision is so obviously wrong that its error lies 'beyond any possibility for fairminded disagreement.'" *Kayer*, 592 U.S. at 118 (quoting *Richter*, 562 U.S. at 103). This standard is "meant" to be "difficult to meet." *Richter*, 562 U.S. at 102. Further, "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011); *see Robert*, 745 F.3d at 998.

Under § 2254(d)(2), habeas relief is available if the state court decision was based on an "'unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *See Miller-El v. Dretke* (*Miller-El II*), 545 U.S. 231, 240 (2005) (quoting § 2254(d)(2)). "[A] decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El v. Cockrell* (*Miller-El I*), 537 U.S. 322, 340 (2003). A state court's factual determination is presumed correct, and a petitioner bears the burden of overcoming that presumption with clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *see Miller-El I*, 537 U.S. at 340. A "factual determination is not unreasonable merely because [a] federal habeas court would

~ 9 ~

have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010); *see Brumfield v. Cain*, 576 U.S. 305, 314 (2015) (explaining that § 2254(d)(2) requires federal courts to "accord the state trial court substantial deference"); *Walden v. Shinn*, 990 F.3d 1183, 1196 (9th Cir. 2021); *Ayala v. Chappell*, 829 F.3d 1081, 1094 (9th Cir. 2016) ("A state court's factual findings are unreasonable if 'reasonable minds reviewing the record' could not agree with them.") (quoting *Brumfield*, 576 U.S. at 314). As with review under § 2254(d)(1), review under § 2254(d)(2) is limited to the record that was before the state court that adjudicated the claim on the merits. *Gulbrandson v. Ryan*, 738 F.3d 976, 993 n.6 (9th Cir. 2013) (*Pinholster* and statutory text make clear that evidence is limited to that before the state court that adjudicated the claim). Therefore:

> for claims that were adjudicated on the merits in state court, petitioners can rely only on the record before the state court in order to satisfy the requirements of § 2254(d). This effectively precludes federal evidentiary hearings for such claims because the evidence adduced during habeas proceedings in federal court could not be considered in evaluating whether the claim meets the requirements of § 2254(d).

*Gulbrandson*, 738 F.3d at 993–94.

### D. Application of *Brecht* to Trial Error Claims

In addition to the foregoing, a petitioner can only receive "habeas relief based on trial error" if he shows that the error had a "substantial and injurious effect or influence" on the verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (internal quotations omitted). A "reasonable possibility" of a substantial and injurious effect or influence does not suffice. *Id*. (internal quotations omitted).

The *Brecht* standard echoes the "presumption of finality and legality," *id.* at 633, which "protects the State's sovereign interest in punishing offenders and its good-faith attempts to honor constitutional rights, while ensuring that the extraordinary remedy of habeas corpus is available to those whom society has grievously wronged." *Calderon v. Coleman*, 525 U.S. 141, 146 (1998) (cleaned up). A federal habeas court "upsets this careful balance" if it overturns a state-court conviction or sentence based on trial error

without applying the *Brecht* test. *Id*. Thus, if the state court adjudicated a claim of trial error on the merits, a habeas court must find that a petitioner has "cleared both [the AEDPA and *Brecht*] tests." *Brown v. Davenport*, 596 U.S. 118, 134 (2022). If the state court did not adjudicate a claim of trial error on the merits, "the AEDPA falls away," and a habeas court may dismiss the claim under *Brecht* without applying the AEDPA. *Id*. at 138.

### E.      Evidentiary Development

Chappell asks to develop the evidence through discovery, expansion of the record, and an evidentiary hearing. (Doc. 105.) As background, the Court will briefly describe the limits to evidentiary development. With respect to discovery, a petitioner is not given discovery as a "matter of ordinary course," but this Court "may" allow it for "good cause" shown by the petitioner. Rule 6(a) Governing Section 2254 Cases; *see Bracy v. Gramley*, 520 U.S. 899, 904 (1997); *Boggs v. Shinn*, No. CV-14-02165-PHX-GMS, 2018 WL 1794917, at *3 (D. Ariz. 2018) (citing *Bracy*, 520 U.S. at 908). Under Rule 7 Governing Section 2254 Cases, the Court may expand the record with material relevant to the petition but within the confines of § 2254(e)(2), *Cooper-Smith v. Palmateer*, 397 F.3d 1236, 1241 (9th Cir. 2005). And Rule 8 Governing Section 2254 Cases permits evidentiary hearings but not when a claim presents an issue of purely law without any "disputed facts," *Beardslee v. Woodford*, 358 F.3d 560, 585 (9th Cir. 2004), or can be resolved on the state-court record, *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007). The Court will expand on these standards below.

## GUILT PHASE CLAIMS

## II.      CLAIMS 1 AND 2(A)(3)

In Claim 1, Chappell alleges that he was denied a trial by a fair and impartial jury in violation of his Sixth and Fourteenth Amendment rights in three ways. (Doc. 25 at 53–61.) First, he alleges that at least one juror saw him shackled during the guilt phase. (*Id*. at 54–56.) Second, he alleges that at least one juror was coerced into reaching a death verdict by the court's instructions and other jurors. (*Id*. at 56–60.) Third, he alleges the bailiff's interactions with jurors denied him a fair and impartial jury, which prejudiced him. In

~ 11 ~

Claim 2(A)(3), Chappell alleges that trial counsel rendered ineffective assistance under the Sixth Amendment by failing to investigate the juror issues in Claim 1. (*Id*. at 84.)

### A.     Additional Background

In the first part of Claim 1, Chappell alleges that at least one juror saw him shackled during the guilt phase, based on the following facts. On August 15, 2007, the bailiff informed the court that he overheard Juror 1 tell the other jurors that they were required to wait in the jury room after trial adjourned for the day until Chappell was shackled and removed from court. (Reporters Transcript, R.T., 8/16/07, a.m., at 3–5.) The court directed the bailiff to inform counsel about Juror 1's statement. (*Id.*) The next day, the court held a hearing with counsel about Juror 1's statement concerning why the jury was held in the jury room after court adjourned for the day. (*Id.*) The prosecutor opined that Juror 1 had speculated about the reason the jury was delayed from leaving and noted that no juror had reported seeing Chappell shackled.[6] (*Id.* at 3.) Defense counsel noted that chains had been left in the jury box earlier during the trial, following a hearing in an unrelated case; the prosecutor pointed out that Juror 1 had been seated the farthest from where the chains had been left, and that the bailiff had not heard any juror mention them. (*Id.* at 5–6.) The trial court agreed with the prosecutor that Chappell had not been shackled while the jury was present and agreed there was no basis to believe that a juror had seen Chappell shackled. (*Id*. at 4–5.) The court allowed the parties to propose curative jury instructions, but neither did so. (*Id*. at 6; R.T. 8/27/07 at 15.)

In the second portion of Claim 1, Chappell alleges that at least one juror felt coerced at the penalty phase by other jurors and by the jury instructions, as follows.

After the court instructed the jury at the penalty phase, but before deliberations began, two jurors submitted notes, and a third orally asked, what would happen if jurors

---

[6] As discussed by the prosecutor and the trial court during the hearing, the usual practice was to allow jurors to leave the courtroom before removing a defendant, which for unknown reasons, had not been followed to that point in Chappell's trial. (*Id.* at 4.) The court directed that for the balance of the trial, the jurors would be excused and allowed to leave before Chappell was removed. (*Id.*)

could not reach a unanimous verdict. (R.T. 10/29/07 at 3.) The court informed the parties of the notes and requested their views. (*Id.*) The prosecutor asked the court to tell the jury what would happen if it deadlocked. (*Id.* at 4–5.) Defense counsel asked the court not to answer the question unless there was an affirmative indication that the jury was deadlocked. (*Id.*) The prosecutor also proposed the court instruct the jury as follows:

> You have a duty to deliberate in this case. The 12 of you who will decide this case have received all of the facts and law applicable and necessary to decide this case. There is no time restriction regarding your deliberation. We will accommodate ongoing deliberations as needed, including the remainder of this week and beyond.
>
> . . .
>
> If you are unable to reach a verdict in this case, a mistrial must be declared, a new jury selected, and the case presented anew to that new jury for penalty determination.

(*Id.* at 5-6.) Defense counsel objected to that proposed instruction, saying the first part did not answer the question, and the second might lead the jury to believe that it would have to deliberate indefinitely to reach a verdict. (*Id.* at 6.) Defense counsel asked the court to instead speak to the three jurors and to instruct the jury that if it could not reach a unanimous verdict, it should inform the court. (*Id.* at 6–8.)

Without objection, the court spoke with each of the three jurors individually and outside the presence of the other jurors. (*Id.* at 10–13.) Each denied having discussed the case with any other juror.[7] (*Id.*) The parties declined to ask the three jurors any questions. (*Id.* at 12–13.)

Following the juror interviews, the prosecutor proposed that the court tell the jury what would happen if it deadlocked to prevent that issue from distracting the jury from its deliberations. (*Id.* at 14–15.) Defense counsel opposed doing so, arguing that it would

---

[7] One juror asked the question because a coworker had dealt with that issue in a different case. (*Id.* at 11.) A second asked out of curiosity. (*Id.* at 12.) And the third asked because the question had been raised in the jury room without any juror giving their position on the verdict. (*Id.* at 13.)

pressure the jury to reach a verdict "one way or the other." (*Id.*) The court instructed the jury as follows:

> You can only discuss the case when 12 of you are in the jury room, and you can only deliberate in that jury room and only ask questions of the Court in writing, and let me tell you this too: We will accommodate ongoing deliberations as needed. This is something you should know, including the remainder of this week and beyond. We will, in other words, in response to a [sic] juror questions, we will be available [from October 31] to [November 13]. We will be available, so you'll be deliberating as long as it takes.
> If the jury is ever at an impasse, the Court should be advised.

(R.T. 10/29/07 at 163.) Chappell alleges the instruction caused at least one juror to feel coerced to agree to a verdict because the court instructed that deliberations would continue until the jury reached a unanimous verdict.

Chappell also alleges that at least one juror felt coerced by other jurors to support a death sentence as follows. During penalty phase deliberations on October 31, 2007, a juror submitted a note to the court saying that "many jurors" were making her feel rushed and that one of the other jurors had told her that she needed "to hurry." (R.T. 10/31/07 at 6–7, 17.) After other jurors had left the jury room, two other jurors voiced concerns to the bailiff about being rushed to reach a decision. (*Id.* at 17.) The parties disagreed about whether the court should speak with the juror who had sent the note. (*Id.* at 8.) The prosecutor asked the court not to speak to the juror because pressuring other jurors was "part of deliberations," and that the dynamic in the jury room should be addressed by the foreperson or another juror. (*Id.*) Defense counsel, however, asked the court to speak with the juror to obtain more details, but without inquiring about deliberations, so that the court could make an appropriate record or take other action, if warranted. (*Id.*) The prosecutor replied that questioning the juror was premature. (*Id.*)

The court decided to respond to the juror's note without speaking to that juror. (*Id.*) Defense counsel asked the court to respond to the note by saying that the juror should not "feel rushed to judgment" and that the juror had "a duty to deliberate and come to [his or her] own individual, moral conclusion" about Chappell's sentence. (*Id.* at 8, 12.) The court

instead proposed the following response: "We are hopeful you can work as a team and come to a unanimous decision if you can . . . ." (*Id*. at 14–15.) The prosecutor argued that saying "if you can," together with "hopeful" might invite the jury "to not reach a unanimous verdict." (*Id*. at 15.) The prosecutor proposed the following:

> One of you has expressed a concern about deliberations in this case being rushed. Please know we will continue to accommodate your schedule and give you whatever time you need to deliberate on this case. . . . We are hopeful that you as a team are able to reach a unanimous verdict.

(*Id*.) Defense counsel argued that "the law contemplates the possibility of a non-unanimous verdict" and again urged the court to interview the juror. (*Id*. at 15–16.) Defense counsel also argued that the court should not instruct the jury that it must "form a consensus" because "the juror's own individual assessment as to what she or he thinks personally ought to be is entitled to respect . . . ." (*Id*.) The court then proposed the following response:

> One of you has expressed a concern about deliberations in this case being rushed. Please know that we will continue to accommodate your schedule and give you whatever time you need to deliberate on this case. . . . Remember, the jury has an obligation to deliberate together. We are hopeful that as a team you are able to reach a unanimous verdict.

(R.T. 11/1/07, vol. 1, at 3.) Both parties objected to the "Remember . . ." sentence of that proposed response, and the court agreed to omit it. (*Id*. at 4–5.)

> Defense counsel then proposed the following response to the note:

> You have expressed a concern about deliberations in this case being rushed. Please know that we will continue to accommodate your schedule and give you whatever time you need to deliberate in this case.

> The law does not require you to return a unanimous verdict. Once an individual juror has in their individual assessment made a determination about what the penalty should be, that juror no longer has a duty to deliberate further.

(*Id*. at 6.) The prosecutor opposed this response as prematurely "approaching a quasi-impasse instruction." (*Id*.) The court agreed with the prosecutor and ultimately responded to the note as follows: "One of you has expressed a concern about deliberations in this case being rushed. Please know that we will continue to accommodate your schedule and give

you whatever time you need to deliberate on this case." (*Id.*)

Later that day, the court received two more notes from the jury: one stating the jury wanted to take a week off, and the other stating, "We thought we heard one of the attorneys make the statement that if we cannot come to a unanimous decision, that the judge would then sentence the defendant to natural life or life with the possibility of parole after 35 years served. Is this correct?" (R.T. 11/1/07, vol. 2, at 3.) The court proposed to respond either by (1) telling the jury that if it could not unanimously agree on a sentence, the penalty phase would be retried to another jury or (2) that information concerning how Chappell might later be sentenced, if this jury could not reach a unanimous decision, was irrelevant. (*Id.* at 4.)

Defense counsel argued the second option was "more appropriate" because jurors should focus on their duty as factfinders and not the effect of a deadlock. (*Id.* at 4, 6.) The prosecutor argued that the second option would permit jurors to proceed "with an absolute misconception" of the law and argued that there was no "downside" to telling jurors the truth, and that jurors would be distracted by the issue if the court "ignor[ed]" the question regarding the effect of an impasse. (*Id.* at 6–8.)

The court responded to the juror notes as follows: "The information you relate with respect to sentencing is incorrect. At this stage of your deliberations, what results, if the jury cannot come to a unanimous decision at the penalty phase of the trial, is irrelevant to any eventual decision of the jury." (*Id.* at 8–9.) The court indicated to counsel that it would consider an impasse instruction if the jury stated that it was deadlocked. (*Id.*) Several days later, on November 14, 2007, the jury returned a verdict of death. (RT 11/14/07 at 5–6.)

On November 20, 2007, defense co-counsel, Lynn Burns, wrote a "memo to file," stating that on November 19, 2007, another attorney had contacted Burns about a conversation that the attorney had with the attorney's pastor. (Doc. 54 at 6.) According to Burns' memo, in that conversation, the pastor had shared that another parishioner "was seeking spiritual council concerning the Chappell matter." (*Id.*) The pastor's comments "led [the attorney] to believe that this parishioner was telling [the pastor] that either" the

parishioner," or "someone very close" to the parishioner, was a juror in Chappell's trial "and that this individual as well as several" other jurors "had been 'coerced'" into sentencing Chappell to death. (*Id*.) The attorney "informed the pastor that she" would "inform" Chappell's defense counsel, i.e., Burns, of these concerns and that Chappell's defense counsel would probably contact the pastor. (*Id*.) According to the memo, on November 19, 2007, Burns spoke to the pastor, who refused to disclose what the parishioner had told him based on clergy-penitent confidentiality. (*Id*.) After explaining the standard to raise a juror coercion claim, Burns informed the pastor that the defense would need "firsthand information from someone in the jury room" to raise a juror coercion claim "within a week or so." (*Id*.)

After investigation, defense counsel "determined" the identity of the juror who had conferred with the pastor and learned that the juror wanted a letter from defense counsel confirming that defense counsel wanted to speak to her about possible coercion. (*Id*. at 5.) In a December 17, 2007 letter, defense counsel, Lawrence Matthew, informed the juror that the defense was seeking first-hand information to assess whether a juror-coercion claim could be raised but that the time within which to raise a coercion claim would "close in the very near future" and because he was going to be unavailable, provided Burns's contact information.[8] (*Id*.) At around the same time as Matthew's letter to the juror, Burns told Chappell's mother that a juror had qualms about voting to impose the death penalty because the juror had wanted to continue deliberating but that the foreman "had bullied her into an early vote to impose the death penalty." (Doc. 53 at 47.)

In the third part of Claim 1, Chappell alleges that he was denied a fair and impartial jury based on improper interactions of the bailiff with two jurors and the bailiff making

---

[8] Chappell submitted a declaration from Matthew, who averred that an investigator called the juror, but the juror requested a letter before she would speak to defense counsel. (*See* Doc. 54 at 5.) Matthew averred that he sent the juror a letter but that as far as he knew, the juror did not contact co-counsel while he was away. (Doc. 105-4, Ex. 31, ¶ 7; *see* Doc. 54.) Although Chappell submitted a declaration from Burns, Burns does not indicate that the juror contacted her. (Doc. 49 at 71–72; Doc. 71, Ex. XXXXX at 7.)

gestures towards those jurors during the defense closing argument at the penalty phase. (Doc. 25 at 60–61.) After closing argument at the penalty phase, defense counsel informed the court—outside the jury's presence—that counsel had seen two front-row jurors laughing and smiling toward the bailiff and that audience members had observed the bailiff "mak[ing] gestures" toward the jury. (R.T. 10/25/07 at 75, 82.) When defense counsel questioned the bailiff, the bailiff told counsel that he had been trying to keep a juror awake because the juror had earlier struggled to stay awake. (*Id*.) When questioned by the court, the bailiff stated that he had been returning break requests to jurors. (*Id*. at 76.) The court directed the bailiff not to communicate with the jurors in any way. (*Id*. at 76–77.) When the jurors re-entered the courtroom, the court also instructed them to address questions to the court and not to the bailiff. (*Id*. at 81–82.) The court concluded that the jurors and the bailiff had not discussed the case. (*Id*. at 82.)

### B.    Claim 1

Respondents argue that Claim 1 is procedurally defaulted under Rule 32.2(a)(3) of the Arizona Rules of Criminal Procedure and that Chappell has not shown cause and prejudice or a fundamental miscarriage of justice to excuse the default. (Doc. 33 at 29.) Chappell argues that Claim 1 is not procedurally defaulted because Rule 32.2(a)(3) was not an adequate and independent state procedural rule. (Doc. 25 at 53; Doc. 87 at 12–14.) He also argues there was no available state corrective process under § 2254(b)(1)(B), or circumstances existed that rendered an available process ineffective to protect his rights such that procedural default does not apply. (Doc. 25 at 53; Doc. 87 at 14–17.) Finally, he argues that even if Claim 1 is procedurally defaulted, the ineffective assistance of PCR counsel excuses the default under *Martinez*. (Doc. 87 at 17–18.)

On PCR, Chappell alleged that defense counsel failed to "adequately investigate and address specific acts of juror misconduct, which rendered his trial fundamentally unfair, and violated his rights to due process, a fair trial, and the assistance of counsel. (Doc. 42 at 8-61, Ex. WWW at 4–5.) The PCR court found the claim precluded under Rule 32.2(a)(3) because it had not been raised at trial, on direct appeal, or in a prior collateral proceeding.

~ 18 ~

(*Id.*, Ex. WWW at 40–46; Ex. OOOOO at 2.) The Arizona Supreme Court denied review. (Doc. 33, Exs. HHHHHH at 9–11 and KKKKK.)

Rule 32.2(a)(3) was in effect at the time the PCR court found Claim 1 precluded, but Chappell argues that Rule 32.2(a)(3) was not strictly and regularly enforced as to claims of juror misconduct, citing three cases. In *Ortiz*, decided in 1998, the Ninth Circuit held that Rule 32.2(a)(3) was a state procedural rule adequate to preclude federal habeas review. Two of the three cases cited by Chappell were decided more than ten years before *Ortiz*. *See State v. Cummings*, 716 P.2d 45 (Ariz. Ct. App. 1985) (denying juror misconduct claims raised on PCR); *State v. Adamson*, 665 P.2d 972 (Ariz. 1983) (denying juror misconduct claim raised on PCR). In the third case, *State v. Fitzgerald*, the court denied a motion for new trial as untimely. 303 P.3d 519 (Ariz. 2013). The court held that a motion for new trial under Arizona Rule of Criminal Procedure 24 had to be filed within ten days of the relevant verdict in a capital trial, i.e., guilt, aggravating, or penalty, and *not* merely within 10 days of the sentencing verdict. *Id.* at 524. It further noted that Rule 24 contained no exception to the 10-day requirement for later discovery of grounds to seek a new trial, explaining,

> *if* a defendant who first discovers possible grounds for a new trial after the ten-day time frame has no available relief under Rule 24.1, he would have to resort to a Rule 24.2 motion to vacate the judgment or a Rule 32 petition for post-conviction relief.[5] *See State v. Adamson*, 136 Ariz. 250, 265, 665 P.2d 972, 987 (1983) (addressing post-conviction relief claim of newly discovered evidence allegedly showing jury misconduct during voir dire); *Hickle,* 129 Ariz. at 332, 631 P.2d at 114 (noting that a defendant whose motion for new trial was untimely under Rule 24.1(b) might not be "foreclosed from relief" under Rule 24.2).

> FN.5 Because a defendant may move to vacate the judgment "no later than 60 days after the *entry of judgment and sentence* but before the defendant's appeal," Ariz. R. Crim. P. 24.2 (emphasis added), the longer time frame for filing under Rule 24.2 would begin to run in a capital case upon the penalty-phase verdict, not the jury's guilt verdict, *Nordstrom*, 230 Ariz. at 116–17 ¶¶ 25–26, 280 P.3d at 1250–51; *see also Spears*, 184 Ariz. at 288, 908 P.2d at 1073 (noting that the trial court reached the merits of a motion alleging juror misconduct by apparently construing it as a timely motion to vacate judgment

based on newly discovered evidence, rather than an untimely motion for a new trial).

303 P.3d at 523.

The *Fitzgerald* court did not hold that a juror misconduct claim discovered after the time to file a timely Rule 24.1 or 24.2 motion would be excepted from application of Rule 32.2(a)(3) but instead indicated that such a claim could possibly be raised on PCR. *Id. Cf. State v. Speers*, 361 P.3d 952, 960 (Ariz. Ct. App. 2015) (petitioner stated colorable IAC based on counsel's abandonment of a proposed jury instruction and failure to develop a record of alleged juror misconduct, which were not precluded by waiver on PCR for failure to raise on direct appeal where defendant was not allowed to bring IAC claims before or during trial, or on direct appeal); *State v. Marietta*, No. 2 CA-CR 2008-0410-PR, 2009 WL 1804167, at *2 (Ariz. Ct. App. June 23, 2009) (assuming without deciding petitioner could state colorable juror misconduct claim in first timely PCR); *State v. Macias*, 469 P.3d 472, 476 (Ariz. Ct. App. 2020) (assuming without deciding that juror misconduct claim in first PCR could be considered, and distinguishing *State v. Kolmann*, 367 P.3d 61, 67 (Ariz. 2016), which held juror misconduct claim in that case could have been raised in post-trial motion under Rule 24). And in *State v. Ojeda*, the PCR court found precluded a juror misconduct claim raised for the first time on PCR, despite the unavailability of discovery to develop the record prior to direct appeal because the claim had not been raised on direct appeal. No. 1 CA-CR 16-0002 PRPC, 2017 WL 2644325, at *1, ¶ 3-4 (Ariz. Ct. App. June 20, 2017). Thus, *Fitzgerald* did not hold that preclusion under Rule 32.2(a)(3) did not apply to juror misconduct claims.  To the contrary, it reflected that such claims must be raised in a timely Rule 24 motion, on direct appeal, or potentially in a petitioner's first PCR.

The cases cited by Chappell do not reflect that Rule 32.2(a)(3) is not strictly and regularly enforced as to claims of juror misconduct. Accordingly, Chappell has failed to show that Rule 32.2(a)(3) was not an adequate to preclude federal habeas review.

Chappell also argues that he lacked an "available state corrective process or circumstances exist[ed] that rendered the process ineffective," citing 28 U.S.C.

~ 20 ~

§ 2254(b)(1)(B), which provides, that "[a]n application for a writ of habeas corpus . . . shall not be granted unless it appears that—(B)(i) there is an absence of available corrective process; or (ii) circumstances exist that render such process ineffective to protect the rights of the applicant." Respondents contend that Chappell could have raised the substance of Claim 1 on direct appeal. (Doc. 33 at 31.) Chappell replies that he could not have raised the substance of Claim 1 under Arizona Rule of Criminal Procedure 24, because the types of juror misconduct he wished to raise, i.e., coercion, inappropriate interactions between jurors and bailiff, and juror observations of shackling, were not raisable under Rule 24.1(c). (Doc. 87 at 14–15, citing *State v. Smith*, 593 P.2d 281, 284 (Ariz. 1979) (holding on direct appeal that instances of juror misconduct alleged by defendant did not fall within the categories of such misconduct contained in Rule 24.1(c)). Assuming that Rule 24.1(c)(3) does not cover the jury-related claims in Claim 1, Rule 24.1(c)(5) covers them by permitting new trials "*for any other reason*, not due to the defendant's own fault, the defendant *did not receive a fair and impartial trial or phase of trial*." Ariz. R. Crim. P. 24.1(c)(5). Claim 1 falls under a (c)(5) assessment.

Chappell further argues that he could not have fairly presented Claim 1 on direct appeal absent the ability to develop evidence outside the trial record and that Rule 24.1 required that a motion be filed within 10 days of the relevant verdict, which was insufficient for him to locate "extra-record evidence and investigat[e] jurors' conduct throughout the trial." (*Id*. at 15–16.) For similar reasons, Chappell argues that the 60-day limitation to file a Rule 24.2 motion to vacate also failed to afford sufficient time to conduct a thorough investigation and develop necessary extra-record factual support and denied him a meaningful state corrective process to raise the substance of Claim 1 in state court. (*Id.* 16–17.) Chappell essentially asserts that it would have been futile to raise his juror-related claims in state court because he could not have fully developed the evidence to support them.

But the Supreme Court has rejected the futility doctrine. *See Engle v. Isaac*, 456 U.S. 107, 130 (1982). "If a defendant perceives a constitutional claim and believes it may

find favor in the federal courts, he may not bypass the state courts simply because he thinks they will be unsympathetic to the claim. Even a state court that has previously rejected a constitutional argument may decide, upon reflection, that the contention is valid." *Id.*; *see also Roberts v. Arave*, 847 F.2d 528, 530 (9th Cir. 1988) ("[T]he apparent futility of presenting claims to state courts does not constitute cause for procedural default."); *Parker v. Kelchner*, 429 F.3d 58, 63 (3rd Cir. 2005) ("Our sister Circuits that have considered the issue have similarly concluded that the exhaustion requirement is not excused merely because a petitioner's claim will likely be denied on the merits in state court."). Therefore, Chappell's contention that it would have been futile to present the juror-related claims in state court fails under § 2254(b)(1)(B). As shown above, the basis for Chappell's juror-misconduct claims were present at the time of trial. Accordingly, the Court finds that Claim 1 is procedurally defaulted.

Chappell next argues that even if Claim 1 is procedurally defaulted, the ineffective assistance of PCR counsel establishes cause to excuse the default under *Martinez*. As discussed above, however, the Supreme Court has limited cause and prejudice to excuse procedural default under *Martinez* to claims of ineffective assistance of trial counsel. Because Claim 1 does not assert an ineffective assistance of trial counsel claim, the alleged ineffective assistance of PCR counsel cannot establish cause to excuse the procedural default of Claim 1.

Chappell also seeks to expand the record and an evidentiary hearing on Claim 1. As described above, "a federal court may not hold an evidentiary hearing—or otherwise consider new evidence" in support of a procedurally defaulted claim unless the "stringent requirements" of 28 U.S.C. § 2254(e)(2) are met. *Shinn*, 596 U.S. at 381 (emphasis added). Under § 2254(e)(2)(i), a federal habeas court may only consider new evidence in support of a procedurally defaulted claim if the petitioner shows that "(A) the claim relies on (i) a new rule of constitutional law made retroactive to cases on collateral review by the Supreme Court, which was previously unavailable; or "(ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; *and* "(B) the

facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the [petitioner] guilty of the underlying offense." 28 U.S.C. § 2254(e)(2). Section 2254(e)(2)(i) is not implicated as to Claim 1. And even assuming the factual predicate could not have been previously discovered through the exercise of due diligence, which Chappell himself does not assert, the facts underlying the claim are not sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found Chappell guilty, in light of the evidence presented, which as described, included Chappell's admissions to police and at the press conference.

For the reasons discussed, Claim 1 is procedurally defaulted and Chappell has not established cause and prejudice or a fundamental miscarriage of justice to excuse the default. Claim 1 will be denied as will Chappell's request for evidentiary development as to Claim 1.

### C.     Claim 2(A)(3)

Chappell alleges that trial counsel rendered ineffective assistance by failing to investigate and raise the three juror issues in Claim 1. (Doc. 25 at 84; Doc. 105, Exs. 31, 34-35.) In support of this claim, Chappell incorporates by reference the "facts and arguments made in Claim [1]."[9] (Doc. 25 at 93.) Chappell asserts this claim was only presented in part on PCR, and the PCR court denied the claim presented on the merits without a hearing. (*Id.*) He argues that evidence developed during these habeas proceedings fundamentally alters the claim considered by the state court, rendering the supplemented claim unexhausted and procedurally defaulted because the new evidence places this claim in a significantly different and stronger evidentiary posture than the claim considered by the state courts. (*Id.*) He further contends this alleged procedural default is excused by the ineffective assistance of PCR counsel. (Doc. 87 at 39–40.) He contends that even if the claim is exhausted, de novo review applies to exhausted IATC claims, like this one. (*Id.* at

[9] Chappell concedes that the factual basis for Claim 1 was not developed based on the PCR court's denial of leave to contact jurors as precluded by Rule 32.2(a)(3). (Doc. 25 at 62.)

40.) Finally, Chappell asserts that the state courts failed to consider the cumulative impact of prejudice resulting from the various IATC claims.

Respondents contend that this claim was exhausted in state court and that the state courts denied it on the merits. (Doc. 33 at 70–75.) They argue that any proffered new evidence does not fundamentally alter the claim considered by the state courts. (*Id*.) Respondents further maintain that the state court's denial of the claim was neither contrary to nor an unreasonable application of Supreme Court law under § 2254(d)(1), and that the state court's decision was not based on an unreasonable determination of the facts in light of the evidence presented in state court under § 2254(d)(2). (*Id*. at 75–80.) Respondents argue this Court should not consider newly proffered evidence "unless and until it concludes that Petitioner can satisfy the standards for evidentiary development" under 28 U.S.C. § 2254(e)(2).[10] (*Id*. at 71 n.33.)

### 1. Exhaustion and Procedural Default

Chappell predicates this IATC claim on the failure to investigate and litigate the same three juror issues raised in Claim 1 in state court. Chappell claims that proffered new evidence[11] fundamentally alters the claim considered by the state courts. This Court may not consider evidence not presented to the state courts if Chappell, or his counsel, failed to diligently develop the factual basis of the claim in state court. 28 U.S.C. § 2254(e)(2); *see Ramirez*, 596 U.S. at 381; *Michael*, 529 U.S. at 435–36. "Diligence for purposes of the

---

[10] Respondents correctly point out that *Ramirez* abrogated the Ninth Circuit's holding in *Dickens* that a court may consider new evidence in determining whether that evidence fundamentally alters the claim considered by state courts and thereby render the supplemented claim unexhausted and procedurally defaulted. *See Hampton v. Shinn*, 143 F.4th 1047, 1076 (9th Cir. 2025). *Ramirez* requires a petitioner to first satisfy § 2254(e)(2), before a federal habeas court may consider evidence not presented to the state courts. *Id.* (citing cases).

[11] To the extent identified by Chappell, that evidence consists of declarations of former habeas counsel and a habeas paralegal reflecting that one juror told them that she saw Chappell in shackles at some point during trial, and another juror told them she felt coerced to support a death sentence by the trial court's instructions. (Doc, 103-4 at 186–88, Exs. 34, 35.)

opening clause of § 2254(e)(2)(ii) depends upon whether the prisoner made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court; it does not depend . . . upon whether those efforts could have been successful." *Michael*, 529 U.S. at 435. Chappell does not argue that he, or PCR counsel, diligently developed the factual basis of his underlying IATC claim in state PCR proceedings.[12] (Doc. 25 at 84.) Indeed, he contends that PCR counsel rendered ineffective assistance by failing to further investigate and develop the factual basis of his IATC claim in state court. (*Id.*; Doc. 87 at 40.) But as discussed in *Michael*, the negligent failure to develop the factual basis of a claim in state court bars the consideration of new evidence in habeas proceedings under § 2254(e)(2)(ii), *Michael*, 529 U.S. at 432, and there is no Sixth Amendment right to the effective assistance of PCR counsel, *Smith v. Idaho*, 392 F.3d 350, 357 (9th Cir. 2004) (citing *Coleman*, 501 U.S. at 752; *Poland v. Stewart*, 169 F.3d 573, 588 (9th Cir. 2004)). The Court therefore concludes that it cannot consider the newly proffered evidence.

Absent consideration of proffered new evidence, Chappell essentially concedes that Claim 2(A)(3) is exhausted. Nevertheless, Chappell asserts that the PCR court did not actually consider the merits of his properly exhausted IATC claims, including this one, and that this Court should review those claims de novo. (Doc. 87 at 39.) In support of this assertion, Chappell notes that the State did not address one of his properly exhausted claims in its briefs, and therefore, there was no State position that could have been adopted as to Claim 2(A)(3) by the PCR court. (Doc. 25 at 68.) Chappell also cites inconsistencies in the PCR court's order denying relief. Specifically, Chappell cites the PCR court's statement that: (1) it had both *not* received the Liles Affidavit regarding prevailing professional norms for capital counsel and that it had received the Liles Affidavit; and (2) it granted Chappell's

---

[12] "Though lack of diligence will not bar an evidentiary hearing if efforts to discover the facts would have been in vain, *see* § 2254(e)(2)(A)(ii), and there is a convincing claim of innocence, *see* § 2254(e)(2)(B), only a prisoner who has neglected his rights in state court need satisfy these conditions." *Id.* at 435. Neither § 2254(e)(2)(A)(ii), nor § 2254(e)(2)(B) appear to apply here.

motion for extension of briefing deadlines after it had already denied his PCR petition.[13] (*Id*. at 68–69.)

A federal habeas court must presume that a state court denied a claim on the merits, even if it did not explain the basis for its decision. *See Johnson v. Williams*, 568 U.S. 289, 293 (2013); *Richter*, 562 U.S. at 98-99. A federal habeas court may only review the merits of a claim de novo if the claim was properly exhausted and the state court "clearly" did not reach the merits of the claim. *Pirtle v. Morgan*, 313 F.3d 1160, 1167–68 (9th Cir. 2002).

In denying Chappell postconviction relief, the PCR court stated that it:

> couldn't say it any better than the [S]tate has done, and this after much reflection on what the court could add or change from the state's analysis on the remaining [un]precluded claims of error. Accordingly and for reasons as stated by the state with respect to each above stated unprecluded claim of error, the court finds that no colorable claim exists mandating an evidentiary hearing. . . .In making its ruling the court finds with respect to the ineffective trial and appellate counsel claims, petitioner has not presented by a preponderance of the evidence either *Strickland* prong. He has not shown any counsel's performance was deficient under prevailing professional standards or that he suffered prejudice as a result. . . .

(Doc. 70 at 13, Ex. OOOOO.) The court also stated that it found the precluded claims failed on their merits. (*Id.*) Thus, the PCR court adopted the State's positions regarding Chappell's properly exhausted IATC claims, and it concluded that Chappell had not made out a colorable basis to establish either prong of *Strickland* on his exhausted IATC claims, and it denied those claims on the merits.

The PCR court's adoption of the State's analyses of claims, including one claim that the State had not addressed in its brief, does not rebut the presumption that the PCR court denied relief on the merits of those claims. The PCR court stated that it reviewed the record, specifically listing what it had reviewed, and explicitly found the properly exhausted IATC claims failed on their merits. Further, the PCR court expressly found that Chappell's

---

[13] The PCR court subsequently vacated the granting of the extension motion. (Doc. 70 at 37, Ex. UUUUU.)

~ 26 ~

exhausted IATC claims failed on their merits under each prong of *Strickland*. The PCR court's order granting the briefing extension appears nothing more than inadvertent, but in any event, merely granting the motion does not *clearly* show that the PCR court did not deny Chappell's properly exhausted IATC claims on the merits.[14] Similarly, the PCR court's inconsistent statements about the Liles' Affidavit does not *clearly* show that the PCR court did not deny Chappell's properly exhausted IATC claims on the merits. Moreover, the PCR court specifically denied the State's request to not consider the Liles exhibit, and it included the affidavit in the list of materials that it reviewed. (Doc. 70-2 at 3, Ex. OOOOO, at 2.) Chappell's exhausted IATC claims are subject to review under § 2254(d).

### 2.    Review under § 2254(d)

A defense attorney "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. Counsel's "particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id*. In reviewing counsel's decision not to investigate, or further investigate, a court should not use hindsight but instead assess the circumstances of counsel's "challenged conduct" from "counsel's perspective at th[at] time." *Id*. at 689.

### a.    Shackling

The three alleged juror issues arose during Chappell's trial. With respect to Juror 1's statement that the jury was being held after adjournment until Chappell was shackled and left the court, trial counsel asked the court to designate Juror 1 an alternate. (R.T. 8/16/07, a.m., at 6.) The court refused but said that it would consider any proposed curative

---

[14] At most, the PCR court's inconsistent statements about the affidavit implicate only whether the PCR court considered the affidavit in denying the exhausted IATC claims on the merits. The inconsistent statements relate to the sufficiency of the court's merits review—not whether it considered the affidavit. In short, the PCR court's conflicting statements do not clearly establish that the PCR court did not consider the exhausted IATC claims on the merits.

instruction of the parties. (*Id*. at 6–7.) Trial counsel did not propose a curative instruction, nor seek to interview jurors at the conclusion of the penalty phase, after the jury was polled.

In *Deck v. Missouri*, the United States Supreme Court held that "the Fifth and Fourteenth Amendments prohibit the use of physical restraints visible to the jury absent a trial court determination, in the exercise of its discretion, that they are justified by a state interest specific to a particular trial." 544 U.S. 622, 629 (2005). Accordingly, "where a court, without adequate justification, orders the defendant to wear shackles that will be seen by the jury, the defendant need not demonstrate actual prejudice to make out a due process violation." *Id.* at 635. The Supreme Court has not held that an inadvertent viewing, by one or more jurors of a defendant in shackles, poses the same due process risks as the visible shackling of a prisoner throughout trial. The Ninth Circuit, however, has "held that visible shackling outside the courtroom—at least when the viewing is brief and accidental—is not inherently prejudicial; instead, a due process violation occurs only if the criminal defendant demonstrates actual prejudice." *Wharton v. Chappell*, 765 F.3d 953, 964–65 (9th Cir. 2014). Courts in other cases have likewise found that the glimpse by a juror or jurors of a shackled defendant as he is brought into the courtroom is not inherently or presumptively prejudicial. *See*, *e.g.*, *Williams v. Woodford*, 384 F.3d 567, 593 (9th Cir. 2004); *Ghent v. Woodford*, 279 F.3d 1121, 1133 (9th Cir. 2002); *United States v. Olano*, 62 F.3d 1180, 1190 (9th Cir. 1995). As the court in *Wharton* explained, one reason to distinguish between "shackling in open court and shackling during transportation" is the fact the jurors are aware that defendants may be in custody and that it is a regular practice to handcuff inmates while they are being transported. 765 F.3d at 965 (citing, e.g., *United States v. Halliburton*, 870 F.2d 557, 561 (9th Cir. 1989)).

Chappell fails to point to anything in the record that he was shackled throughout trial or that his shackling was readily visible to jurors. Further, Chappell points to no evidence before the state court, to support that *any* juror saw him shackled, or that any juror informed trial counsel, or anyone else, that they had seen Chappell shackled. After Juror 1 was overheard telling other jurors they were delayed from leaving following adjournment

~ 28 ~

for the day until Chappell was shackled and removed, the trial court instructed that thereafter, Chappell would be removed from court after the jury had departed for the day. (R.T. 8/16/07, a.m., at 7.) The trial court and prosecutor both observed that the jury was not present when Chappell was shackled, suggesting that any viewing of Chappell in shackles occurred as he was being transported to or from court. There is nothing to suggest that if one or more jurors saw Chappell shackled was anything but fleeting and inadvertent.

Based on the above circumstances, the state court's determination that trial counsel had not acted deficiently by failing to investigate whether one or more jurors saw Chappell shackled did not result in a decision that was contrary to, or involved in an unreasonable application of, clearly established Supreme Court law. 28 U.S.C. § 2254(d)(1). The record also does not support that the state courts made an unreasonable determination of the facts in light of the evidence presented in state court proceedings.

But even if trial counsel performed deficiently by failing to investigate and litigate the shackling issue, Chappell was not prejudiced by such deficiency. There was no showing that any juror saw Chappell shackled, and the circumstances in which a juror could have seen Chappell shackled (transported to or from court) would have been fleeting and inadvertent and would not have otherwise caused inherent prejudice. Accordingly, the state court's determination that Chappell was not prejudiced by trial counsel's alleged failure to investigate whether one or more jurors saw Chappell shackled also did not result in a decision that was contrary to, or involved an unreasonable application of, clearly established Supreme Court law. The record also does not support that the state courts made an unreasonable determination of the facts in concluding that Chappell was not prejudiced by any alleged deficient performance by trial counsel in light of the evidence presented in the state court proceedings. The Court will deny habeas relief as to Claim 2(A)(3)(i).

### b.    Juror Coercion (Claim 2(A)(3)(ii))

Chappell claims that trial counsel rendered ineffective assistance by failing to investigate and litigate whether one, or more jurors, were coerced by the jury instructions, or other jurors, into supporting a death sentence and thereby denied Chappell due process

and a fair jury. For the reasons discussed in Claim 2(A)(3)(i) above, the Court will deny Chappell's request for evidentiary development as to this portion of Claim 2(A)(3).

A determination whether a jury instruction was coercive is based on the totality of the circumstances, including the form of the instruction, the context in which it was given, the time elapsed between when the allegedly coercive supplemental instruction was given and the verdict, and other indicia of coercion. *Lowenfield v. Phelps*, 484 U.S. 231, 237 (1988). *Lowenfield* considered whether a supplemental jury instruction, a so-called *Allen* charge, given after the jury reached a deadlock, was unduly coercive. *Id*. at 237–41. Even then, the United States Supreme Court concluded that the instruction was not coercive under the circumstances there. *Id*. at 241.

After learning that one juror sent a note stating that "many jurors" were making her feel rushed, and that two other jurors had voiced a similar concern to the bailiff, Chappell's counsel asked the court to speak with the juror who had written the note to ascertain the details and make a record or take other action, if warranted, which the prosecutor opposed. (R.T. 10/31/07 at 6-8.) Chappell's counsel also urged modifications of the court's proposed response to the juror. Chappell fails to allege or show what more trial counsel could have done under the circumstances and the court's decision not to interview the juror or adopt counsel's proposed responses to the note does not support that trial counsel acted deficiently. Indeed, to some extent, the trial court modified its response to the juror based upon trial counsel's arguments. *Cf. United States v. McGuire*, No. 3:14-cr-00116-TMB-1, 2019 WL 5197554, at *9 (citing cases) (D. Alaska Oct. 15, 2019) ("[I]t is well-settled that ineffective assistance of counsel stems from failure to make reasonable efforts and not from failure to achieve desired results."); *Portillo-Diaz v. Ryan*, CV-15-1172-PHX-JJT (JFM), 2016 WL 4611574, at *8 (D. Ariz. June 1, 2016) (noting that "an outcome determinative view says nothing about the objective reasonableness of the actions undertaken by counsel in the representation").

Moreover, trial counsel asked the court to tell the juror that she should not "feel rushed to judgment" and that she had a duty to reach her own conclusions about Chappell's

~ 30 ~

sentence. (*Id.* at 12.) The court, instead, told the jury that the court would give the jury the time it needed to deliberate. (R.T. 11/1/07 at 6.) The decision of the court did not render counsel's assistance ineffective. *Cf. Strickland*, 466 U.S. at 689. After the jury returned its verdict, trial counsel polled the jurors, all of whom avowed that the verdict was each juror's true verdict. (R.T. 11/14/07 at 6–7.)

Counsel also informed a pastor, to whom a juror had voiced concerns about coercion, about what constituted juror coercion. (App. to PCR Pet., Attach. BB at 2.) Counsel also sent the juror a letter asking to speak with her about such concerns. (App. to PCR Pet., Attach. BB at 1–2.) But the state court record does not reflect that the juror replied, or if she did, the result. Therefore, the PCR court reasonably, implicitly, presumed that Counsel's decision not to move for a new trial or to vacate the judgment was sound trial strategy. Counsel could have reasonably believed that the pastor had relayed the information on coercion to the juror and that the juror chose not to reply based on that information. Further, without the juror's statements, a motion for a new trial or to vacate the judgment would have been unsuccessful. *James*, 24 F.3d at 27. The PCR court reasonably found that trial counsel had not performed deficiently.

Chappell argues that by telling the jury that the court would accommodate the jurors' schedules and afford them the time they needed to deliberate, and telling the jury that what would happen if the jury could not reach a unanimous verdict was irrelevant to any eventual decision by the jury, created the impression that the jurors would be required to continue to deliberate until it reached a unanimous verdict. Jurors are presumed to follow the instructions given them by the court. *Weeks v. Angelone*, 528 U.S. 225, 234 (2000) (citing *Richardson v. Marsh*, 481 U.S. 200, 211 (1987)). The trial court instructed the jury to inform it if it could not reach a unanimous verdict. (R.T. 10/29/07 at 163.) The jury never did so, thus undermining Chappell's contention that the jury was coerced to reach a verdict by the court's instructions.

More significantly, the United States Supreme Court has not held that the instructions given here are coercive. The Supreme Court has found coercion when a court

polled the jury regarding how a jury is divided, *see United States v. United States Gypsum Co.*, 438 U.S. 422, 462 (1978), especially when a jury reached a verdict shortly thereafter, *Brasfield v. United States*, 272 U.S. 448, 450 (1988). Those circumstances were not present in this case.

The PCR court determined that trial counsel did not render deficient performance by failing to investigate or litigate whether one or more jurors was coerced by the jury instructions or other jurors, or any resulting prejudice to the defense. (Doc. 33, Exs. WWW at 40-46 and OOOOO at 3.) Under the circumstances, the state court's determination that trial counsel had not acted deficiently by not further investigating whether one or more jurors was coerced was neither contrary to, nor involved in an unreasonable application of, clearly established Supreme Court law. 28 U.S.C. § 2254(d)(1), or that the state courts made an unreasonable determination of the facts in light of the evidence presented in state court proceedings. 28 U.S.C. § 2254(d)(2). Similarly, the state court's determination that Chappell was not prejudiced by any alleged deficient performance was neither contrary to, nor involved in an unreasonable application of, clearly established Supreme Court law. 28 U.S.C. § 2254(d)(1), and the state courts did not make an unreasonable determination of the facts in light of the evidence presented in state court proceedings. 28 U.S.C. § 2254(d)(2). The Court will deny this portion of Claim 2(A)(3).

### c. Bailiff's Interactions with Jurors (Claim 2(A)(3)(iii))

Finally, the state court's denial of this portion of Claim 2(A)(3) did not result in a decision that was contrary to, or involved an unreasonable application of, clearly established Supreme Court law. At trial, counsel raised the issue of possible inappropriate contact between the bailiff and two jurors, first by speaking to the bailiff, and then by raising the issue with the court. (R.T. 10/25/07 at 75–77, 82.) The bailiff explained to counsel that he (the bailiff) had been trying to keep a juror awake, after the juror had earlier struggled. (*Id.*) The bailiff explained to the trial court that he had been returning break requests to the jurors. (*Id.* at 76.) The court directed the bailiff not to communicate with the jurors whatsoever (*id.* at 76–77) and instructed the jurors to address questions to the

court and not to the bailiff (*id.* at 81–82). The court found that the jurors and the bailiff had not discussed the case with each other. (*Id.* at 82.) Although relatives of Chappell claimed on PCR that the bailiff continued to interact with the jurors, the state court record does not reflect that any such communication concerned issues in the trial or that trial counsel had any knowledge of that. (Doc. 53 at 38-42, Ex. CCCC, pt. 11, Attach. X–Y.) Based on the record, counsel reasonably could have concluded that there was no evidence to warrant further investigation. Claim 2(A)(3) will be denied.

### d.  Cumulative Prejudice of IATC Claims

Chappell also claims that the state courts failed to consider the cumulative effect of his IATC claims. The United States Supreme Court has not specifically recognized the doctrine of cumulative error as an independent basis for habeas relief. *See Lorraine v. Coyle*, 291 F.3d 416, 447 (6th Cir. 2002) ("The Supreme Court has not held that distinct constitutional claims can be cumulated to grant habeas relief."); *cf. Morris v. Sec'y Dep't of Corr.*, 677 F.3d 1117, 1132 n.3 (11th Cir. 2012) (refusing to decide whether "under the current state of Supreme Court precedent, cumulative error claims reviewed through the lens of AEDPA can ever succeed in showing that the state court's decision on the merits was contrary to or an unreasonable application of clearly established law"); *Villalobos v. Ryan*, No. CV 17-00633 PHX DJH (CDB), 2021 WL 6883076, at *9–12 (D. Ariz. May 20, 2021). Because Supreme Court precedent does not recognize the doctrine of cumulative error, and because this Court otherwise determines herein that no prejudice resulted from the IATC errors alleged, the claim of cumulative prejudice is meritless.

### III.  CLAIMS 2(A)(4), 3, AND 4(B)

In Claim 2(A)(4), Chappell alleges that trial counsel rendered ineffective assistance by failing to move to suppress Chappell's press statements on the same grounds alleged in Claim 3. (Doc. 25 at 85–86.) In Claim 3, Chappell alleges that his Sixth Amendment right to counsel was violated by jail staff allowing the jail press conference while Chappell was taking psychiatric medications and was on suicide watch, had not yet conferred with appointed counsel, and without first notifying appointed counsel. (*Id.* at 116–19.) In Claim

4(B), Chappell asserts that appellate counsel rendered ineffective assistance by failing to claim on direct appeal that the trial court erred by admitting Chappell's press statements. (*Id.* at 122.)

### A.   Additional Background

The day after Devon drowned, *Chappell*, 225 P.3d at 1180, ¶ 6, Chappell spoke with detectives at a local police station (Doc. 120-1 at 62–206, Tr. Ex. 150). Chappell admitted to detectives that he had choked Devon in December 2003 and had subsequently drowned him. (Doc. 120-1 at 62–183.) He was arrested and jailed that same day. (*See* Doc. 121-3 at 13–14, Tr. Ex. 346.) Chappell denied being suicidal and was placed in an isolation cell for his safety. (*Id.* at 11.)

On March 13, 2004, jail psychiatric staff prescribed antipsychotic and anxiety medications and a suicide blanket for Chappell. (*Id.* at 12.) Chappell was removed from suicide watch that day. (*Id.* at 18.) He was noted to be sleeping, and when awake, he "responded to questions coherently, [with] logical answers." (*Id.*) A nurse noted no behaviors indicating that Chappell was a danger to himself or others. (*Id.*) The next day, Sunday, March 14, 2004, Chappell appeared in court, where the court ordered him held without bond and appointed the Legal Advocate's Office to represent him. (R.O.A. 5 and 23.) Correctional Health Services (CHS) ordered that Chappell be held on suicide watch from 4 a.m. to noon, and again between 6 to 10 p.m. (Doc. 121-3 at 9–10.)

Although the sequence of events is unclear, on Monday, March 15, a direct criminal complaint was filed against Chappell charging him with first degree murder. That afternoon, jail staff removed Chappell from a suicide-watch cell, placing him in administrative segregation, before taking him to a room where 15 to 20 media representatives were gathered. (R.T. 8/9/07 at 150–52; Doc. 120-1 at 44–59, Tr. Ex. 142.) Chappell was still taking three psychiatric medications and had not yet conferred with appointed counsel. (Trial Ex. 346 at 100606.) An investigator for the Maricopa County Attorney's Office arrived at the gathering and subsequently recorded the ensuing

conference.[15] (R.T. 8/9/07 at 150–52; Doc. 120-1 at 44–59.) Chappell answered questions from media representatives and implicated himself in Devon's drowning. (R.T. 8/9/07 at 150–51; Doc. 120-1 at 44–59.)

While responding to press questions, Chappell admitted that in December 2003, he had held Devon "by the throat," shortly after beginning a bipolar medication that made him irritable. (Doc. 120-1 at 49, 51–52.) He also admitted drowning Devon. (*Id.* at 46–50, 51.) Chappell described walking Devon to the pool gate, which "was propped open." (*Id*. at 52.) He further described that when they reached the pool, Devon "turned around," "looked up at [Chappell]," and "put[] his arms up towards [Chappell] like he wanted to be picked up." (*Id*.) Chappell described picking Devon up and "put[ting] him in the pool." (*Id*.) Chappell stated that after putting Devon in the water, he "wanted to change [his] mind" but "figured it[ had] already gone this far," and if he "back[ed] down now," he would be punished. (*Id*. at 48–49.) Chappell stated that Devon tried to stay afloat and tread water, but drowned in "less than a minute," or perhaps "less than 30 seconds." (*Id*. at 53.) Chappell claimed that Kristal had told him to kill Devon because she wanted "a clean start" without either Chappell or Devon. (*Id*. at 45–46.) Chappell also claimed that Devon would have still been alive if CPS had placed Devon in foster care after Chappell reported that Kristal had smothered Devon with a pillow and had often hit Devon in front of Chappell's friends. (*Id*. at 56.)

In explaining why he was speaking to the press, Chappell said he had nothing to hide, and:

> From the very beginning, I mean, as soon as the detectives starting and asking me this and asking me that, I just realized it wasn't right. I mean, I was honest with them. When I choked Devon the first time, there wasn't a moment in my mind that I thought I should lie about it. I was open and honest then, too. I mean it's not that I'm upset with Kristal. It's not that, um, I'm not upset with anybody. It's just – I am – I feel sick to my stomach every night before

---

[15] At trial, the investigator testified that he had been informed by an unidentified person that Chappell had asked to meet with the press. (R.T. 8/9/07 at 150–52; Doc. 120-1 at 44–59, Ex. 142.)

I go to bed. I can't sleep hardly without the help of some meds. Um . . .

. . .

. . . I'm sure there's about half the city of Mesa wondering why I did this and if [I] could at all just give them an explanation for what I did, that would be it.

(*Id*. at 50–51.) He further explained,

For one I can't keep a secret. And, uh, two, and yeah, I wanted to get caught. I can't – I wouldn't be able to live with myself. All the – the night that it happened, people, I stayed up and – the night that it happened, I laid in bed and I never sweat so much in my life. I took a shower and got back into bed. And that was going on around 5:30 in the morning. Still sweating. Still not able to sleep. Still thinking – every time I closed my eyes, he was looking at me straight in the eyes as he was in the water. Am I – I glad that I [got] caught? Yeah I am. Am I glad that I'm here? Yeah I am because now it's my turn to face up to what's happened.

(*Id*. at 55.) Once the press conference concluded, jail staff returned Chappell to suicide watch; according to jail medical notes, Chappell made statements to a tv reporter that he did not want to live and just wanted to die. (*Id*. at 21.) About a week later, Chappell was indicted with child abuse for the December 2003 choking incident and first-degree murder. (R.O.A. 1 and 10.) Chappell pleaded not guilty. (R.O.A. 23.)

At the guilt phase of trial, the County Attorney's investigator who attended the press conference testified about the conference and that he had heard that Chappell had asked to speak with the press; the defense did not question the County Attorney investigator. (R.T. 8/9/07 at 148, 150, 154–55.) Without objection, the trial court admitted video of the conference, which was shown to the jury. (*Id*. at 154; *see* Ex. 131.) Chappell now concedes that he did not challenge the press-conference evidence on direct appeal. (Doc. 25 at 116–17.)

On PCR, Chappell claimed that trial counsel rendered ineffective assistance by failing to move to suppress "inculpatory statements made by [Chappell] during his March 15, 2004 'Press Conference[.]'" (Doc. 42-3 at 4, 14-21, Ex. WWW.) He argued that the State coerced his statements to the press where he was not again provided *Miranda*

~ 36 ~

warnings, and the press conference was held prior to Chappell meeting with appointed counsel, in violation of the Fifth and Sixth Amendments. (*Id*. at 18, 21.) He also argued that "he was under the influence of mind-altering drugs administered" by the State at the time of the conference, and before conferring with appointed counsel, the State (or County staff) facilitated the press conference, and failed to notify appointed counsel before taking Chappell to the press conference.[16] (*Id*.) He also argued that he was prejudiced by trial counsel's failure to challenge the admission of press conference evidence. (*Id*.)

In response, the State maintained that trial counsel neither acted deficiently, nor prejudiced Chappell. (Doc. 54-6 at 40–44, Ex. RRRR.) The State claimed that Chappell voluntarily spoke to the press, and that he was not "in a confused state," and it denied that it played any role in setting up the conference. (*Id*. at 42–43.) Finally, the State argued that Chappell was not prejudiced by the admission of the press conference evidence because he had confessed to police prior to his arrest, evidence of which was also admitted into evidence. (*Id*. at 44.) In his reply, Chappell requested an evidentiary hearing to determine who had facilitated the press conference. (Doc. 69-5 at 17–27, Ex. IIIII.)

The PCR court summarily denied Chappell's IAC claim, adopting the State's arguments, as discussed above. (Doc. 70-2 at 3, Ex. OOOOO.) Chappell petitioned for review by Arizona Supreme Court, which was denied. (Doc. 72-3 at 11-13, Ex. HHHHHH; Doc. 72-6, Ex. KKKKKK).

### B.      Claim 2(A)(4)

Chappell alleges that trial counsel rendered ineffective assistance by failing to seek to suppress Chappell's press statement. (Doc. 25 at 85–86.) Chappell presented this claim to the state courts, and it is exhausted. As discussed above in connection with Claim 2(A)(3), the state courts denied Chappell's exhausted IATC claims on the merits. Chappell contends that the state court denial of this claim was contrary to and an unreasonable application of clearly established law "at the time of Chappell's arrest."[17] (Doc. 25 at 94.)

---

[16] Chappell first met with counsel on March 16, 2004. (PCR R.O.A. 105, Ex. V at 1.)

[17] In his Petition, Chappell argued that government efforts to elicit information from him

He contends that after he was appointed counsel, and while on psychiatric medications and suicide watch, "the State arranged for him to provide a statement to the media," without notifying his appointed counsel. (Doc. 25 at 95.) He contends that trial counsel should have filed a motion to suppress his press statement on the same basis as alleged in Count 3. He contends that had a motion to suppress been filed, there was a reasonable probability that the evidence would have been suppressed, and the outcome of the trial would have been different if that evidence had been suppressed.

The Sixth Amendment provides, "In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. Const. amend. VI. This right does not attach until the prosecution starts. *Rothgery v. Gillespie Cty.*, 554 U.S. 191, 198 (2008); *McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991). The prosecution starts at "the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *Rothgery*, 554 U.S. at 198 (internal quotations omitted). "[A] criminal defendant's initial appearance before a judicial officer, where he learns the charge against him and his liberty is subject to restriction, marks the start of adversary judicial proceedings that trigger attachment of the Sixth Amendment right to counsel." *Id*. at 199 and 213 (2008) (citing *Michigan v. Jackson*, 475 U.S. 625, 629 n.3 (1986), *overruled on other grounds by Montejo v. Louisiana*, 556 U.S. 778, 797 (2009); *Brewer v. Williams*, 430 U.S. 387, 399 (1977)).

"The [initiation] rule is not mere formalism, but a recognition of the point at which the government has committed itself to prosecute, the adverse positions of government and defendant have solidified, and the accused finds himself faced with the prosecutorial forces of organized society, and immersed in the intricacies of substantive and procedural criminal law." *Id*. (internal quotations and citation omitted).

---

at the relevant time violated his Sixth Amendment rights under *Michigan v. Jackson*, 475 U.S 625, 629-30 (1986). In 2009, the Supreme Court overruled *Jackson*. *Montejo v. Louisiana*, 556 U.S. 778 (2009). Chappell seemingly insinuates that he can obtain habeas relief for violation of an overruled case.

Moreover, the Sixth Amendment right to counsel "is 'offense specific.'" *Texas v. Cobb*, 532 U.S. 162, 165 (2001) (quoting *McNeil v. Wisconsin*, 501 U.S. 171 (1991)). That is, "a defendant's statements regarding offense for which he had not been charged were admissible notwithstanding the attachment of his Sixth Amendment right to counsel on other charged offense." *Id*. at 168 (citing *McNeil*, 501 U.S. at 176).

As to the first-degree murder accusation against Chappell, the Sixth Amendment right to counsel attached to Chappell at his initial appearance in court, where the trial court informed him of that accusation and restricted his liberty by ordering him held in jail without bond. (R.O.A. 5 at 23.) Respondents do not assert otherwise. That right, however, did not attach to the accusation of child abuse against Chappell. At his initial appearance, the court did not notify him of the child-abuse allegation or restrict his liberty because of it. (*See id*.) Nor did the direct complaint filed on the day of the press conference allege such abuse. (*See* R.O.A. 1.) The right as to the child-abuse accusation did not attach until a grand jury charged him with that crime a week after the press conference—the initiation of adversary judicial criminal proceedings as to that charge. (*See* R.O.A. 10.) For this reason, a motion to suppress Chappell's press statements about the December 2003 choking accusation that led to the child-abuse charge would have lacked merit. Chappell's trial counsel thus did not perform deficiently or prejudice Chappell by not filing it. The PCR court reasonably found as such.

The PCR court also reasonably found that counsel did not perform deficiently or prejudice Chappell by not moving to suppress Chappell's press statements regarding the alleged first-degree murder accusation.

"Once [the Sixth Amendment right to counsel] attaches, the government may no longer initiate interrogation of a suspect, and even a written waiver of the right to counsel is invalid." *United States v. Covarrubias*, 179 F.3d 1219, 1223 (9th Cir. 1999) (citing *Jackson*, 475 U.S. at 635–36), *abrogated on other grounds by Cobb*, 532 U.S. 162. The PCR court reasonably found that Chappell—not the State—initiated the press conference. And there is no clearly established federal law that states that initiation includes setting up

a press conference. Therefore, the PCR court reasonably found that the State did not violate Chappell's Sixth Amendment right to counsel.

Chappell argues that he involuntarily spoke to the press because he was on suicide watch moments before and after he made them and was on medication. (Doc. 25 at 86.) "Involuntary or coerced confessions are inadmissible at trial," *Brown v. Horell*, 644 F.3d 969, 979 (9th Cir. 2011) (citing *Lego v. Twomey*, 404 U.S. 477, 478 (1972)), as their admission violates a defendant's Fourth Amendment right to due process," *id*. (citing *Jackson v. Denno*, 378 U.S. 368, 385-86 (1964)). Mental, rather than physical coercion can render a confession involuntary. *Blackburn v. State of Alabama*, 361 U.S. 199 (1960).

The state-court record does not show that Chappell participated in the press conference involuntarily. He was responsive in all his answers. He explained why he wanted to come before the media. No one in the media voiced any concerns about his appearance—only why he wanted to admit to the murder in the first place. There is no evidence that the psychiatric medication would overcome his personal will. Moreover, he seemed to scoff at the fact that he was placed under suicide watch. He did not even mention that he was suicidal at the press conference, even though he was open about it at other times. In fact, he seemed confident that he was not fully at fault for Devon's murder. Although the record is unclear as to whether Chappell was told to attend the press conference, was given the option of the press conference, or whether Chappell requested the press conference, the record also does not state—and Chappell does not appear to suggest—that the jail forced him to participate. Nor did his mental status overcome his will.

Because a motion to suppress Chappell's press statements would have lacked merit, his trial counsel did not render ineffective assistance by not moving as such. *See Premo v. Moore*, 562 U.S. 115, 124 (2011) (failure to move to suppress unlikely to succeed, in general, is not ineffective assistance of counsel); *see also Lowry v. Lewis*, 21 F.3d 344, 346 (9th Cir. 1994) (holding that failure to move to suppress which would "be meritless on the facts and the law" is not ineffective assistance of counsel); *Petrocelli v. Baker*, 869 F.3d

710, 723 (9th Cir. 2017) ("A failure to make a motion to suppress that is unlikely to succeed generally does not constitute ineffective assistance of counsel."); *Mahrt v. Beard*, 849 F.3d 1164, 1169-72 (9th Cir. 2017) ("hold[ing] . . . that the state court could reasonably have concluded that Mahrt's counsel did not" ineffectively assist Mahrt in not moving to suppress evidence," finding that counsel should have moved to suppress, as there "was at least a chance that such a motion would have succeeded" but that "[i]t would have been reasonable for the state courts to conclude that a motion to suppress, if brought, would likely have been denied"); *Zapien v. Martel*, 849 F.3d 787, 796 (9th Cir. 2016) (holding that trial counsel did not ineffectively assist petitions when "[c]ompetent counsel could reasonably have concluded that moving to exclude [evidence] on the grounds Zapien now suggests would have seemed frivolous"). There is no clearly established federal law that medication and suicidal ideations renders statements *per se* involuntary.

Finally, even if constitutional error occurred and Chappell's trial counsel was deficient by not moving to suppress the press conference under Chappell's Sixth Amendment right to counsel or on voluntariness grounds, such deficiency did not prejudice him. For Chappell's statements to the press were merely cumulative in describing the abuse of Devon (choking incident) and the first-degree murder of Devon (forcible drowning) of his statements to detectives—which Chappell no longer challenges. *See Bradford v. Davis*, 923 F.3d 599, (9th Cir. 2019)\; *Padilla v. Terhune*, 309 F.3d 614, (9th Cir. 2002); *Mata v. Ricketts*, 981 F.2d 397, (9th Cir. 1991); *Cooper v. Taylor*, 103 F.3d 366, (4th Cir. 1996).

Like Chappell's statements to the press, Chappell's statements to investigators detailed the events leading up to the child's murder. Therefore, even without his video confession from the press conference, the jury still read his detailed confession at the police station. The Court cannot say that on this record that the press statements had a substantial and injurious effect or influence on the verdict, in light of the statements to investigators. At most, there was a reasonable possibility of such effect or influence but that will not pass the *Brecht* test.

The Court will deny Claim 2(A)(4).

~ 41 ~

The state court's determination that trial counsel neither rendered deficient performance, nor prejudiced Chappel by failing to seek suppression of the press conference, did not result in a decision that was contrary to, or involved an unreasonable application of, clearly established Supreme Court law, 28 U.S.C. § 2254(d)(1), and did not rely on an unreasonable determination of the facts in light of the evidence presented in state court, 28 U.S.C. § 2254(d)(2).

The Court will deny Claim 2(A)(4).

## C.    Claim 3

Chappell alleges that his Sixth Amendment right to counsel was violated by jail staff facilitating the press conference, before Chappell had conferred with appointed counsel and without notifying appointed counsel, and while Chappell was taking three psychiatric medications, and had been on suicide watch. (*Id.* at 116–119.) Chappell also seeks evidentiary development in support of Claim 3. (Doc. 105 at 43–44.) The parties agree that this claim was not presented to the state courts and that it is procedurally defaulted. (Doc. 25 at 116–17; Doc. 33 at 106.)

Chappell argues the procedural default is excused by the ineffective assistance of his PCR counsel under *Martinez*. (Doc. 25 at 117; Doc. 87 at 66.) But the ineffective assistance of PCR counsel can only excuse the procedural default of an IATC claim. *Martinez (Ernesto) v. Ryan*, 926 F.3d 1215, 1225 (9th Cir. 2019); *Pizzuto*, 783 F.3d at 1177; *Hunton*, 732 F.3d at 1126–27. To the extent he also argues that Claim 3's procedural default is excused by the ineffective assistance of his appellate counsel, this argument fails. PCR counsel did not raise such an ineffective-assistance-of-counsel. *See Edwards v. Carpenter*, 529 U.S. 446, 453 (2000). Claim 3 otherwise lacks merit. (*See* Claim 2(A)(4), *supra*.)

Chappell further argues that because the state courts did not deny this claim on the merits, it is subject to de novo review by this Court. (Doc. 87 at 67.) As stated above, a federal habeas court may only review the merits of a claim de novo if the claim was properly exhausted *and* the state court "clearly" did not reach the merits of the claim. *Pirtle*,

~ 42 ~

313 F.3d at 1167–68. Because this claim was never presented to the state courts, much less denied, de novo review does not apply.

Chappell requests evidentiary development in support of this claim. As described above, "a federal court may not hold an evidentiary hearing—*or otherwise consider new evidence*" in support of a procedurally defaulted claim unless the "stringent requirements" of 28 U.S.C. § 2254(e)(2) are met. *Shinn,* 596 U.S. at 381 (emphasis added). Under § 2254(e)(2)(i), a federal habeas court may only consider new evidence in support of a procedurally defaulted claim if the petitioner shows that "(A) the claim relies on (i) a new rule of constitutional law made retroactive to cases on collateral review by the Supreme Court, which was previously unavailable; or "(ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; *and* "(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the [petitioner] guilty of the underlying offense." 28 U.S.C. § 2254(e)(2).

Claim 3 does not rely on a new rule of constitutional law made retroactive to cases on collateral review that was previously unavailable, or upon a factual predicate that could not have been discovered through the exercise of due diligence, and the facts underlying the claim are not sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found Chappell guilty of the underlying offenses.

Accordingly, Chappell's request as to evidentiary development as to this claim will be denied, and the Court will deny relief on Claim 3.

### D.    Claim 4(B)

Chappell argues that appellate counsel rendered ineffective assistance by failing to challenge the State's "deprivation" of his Sixth Amendment right to counsel at issue in Claim 3. (Doc. 25 at 122.) Chappell acknowledges that this claim is procedurally defaulted but argues that he can overcome the default based upon the alleged ineffective assistance of PCR counsel, who failed to raise "this substantial claim" under *Martinez*, 566 U.S. 1

and *Nguyen v. Curry*, 736 F.3d 1287 (9th Cir. 2013), in which the Ninth Circuit expanded the *Martinez* exception to a PCR counsel's failure to raise a claim of ineffective assistance of appellate counsel. (*Id.*) But in *Davila*, the United States Supreme Court effectively abrogated *Nguyen* by expressly rejecting such an expansion of the *Martinez* exception. *Davila*, 582 U.S. at 529-31; *see also Bejarano v. Reubart*, 136 F.4th 873, 899 n.9 (9th Cir. 2025) (acknowledging the abrogation and stating the *Martinez* exception "does not apply to the procedurally defaulted appellate IAC claims"). Because Claim 4(B) is procedurally defaulted, and Chappell has not shown cause and prejudice to excuse the default, Claim 4(B) will be denied.

## IV.     Claims 2(A)(1) and 2(A)(2)

### A.     Claim 2(A)(1)

In Claim 2(A)(1), Chappell alleges that trial counsel rendered ineffective assistance at the guilt phase by failing to investigate and present a viable defense to premeditated murder under *State v. Christensen*, 628 P.2d 580, 582-83 (Ariz. 1981) (*in banc*), which held that a defendant charged with first-degree premeditated murder could present expert and non-expert opinion to establish that a defendant had a character trait of impulsivity to negate premeditation. *See State v. Leteve*, 354 P.3d 393, 401 (Ariz. 2015) ("[A] defendant who can show that he has a character trait for acting without reflection presents a fact that makes it more likely that he acted impulsively."). Chappell argues that evidence of his impulsivity would have supported a lesser-included offense instruction to the premeditated murder count, which if successful, would have alleviated the risk of a death sentence. (Doc. 25 at 72–78.) Chappell asserts that he raised this claim on PCR, that while the PCR court listed his other claims, it omitted this claim, and that the PCR court therefore did not rule on the claim's merits. (*Id.* at 72.) He claims that he is now entitled to de novo review by this Court. (*Id.*) Chappell also requests evidentiary development in support of this claim. (Doc. 105 at 29.)

Respondents concede the claim is exhausted but contend the PCR court denied the claim on the merits and that Chappell is not entitled to relief under § 2254(d).

~ 44 ~

### 1.  Additional Background

During the guilt and penalty phases, family and friends testified about Chappell's impulsive behavior. (R.T. 9/26/07 at 142; R.T. 10/17/07 at 142.) At the guilt phase, regarding the child abuse count, Dr. John Kennedy testified about the effects of Wellbutrin, which Chappell was taking at the time of the December 2003 choking incident and noted that records reflected Chappell's impulsive character. (R.T. 8/20/2007 at 95.) At the penalty phase, Chappell's treating psychiatrist, Dr. Gronley, testified that Chappell had impulsive traits, likely due to ADHD, or possibly to other personality-related mental illnesses. (R.T. 10/10/07 at 10–11, 22–23, 40, 46.) Chappell's treating psychologist, Dr. Gourley, also testified that Chappell "had a lot of impulsive behavior." (R.T. 10/16/07 at 83.) The State's forensic psychiatrist, Elizabeth Kohlhepp, M.D., testified that Chappell exhibited impulsivity—a symptom of personality disorders with which she diagnosed Chappell. (R.T. 10/23/07 at 38; *see also* R.T. 10/23/07 at 40, 109.)

In addition, at trial, various witnesses testified about several stressors on Chappell in the days and weeks prior to the killing. In state PCR proceedings, Dr. Joseph Wu, a physician specializing in neuroimaging ordered brain imaging finding abnormalities in the "frontal lobe, with significant atrophy in forebrain parenchyma bilaterally worse on the right." (PCR R.O.A. 104, Ex. U at 10.) "The frontal lobe is the portion of the brain which is involved in higher order cognitive and emotional processing," and normally functioning frontal lobes allow an individual to control aggressive impulses, while one with dysfunctional frontal lobes will act more impulsively. (*Id.*)

### 2.    Exhaustion

Chappell alleges that defense counsel failed to investigate and present a viable defense to premeditated murder by developing and presenting additional evidence of his impulsivity, and the impact of extreme stressors in the days and weeks prior to the killing, both of which would have tended to negate premeditation, and would have entitled him to a lesser-included offense instruction if sufficiently supported. (Doc. 25 at 88, citing *State v. Whittle*, 752 P.2d 489, 492 (Ariz. App. 1985) (dicta stating that in a capital case the court

must instruct on lesser-included offenses that the evidence will support, citing *State v. Clabourne*, 690 P.2d 54 (1984)). Chappell contends that while he presented this claim to the state courts on PCR and his petition for review, he claims the state courts did not deny this claim on the merits. (Doc. 25 at 72.) He notes that the PCR court omitted this claim from a list enumerating Chappell's IATC claims and argues that the PCR court overlooked this claim, rendering it not subject to review under § 2254(d). (*Id*.) Respondents contend that under controlling law, this Court must presume that the claim was denied on the merits, even if the PCR court did not specifically mention the claim. (Doc. 33 at 57–58, citing *Johnson*, 568 U.S. at 293.)

Chappell raised Claim 2(A)(1) in state court, and the parties agree that the PCR court omitted this claim from its enumerated list of claims in denying Chappell's PCR petition. (Docs. 25 at 81; Doc. 33 at 58.) Chappell argues, however, that the PCR court failed to rule on the merits of this claim, citing the omission of the claim from the enumerated list. (Doc. 25 at 81.) Respondents argue that the PCR court's more general ruling denying Chappell's claims was not limited to the enumerated claims, noting that the PCR court concluded that Chappell had failed to prove either prong of *Strickland* as to his IATC claims. (Doc. 33 at 58.)

As discussed above in connection with Claim 2(A)(3), a federal habeas court must presume that a state court denied a claim on the merits, even where it did not specifically address a claim, but did specifically address others. *Johnson*, 568 U.S. at 301, *Richter*, 562 U.S. at 98–99. The court may only review the merits of an exhausted claim de novo if the state courts "clearly" did not reach the merits of the claim. *Pirtle*, 313 F.3d 1160, 1167–68 (9th Cir. 2002). Given the PCR court's express statement that Chappell failed to establish either prong of *Strickland* as to his exhausted IATC claims, Chappell has not established that the state courts "clearly" failed to reach the merits of this claim. The Court finds that this claim is exhausted and that the state courts denied this claim on the merits. It is therefore subject to review under § 2254(d).

//

### 3.    Merits

As noted above, Chappell requests evidentiary development in support of this claim, specifically, an expert report of Sean O'Brien on the standard of care for defense counsel in a capital case and a November 14, 2006 defense-team memorandum, to show that defense counsel recognized prior to trial that if they relied on allegations that Kristal was responsible for the murder, they risked losing credibility with the jury, and did not come up with an alternative defense theory. (Doc. 105 at 25–26.) This claim does not rely on a new rule of constitutional law under § 2254(e)(2)(A)(i), and Chappell does not assert, nor does it otherwise appear, that the factual predicate for this claim could not have been previously discovered through the exercise of due diligence or that the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found him guilty. Accordingly, Chappell's request for evidentiary development will be denied.

The state courts denied this claim without explaining the basis for its decision but more generally stating that Chappell had shown neither deficient performance nor prejudice as to his IATC claims. Respondents argue, and the Court agrees, that reasonable counsel could have chosen not to present a *Christensen* defense and request a lesser-included instruction in light of the facts of the crime. (Doc. 33 at 59.) Chappell had admitted to both police, and to the press, that he killed Devon, and after having hours to reflect before doing so. Such admissions clearly supported that Chappell had not acted impulsively when he killed Devon. *See Chappell*, 236 P.3d at 1180-81. (Doc. 120-1 at 44–59, 62–206, Tr. Exs. 142, 150, 153.) As Respondents argue, Chappell's admissions undermined a *Christensen* defense, and his defense counsel did not perform deficiently. Defense counsel presented evidence of Chappell's possible impulsivity character trait in connection with a voluntary intoxication defense to the child abuse charge, and alternatively proposed that Devon might have accidentally drowned. (R.T. 8/27/07 at 61–111.) They addressed Chappell's admissions by suggesting that he might have falsely confessed to "take the fall" for Kristal, citing Chappell's immaturity, impulsiveness, and mood swings. (*Id.* at 105,

111.)

Under circumstances where Chappell had admitted to the police and to the press that he had drowned Devon and admitted facts strongly inconsistent with an impulsiveness defense, the decision not to proffer a *Christensen* defense was not objectively unreasonable. Chappell stated that Kristal had suggested that he drown Devon hours before Chappell returned from his parents' home to her complex to do so, bringing a rock to prop open the pool gate to create an appearance that Devon had wandered into the pool and drowned, and then returned to the pool to leave one of Devon's toys in the pool to support that appearance. (Trial Exs. 142, 150, 153.) For analogous reasons, the defense was not prejudiced by the failure to present a *Christensen* defense.

The state court's denial of this claim was neither contrary to, nor involved an unreasonable application of, clearly established Supreme Court law. 28 U.S.C. § 2254(d)(1). Similarly, Chappell has not established that the state courts made an unreasonable determination of the facts in light of the evidence presented in state court. 28 U.S.C. § 2254(d)(2). The Court will deny this claim.

**B.    Claim 2(A)(2)**

Chappell alleges trial counsel rendered ineffective assistance by failing to investigate and present expert medical evidence to undermine or refute the State's expert, who testified that the December 2003 choking incident had endangered Devon's life or risked serious injury, a necessary element to prove child abuse, which was the qualifying offense to seek a death sentence. (R.O.A. 10.) Chappell further alleges that such evidence, coupled with evidence that Chappell's acts were involuntary due to the effects of Wellbutrin, would have established a reasonable probability that the jury would not have found Chappell guilty of child abuse beyond a reasonable doubt. (Doc. 25 at 88.) Chappell concedes the claim is procedurally defaulted but argues that PCR counsel rendered ineffective assistance by failing to present this claim in PCR proceedings, which establishes cause to excuse the default under *Martinez*. (Doc. 25 at 79; Doc. 87 at 36–39.)

Respondents agree the claim is procedurally defaulted, but dispute that the alleged

ineffective assistance of PCR counsel excuses the default under *Martinez* and further argues that even if it did, the claim fails on the merits. (Doc. 33 at 62.)

Chappell requests evidentiary development in support of this claim and to show cause under *Martinez*.[18] Claim 2(A)(2) is procedurally defaulted and it does not rely on "a new rule of constitutional law made retroactive to cases on collateral review by the Supreme Court, which was previously unavailable." 28 U.S.C. § 2254(e)(2)(i). Nor has Chappell argued or shown that this claim relies on a factual predicate that could not have been previously discovered through the exercise of due diligence, and that the facts underlying it are not sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found Chappell guilty of child abuse. Finally, the Court may not consider non-record evidence in assessing whether the ineffective assistance of PCR counsel excuses the procedural default. *See Ramirez*, 596 U.S. at 381. Accordingly, Chappell's request for evidentiary development as to this claim will be denied.

### 1.    Additional Background

The December 10, 2003 choking incident was the predicate offense for seeking a death sentence on the murder count. At the time of the incident, Chappell was at his parents' home with Devon, whose leg was in a cast. (Doc. 120-3 at 40, Tr. Ex. 327 at 21.) Chappell took Devon into a bedroom to change his diaper; while Chappell was trying to change the diaper when Devon began kicking and screaming (*Id*.) As Devon continued kicking and

---

[18] Chappell seeks Devon's complete medical records for review by Dr. Michael Weinraub about other potential causes of Devon's petechial bruising and to submit Dr. Weinraub's report opining that Devon's petechiae was uncharacteristic of strangulation. (Doc. 105 at 26–27.) He also seeks to submit Sean O'Brien's report concerning defense counsel's duty to further investigate other possible child abuse, a copy of an April 12, 2005 memo to defense counsel about problems with asserting an alleged reaction to Wellbutrin as part of an involuntary intoxication defense to count 2, appellate counsel's letter to PCR counsel citing potential issues relevant to arguing that involuntary intoxication caused Chappell to choke Devon, absent expert testimony, declarations of PCR counsel, and PCR counsel documents to help demonstrate PCR counsel performed deficiently. (*Id*. at 27–29.)

resisting, Chappell pressed down on his shoulders and told him to stop. (Doc. 120-4 at 12, Tr. Ex. 329 at 11.) Chappell stopped pressing when Devon's face turned red, with a shocked look. *Chappell*, 225 P.3d at 1180. Based on Devon's reaction, Chappell assumed that he had been pushing too hard on Devon's chest. (Doc. 120-4 at 12–13, Tr. Ex. 329 at 11–12.) Chappell called Kristal at work and told her that he had hurt Devon and asked her to come home. Kristal left work and found Chappell outside with Devon. (Doc. 120-3 at 67–68, Tr. Ex. 327 at 20–21.) After Kristal arrived, Chappell began crying and apologized to her. (*Id.* at 21.)

When later interviewed by police, Chappell said that things "happened so fast" and he was not sure of the details. (Doc. 120-4 at 15, Tr. Ex. 329 at 14.) After a detective told Chappell that "[i]n order to get the hemorrhage, you had to cut off his oxygen supply there a little while," Chappell acknowledged that choking could have been a "possibility," even though he said he was holding onto Devon's shoulders. (*Id.*)

Following Devon's death three months later, Chappell was charged with child abuse in connection with the December incident. At his trial, the prosecution presented expert testimony regarding the December incident from Jennifer Geyer, M.D. Dr. Geyer testified that Devon had petechial bruising on his neck, face, and behind the ears following the December incident. (R.T. 8/7/07 at 14.) She explained that "petechia" are little pinpoint red bruises that result from blood vessels that rupture at the surface of the skin. (*Id.* at 15.) Dr. Geyer said that this type of mark is "relatively rare," and she had "only seen [it] a handful of times." (*Id.* at 18.) She opined that this type of injury would have required a significant amount of force and would not have been consistent with Chappell pushing down on Devon's shoulders. (*Id.* at 21.) Dr. Geyer also opined that, based on Devon's injuries, Devon had "absolutely" been placed at "risk of serious physical injury or even death." (*Id.* at 23.) On cross-examination, defense counsel only asked Dr. Geyer questions about Devon resisting her during her examination of him. (*Id.* at 24–25.) Defense counsel did not present expert testimony to refute or challenge Dr. Geyer's opinion regarding whether Devon had been at risk of serious physical injury or death during the choking

incident.

Chappell asserts that defense counsel rendered ineffective assistance by failing to retain a medical expert to review the records related to the choking incident to attempt to refute that Chappell had acted in a manner "likely to produce death or serious physical injury," as a defense to the child abuse charge. (Doc. 25 at 79, quoting R.O.A. 10.) He contends that medical evidence supporting that a defense, coupled with evidence that Chappell's actions were involuntary where he had recently begun taking Wellbutrin, gave rise to a reasonable probability that the jury would not have found him guilty of child abuse beyond a reasonable doubt. (*Id.*)

Chappell asserts that defense counsel's failure to obtain an expert medical opinion to refute Dr. Geyer's opinion, constituted deficient performance. (*Id*. at 81–82.) Chappell also asserts that defense counsel acted deficiently by failing to consult with a pediatrician to determine whether petechial bruising was consistent with the reported incident and whether there may have been alternative explanations for the presence of petechiae in light of Devon's medical history. (*Id*. at 82–83.)

### 2. Exhaustion and Procedural Default

The parties agree that this claim is procedurally defaulted but disagree whether the alleged ineffective assistance of PCR counsel establishes cause to excuse the default. Respondents argue that Chappell has not established cause and prejudice under *Martinez*, and that even if he had, the claim fails on the merits. (Doc. 33 at 62.) They further argue that the underlying IATC claim is not substantial, and that because defense counsel was not ineffective, PCR counsel was not ineffective for failing to raise the claim. (*Id.*)

PCR counsel did not submit any expert medical, or lay, evidence to support that Devon's petechial bruising could have resulted from a cause other than Chappell's admitted choking of him.[19] And absent the presentation of any evidence on PCR to support

---

[19] Moreover, the introduction of such evidence might have resulted in the introduction of additional evidence regarding other injuries suffered by Devon after Chappell had cared for him.

that trial counsel could have obtained and presented such evidence, Chappell fails to establish that PCR counsel rendered ineffective assistance by failing to raise the underlying IATC claim on PCR. Chappell therefore fails to establish that the alleged ineffective assistance of PCR counsel demonstrates cause to excuse the procedural default of the IATC claim.

Defense counsel could have objectively and reasonably decided not to obtain an alternative medical opinion where Chappell had admitted choking Devon resulting in observable and documented injuries. (Doc. 120-1 at 28–32, Tr. Ex. 115.) Defense counsel could also have reasonably concluded that contesting whether the force used by Chappell was likely to produce serious physical injury or death, could have undermined Chappell's credibility concerning his regret about the incident. *See e.g.*, *De Cicco v. Ercole*, No. 9:07CV1030, 2011 WL 5325654, at *3 (N.D.N.Y. Nov. 3, 2011); *Vinton v. Nolan*, No. Civ.A. 04-10209-DPW, 2005 WL 562760, at *14 (D. Mass. Mar. 8, 2005). Further, defense counsel could have reasonably viewed presenting evidence regarding the cause of the petechial bruising, would undermine their involuntary intoxication defense to humanize Chappell.

Counsel objectively, reasonably chose to defend against Count 2 by not arguing that the choking incident would not likely produce death or serious physical injury. Chappell confessed that he choked Devon, which caused Devon visible harm consistent with strangulation. (Ex. 115 at 9–11; R.T. 8/7/07 at 14–23.) With this in mind, a defense that the choking—the deprivation of oxygen—would not likely produce death or serious physical injury would have undermined Chappell's credibility. *See*, *e.g.*, *De Cicco v. Ercole*, No. 9:07CV1030, 2011 WL 5325654, at *3 (N.D.N.Y. Nov. 3, 2011) ("Because [petitioner's counsel] could have reasonably decided that to call . . . [the proposed] alibi witness would risk [petitioner's] credibility in the eyes of the jury, his representation did not fall below an objective standard of reasonableness."); *Vinton v. Nolan*, No. Civ.A. 04-10209-DPW, 2005 WL 562760, at *14 (D. Mass. Mar. 8, 2005) (finding trial counsel's choice of defense reasonable because counsel "apparently conducted a rational cost-benefit

analysis" of certain evidence "and determined that the risks [the evidence] posed—in terms of undermining [p]etitioner's credibility and possibly inflaming the passions of the jury—outweighed any advantage [the evidence] might confer in supporting [p]etitioner's claim of self-defense").

Further, by asserting the involuntary-intoxication defense, counsel reasonably tried to humanize Chappell in case the trial reached the sentencing phase. *See*, *e.g.*, *Roche v. State*, 690 N.E.2d 1115, 1124–25 (Ind. 1997) (refusing to find trial counsel's assistance ineffective in having defendant testify at the guilt phase, in part, based on counsel's explanation that counsel had him testify "to humanize [him] in front of the jury before the penalty phase"). Counsel, in short, did not perform deficiently.

Even if trial counsel's performance was deficient, Chappell fails to show that their failure to investigate and present medical or lay evidence to support an alternative cause of Devon's petechial bruising prejudiced his defense. As noted above, PCR counsel failed to present any such evidence during PCR proceedings. Claim 2(A)(2) will be denied.

## V.     Claim 19

In Claim 19, Chappell argues violations of the Fifth Amendment Indictment Clause, Sixth Amendment Notice Clause, the Eighth Amendment,[20] and the Fourteenth Amendment Due Process Clause where the grand jury did not include the aggravating circumstances alleged by the State in the indictment. (Doc. 25 at 184.) Chappell alleges that clearly established federal law requires that any fact, other than a prior conviction, that increases the punishment for a crime must be treated as an element of the offense. (*Id.*, citing *Apprendi v. New Jersey*, 530 U.S. 466, 477 (2000)[21], and *Ring v. Arizona*, 536 U.S.

---

[20] Courts connect the Eighth Amendment to the indictment process only when a party argues that the crimes charged in an indictment will subject him to a cruel and unusual punishment. *See*, *e.g.*, *United States v. Johnson*, 423 F.2d 621, 622 (9th Cir. 1970) (per curiam). Chappell concedes that he did not raise the Eighth Amendment aspect of this claim in state court (Doc. 87 at 113) and he does not develop it here—citing case law that neither supports this portion of the claim nor relates the Eighth Amendment to the indictment process. The Eighth Amendment aspect of this claim lacks merit and will be denied.

[21] In *Apprendi*, the Supreme Court held that any "fact" that increases the penalty for a state

584, 609 (2002) [22]).

While the Fifth Amendment's Indictment Clause requires a grand jury indictment to be supported by probable cause in federal prosecutions, U.S. Const. amend. V, it has not been incorporated by the Fourteenth Amendment to apply to the states, *Branzburg v. Hayes,* 408 U.S. 665, 688 n. 25 (1972); *Hurtado v. California,* 110 U.S. 516, 538 (1884); *see also Alexander v. Louisiana*, 405 U.S. 625, 633 (1972) ("Although the Due Process Clause guarantees petitioner a fair trial, it does not require the States to observe the Fifth Amendment's provision for presentment or indictment by a grand jury, . . . the Court has never held that federal concepts of a 'grand jury,' binding on the federal courts under the Fifth Amendment, are obligatory for the States.") (internal citation and some punctuation omitted); *Gautt v. Lewis*, 489 F.3d 993, 1003 n.10 (9th Cir. 2007); *Williams v. Haviland*, 467 F.3d 527, 531-32 (6th Cir. 2006). Thus, regardless of any unexcused procedural default, the Fifth Amendment aspect of this claim lacks merit.

The Court now turns to the Sixth and Fourteenth Amendment portions of this claim. On April 8, 2004, the prosecution faxed defense counsel its Notice of Intent to Seek Death for the murder and disclosed the three aggravating circumstances that it intended to prove in seeking the death penalty: Chappell's previous conviction of a serious offense, i.e., child abuse; the murder was especially cruel; and Chappell was an adult, and the victim was less than 15 years old. (ROA 18.) Chappell's state jury trial commenced 38 months after defense counsel received the Notice of Intent. (ROA 245.) The jury subsequently found all three alleged aggravating circumstances.

Chappell raised the Sixth and Fourteenth Amendment aspects of Claim 19 on direct appeal. The Arizona Supreme Court denied the claim on the merits based on *McKaney v.*

offense beyond the statutory maximum, other than the fact of a prior conviction, must be found by a jury or admitted by the defendant.  530 U.S. at 66, 488–90.

[22] In *Ring*, the United States Supreme Court overruled *Walton v. Arizona*, 497 U.S. 639, 649 (1990), to the extent that *Walton* allowed a sentencing judge, sitting without a jury, to find aggravating circumstances necessary to impose a death sentence, as violating the Sixth Amendment requirement that such facts be found by a jury.

*Foreman*, 100 P.3d 18, 20-23, ¶¶ 9-24 (Ariz. 2004), which held that federal due process did not require the state to allege aggravating circumstances in an indictment and found McKaney received notice of the alleged aggravating circumstances well in advance of trial. *See Chappell*, 236 P.3d at 1190.

Under the Sixth Amendment, the accused has the right to notice "of the nature and cause of the accusation" against him. U.S. Const. amend. VI. Due process also ensures this right. *See Jackson v. Virginia,* 443 U.S. 307, 314 (1979); *Cole v. Arkansas,* 333 U.S. 196, 201 (1948); *In re Oliver,* 333 U.S. 257, 273 (1948). The Sixth Amendment right to notice extends to the states through the Fourteenth Amendment's due process clause. *Guatt v. Lewis*, 489 F.3d 993, 1003 (9th Cir. 2007) (citing *Cole*, 333 U.S. at 201). It also flows from due process alone. *See Cole*, 333 U.S. at 201. The Supreme Court, however, has never held that the Sixth Amendment Notice Clause, or due process, requires state court indictments to include alleged aggravating circumstances for a punishment, in this case, a death sentence, for an offense potentially punishable by a capital sentence. Accordingly, the state court's decision denying this claim was neither contrary to, nor involved an unreasonable application of, clearly established Supreme Court law, § 2254(d)(1), and was not based on an unreasonable determination of the facts in light of the evidence presented in the state courts, §2254(d)(2). Accordingly, the Court will deny relief on Claim 19.

## VI.   Claim 20

In Claim 20, Chappell argues that the "reasonable doubt" jury instruction denied him a fair jury trial under the Sixth Amendment and due process under the Fourteenth Amendment.[23] (Doc. 25 at 177–78.) Chappell alleges the reasonable doubt instruction "lowered the burden of proof" so that a juror only needed to be 'firmly convinced' of guilt'" and shifted the burden to Chappell to prove "there [was] a 'real possibility that he [was] not guilty.'" (*Id*. at 178.) Chappell also claims the instruction misinformed the jury that the State need not overcome *every* doubt. (Doc. 25 at 178.) He claims that although he raised

---

[23] Chappell only addresses the due process basis of this claim and abandons the Sixth Amendment portion. (*See* Doc. 25 at 177–78; Doc. 87 at 115–17.)

this claim on direct appeal, the Arizona Supreme Court did not deny it on the merits but merely listed it verbatim in the Appendix to its decision without discussion. (*Id*. at 177.) He contends the claim is not, therefore, subject to review under § 2254(d). (*Id*.) Chappell further alleges that to the extent this Court finds any aspect of the claim unexhausted, the ineffective assistance of appellate counsel excuses the default. (*Id*.)

Respondents contend that Chappell failed to fairly present this claim on direct appeal because he failed to support the claim with argument or citation to authority, rendering it procedurally defaulted. (Doc. 33 at 216.) To the extent the Court concludes otherwise, Respondents argue the claim fails on the merits. (*Id*. at 217–21.)

In its decision on direct appeal, the Arizona Supreme Court listed the claim in an Appendix of claims asserted "to avoid preclusion on federal review." *Chappell*, 236 P.2d at 1190, ¶ 61, n.11 & Appendix. The Arizona Supreme Court cited two of its previous decisions rejecting challenges to the same reasonable doubt instruction given at Chappell's trial, *State v. Portillo*, 898 P.2d 970, 974 (Ariz. 1995), and *State v. Ellison*, 140 P.3d 899, 929, 916, ¶¶ 63 & 145 (Ariz. 2006). In *Portillo*, the Arizona Supreme Court adopted the reasonable doubt instruction given at Chappell's trial, stating that the instruction was thereafter to be given in state criminal cases, and in *Ellison* it denied challenges to the *Portillo* instruction.

Chappell sufficiently presented this claim to the state court on direct appeal, and it is exhausted. Further, as discussed above, this Court must presume that the denial of a claim by the state courts is a denial on the merits unless a state court "clearly" did not reach the merits of the claim. *Pirtle*, 313 F.3d at 1167–68. The Arizona Supreme Court's inclusion of the claim in its Appendix, and citation of cases denying challenges to the same instruction, reflects that the claim was denied on the merits, and does not clearly support the contrary conclusion. Because the claim was denied on the merits, it is subject to review under § 2254(d).

At both the guilt and sentencing phases of trial, the court defined proof beyond a reasonable doubt as "proof that leaves you firmly convinced of a defendant's guilt." (R.T.

8/27/07 at 7–8 [guilt phase]; R.T. 8/30/07 at 9 [aggravation phase]) (emphasis added). Chappell alleges the reasonable doubt instruction "lowered the burden of proof to one where a juror need only be 'firmly convinced' of guilt'" and shifted the burden to Chappell to prove "there is a 'real possibility that he is not guilty.'" (Doc. 25 at 178.) Chappell also claims the instruction misinformed the jury that the State need not overcome every doubt. (*Id*.)

"The beyond a reasonable doubt standard is a requirement of due process, but the Constitution neither prohibits trial courts from defining reasonable doubt nor requires them to do so as a matter of course." *Victor v. Nebraska*, 511 U.S. 1, 5 (1994). So long as the jury is instructed that the defendant must be found guilty beyond a reasonable doubt, "the Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof. Rather, taken as a whole, the instructions must correctly convey the concept of reasonable doubt to the jury." *Id.*

The instruction provided by the trial court, which was consistent with Arizona law, *see Portillo*, 898 P.2d at 974, is based on the pattern instruction adopted by the Federal Judicial Center. *See State v. Van Adams*, 984 P.2d 16, 25–26 (Ariz. 1999). Chappell cites no controlling authority holding that the instruction impermissibly lowers the burden of proof, and, in *Victor*, Justice Ginsburg praised the instruction as "clear, straightforward, and accurate." 511 U.S. at 26 (Ginsburg, J., concurring). The Ninth Circuit has upheld identical or substantially similar instructions. *See, e.g.*, *United States v. Artero*, 121 F.3d 1256, 1257– 59 (9th Cir. 1997); *United States v. Velasquez*, 980 F.2d 1275 (9th Cir. 1992); *see also Harris v. Bowersox*, 184 F.3d 744, 751–52 (8th Cir. 1999). For the reasons discussed, the Court will deny Claim 20 because the Arizona Supreme Court's decision on direct appeal was neither contrary to nor an unreasonable application of clearly established federal law.

///

///

///

~ 57 ~

## VII.    CLAIM 29

In Claim 29, Chappell argues that the prescreening of the prospective jurors violated his right to counsel and his due process right to "an impartial jury selected from a fair cross-section of the community" under the Fifth, Sixth, and Fourteenth Amendments. (Doc. 25 at 203–04; Doc. 87 at 141–44.) Chappell asserts the claim is exhausted but that because the Arizona Supreme Court did not deny it on the merits, the claim is not subject to review under § 2254(d). (Doc. 25 at 203; Doc. 87 at 141–43.) Respondents argue the claim is procedurally defaulted, but even if it is not, the Arizona Supreme Court denied the claim on the merits and it is subject to review under § 2254(d), and relief should be denied. (Doc. 33 at 249–56.)

### A.    Additional Background

Chappell's trial was scheduled to take about three months; the jury commissioner was responsible for prescreening prospective jurors and excuse those claiming a hardship or inability to serve in a three-month trial. (ROA 215 at 1.) After prescreening, the remaining prospective jurors would proceed to their assigned courtroom, listen to the trial court's "preliminary statement," and complete a questionnaire. (*Id*. at 2.) Those who claimed an inability to serve as a juror in the expected three-month trial were required to complete a form explaining why and were excused or reassigned to a different trial by the jury commissioner. (*Id*. at 1–2; R.T. 6/19/07, p.m., at 1, 5.)

In April 2007, Chappell's counsel moved to attend the prescreening and review the forms. (R.O.A. 186 at 2.) Initially, the trial court agreed. (R.O.A. 215 at 1.) But it later reversed itself based on a jury commissioner policy, which barred attorneys from attending the prescreening. (R.O.A. 219, attach.) The court did allow counsel to review the forms giving reasons for seeking to be excused. (*Id*.) Defense counsel objected to not being allowed to be present during prescreening, which the court overruled. (R.O.A. 219; R.T. 6/1/07 at 8–10.)

The prescreening lasted five rounds. (*See* R.T. 6/19/07, 6/25/07, 6/26/07, 6/27/07, and 7/2/07.) After reviewing the forms following the first round, defense counsel asserted

that prospective jurors could be excused simply by submitting a form, which the jury commissioner did not review before excusing prospective jurors.[24] (R.T. 6/25/07 at 3–7.) The defense cited reasons provided on some of the forms to support its request that the court follow-up on the reasons given and retain the prospective jurors claiming hardship until the court and counsel reviewed their forms. (*Id*. at 6–8.) The court denied the request, stating that doing so "would paralyze the jury system" in Maricopa County. (*Id*. at 8.) Defense counsel objected, arguing that the court was denying their client due process by violating § 21-202 of the Arizona Revised Statutes.[25] (*Id*. at 10–11.) The court overruled the objection, citing *State v. Morris*, 160 P.3d 203, 212–14 (Ariz. 2007); *State v. Wooten*, 972 P.2d 993, 997–99 (Ariz. 1998); and *State v. Atwood*, 832 P.2d 593, 639–40 (Ariz. 1992), all of which had upheld the prescreening procedure without the review procedure that counsel had requested. (*Id*. at 11–12.)

Chappell filed a notice of continuing objection to the prescreening process as violating his rights to due process, equal protection, a fair and impartial jury, a full appeal, and against cruel and unusual punishment. (R.O.A. 252 at 4–6.) The court found Chappell's objection preserved (R.T. 7/2/07 at 17–18), before commencing voir dire of the unexcused prospective jurors, with counsel, and then empaneling a jury (*see*, *e.g.*, R.T. 7/9/07, a.m. and p.m.).

---

[24] The court also had not reviewed the forms. (*See* R.T. 6/19/07 at 12.)

[25] Arizona Revised Statute section 21-202(B) (2005) provided that a prospective juror could be excused from serving as a juror if the judge or jury commissioner found the prospective juror had a mental or physical condition causing the prospective juror to be incapable of performing juror duty, with supporting documentation; jury service would substantially and materially affect the public interest or welfare in an adverse manner; the prospective juror was currently incapable of understanding the English language; jury service would cause undue or extreme physical or financial hardship to the prospective juror or to a person under the prospective juror's supervision; the prospective juror is a peace officer employed by the State or any political subdivision of the State, who applies to be excused; and for good cause based upon a showing of undue or extreme hardship under the circumstances, including being temporarily absent from the jurisdiction or a lack of transportation.

On direct appeal, while acknowledging the holding in *Morris*, 160 P.2d at 213, n.2, Chappell claimed that the prescreening process violated due process under the Fifth and Fourteenth Amendments and asked the Arizona Supreme Court to reconsider *Morris*. (O.B. at 140.) The Arizona Supreme Court listed the claim verbatim in an appendix of issues raised to avoid preclusion on federal review and specifically cited *Morris* as to the claim. *Chappell*, 236 P.3d at 1190, ¶ 61.

### B.    Exhaustion and Procedural Default

In his habeas claim, Chappell asserts a violation of his Fifth, Sixth, and Fourteenth Amendment rights based on the prescreening process. (Doc. 25 at 203–04.) Respondents claim that Chappell failed to fairly present his habeas claim because he failed to offer specific legal or factual arguments to support the claim in state court, rendering it procedurally defaulted. (Doc. 33 at 250.)

On direct appeal, Chappell claimed that "[a]llowing the jury commissioner to 'time screen' jurors over defense objection," and absent the presence of counsel, violated Chappell's Fifth and Fourteenth Amendment due process rights. (O.B. at 139−40.) Chappell fairly presented the due process aspect of his habeas claim to the state courts, and this Court rejects Respondents' contention that he did not, where the record is clear that Chappell raised that portion of his habeas claim in state court. Chappell did not, however, assert a Sixth Amendment violation in state court based on the prescreening process, and he may not do so now. This portion of Claim 29 was not properly exhausted and is now procedurally defaulted.

Chappell asserts that the ineffective assistance of appellate counsel in failing to raise the Sixth Amendment portion of this claim, and the ineffective assistance of PCR counsel in failing to raise the ineffective assistance of appellate counsel on PCR, constitutes cause and prejudice under *Martinez* to excuse the procedural default of the Sixth Amendment portion of this claim. (Doc. 87 at 143.) Because Claim 29 is not an IATC claim, the procedural default of the Sixth Amendment portion of Claim 29 cannot be excused under *Martinez*. *See Davila*, 582 U.S. at 529-31; *see also Bejarano*, 136 F.4th at 899 n.9.

The Sixth Amendment portion of Claim 29 will be denied as procedurally defaulted.

### C.    Merits

Chappell argues that although he presented the remainder of his habeas claim to the Arizona Supreme Court, it did not deny the claim on the merits but merely listed the exhausted portion of the claim as one raised to avoid preclusion on federal review, without addressing the merits, *see Chappell*, 236 P.2d at 1190, ¶ 61, n.11, and Appendix. He claims this portion of Claim 29 is therefore not subject to review under § 2254. (Doc. 87 at 143–44.)

The Arizona Supreme Court denied relief on the exhausted portion of Claim 29 based on its decision in *Morris*, 160 P.3d at 213, *supra.* at n.2, which it expressly cited. The Court concludes that the denial of this portion of Claim 29 was a denial on the merits, rendering it subject to review under § 2254(d). Chappell's request for evidentiary development in support of this claim to establish exhaustion will be denied as moot.

The Arizona Supreme Court's denial of the exhausted portion of Claim 29 was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. Chappell has not cited any United States Supreme Court decision holding that the absence of counsel from prescreening of prospective jurors concerning availability to serve on a long trial violates any constitutional right, and this Court has found none. Accordingly, the Arizona Supreme Court's denial of the exhausted portion of Claim 29 was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. Relief under § 2254(d)(1) will be denied.

Chappell also fails to show that the Arizona Supreme Court's decision was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. There is nothing in the record to support that any distinctive group was excluded or excused from the jury panel for any reason unrelated to unavailability, or that the jury was not fair and impartial. *See United States v. Moreland*, 703 F.3d 976, 982 (7th Cir. 2012) (citing *Berghuis v. Smith*, 559 U.S. 314, 320 (2010); *Duren*, 439 U.S. at 364–66; *United States v. Neighbors*, 590 F.3d 485, 492 (7th Cir. 2009)) (rejecting complaint

that the judge, before *voir dire*, excused prospective jurors based on hardship, "without some evidence of *systematic* exclusion of some definable element of society," e.g., "a racial or ethnic group" or "a group defined by income or social class") (emphasis in original).

Further, nothing in the record reflects that prospective jurors were provided any information about the type of trial, civil or criminal, or anything about Chappell, his case, the crimes charged, or any possible sentence. (R.O.A. 215.) At most, prospective jurors learned that a trial—without providing information about the type of trial or the parties— would last three months and the trial dates. (*Id*. at 1.) The only issue before prospective jurors was their availability to serve as a juror in a lengthy trial, and if they were unavailable to serve, they had to provide a written explanation regarding their unavailability. (*Id*. at 1– 2.) Chappell fails to point to anything to support that prescreening of prospective jurors regarding their availability to serve on a lengthy trial, in any way affected the impartiality of prospective jurors.

For the reasons discussed, the Court will deny Claim 29.

## VIII. Claim 30

In Claim 30, Chappell argues that at the time of his prosecution, Maricopa County Attorney Andrew Thomas was engaged in a criminal conspiracy against the Maricopa County Superior Court and its judges, which was sufficient to deny Chappell an impartial trial judge in violation of Chappell's Fifth, Sixth, Eighth, and Fourteenth Amendment rights. (Doc. 25 at 205–11.) Chappell asserts that Thomas engaged in intimidation against some judges, by filing spurious RICO charges against them, which he asserts affected the entire Maricopa County Superior Court bench.[26] (*Id*. at 207–10.) Chappell acknowledges

---

[26] He argues the lack of an impartial judge constituted structural error, and that he does not have to show that he was prejudiced by the alleged intimidation or that he is innocent of the crimes of conviction. (Doc. 25 at 211, citing *United States v. Marcus*, 560 U.S. 258, 263 (2010), and *Tumey v. Ohio*, 273 U.S. 510 (1927)). Chappell points to nothing in the record of either Thomas' disbarment proceedings or Chappell's trial to even arguably support that his trial judge had been subject to or affected by Thomas' misconduct towards other Superior Court judges.

that he did not raise this claim in state court on direct appeal or PCR and that it is procedurally defaulted. (*Id*. at 205.). He argues in part that some of the factual bases of this claim could not have been presented in state court at relevant times because they had not yet become a matter of public record and that the ineffective assistance of appellate and PCR counsel excuses the procedural default of this claim. (*Id*.) Chappell seeks evidentiary development in support of this claim and to show cause to excuse his procedural default.[27] (Doc. 105 at 49–50.) Respondents argue the claim is procedurally defaulted and that Chappell has not shown cause and prejudice to excuse the default. (Doc. 33 at 257–59.) They argue the claim also fails on the merits. (*Id*. at 259–62.)

As described herein, this Court may not consider non-record evidence in support of a procedurally defaulted claim unless the Chappell satisfies 28 U.S.C. § 2254(e)(2). *Ramirez,* 596 U.S. at 381 (emphasis added). Claim 30 does not rely on a new rule of constitutional law made retroactive to cases on collateral review that was previously unavailable, and as discussed below, it does not rely on a factual predicate that could not have been discovered previously through the exercise of due diligence. 28 U.S.C. § 2254(e)(2). Nor do the facts underlying the claim establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the [petitioner] guilty of the underlying offense." 28 U.S.C. § 2254(e)(2). Thus, under *Ramirez*, the Court may not consider non-record evidence to establish cause to excuse the procedural default. 596 U.S. at 381. Chappell's request for evidentiary development as to Claim 30 will be denied.

Claim 30 is procedurally defaulted. Chappell claims the ineffective assistance of appellate counsel excuses the default. However, appellate ineffective assistance can only establish cause to excuse a procedural default if it was first exhausted in state court as an independent constitutional claim. *See Edwards*, 529 U.S. at 453; *Murray v. Carrier*, 477

---

[27] He seeks to depose the trial judge, an expansion of the record to include the opinion and order imposing sanctions on Thomas, and news articles about Thomas's alleged conspiracy against Maricopa County officials.

U.S. 478, 489–90 (1986). Chappell did not raise a claim of appellate ineffective assistance based on appellate counsel's failure to raise the underlying claim. Chappell also asserts that the ineffective assistance of PCR counsel establishes cause under *Martinez* but as discussed herein, cause under *Martinez* can only excuse the default of IATC claims. *See Hunton*, 732 F.3d at 1126–27; *see also Martinez (Ernesto)*, 926 F.3d at 1225; *Pizzuto*, 783 F.3d at 1177. Accordingly, Chappell fails to establish cause and prejudice to excuse the procedural default of this claim.

Chappell also asserts that he lacked a factual basis to raise this claim because Thomas's alleged intimidation of Superior Court judges was not then a matter of public record. (Doc. 25 at 205.) Respondents note that Thomas was disbarred on April 10, 2012, six months before Chappell filed his initial PCR petition, which he amended a month later, and more than 15 months after Thomas's disbarment. (Doc. 33 at 258.) Chappell has not alleged or shown that he could not have raised this claim in his PCR proceedings, or that facts to support this claim could not have been presented in PCR proceedings. Claim 30 will be denied.

## SENTENCING PHASE CLAIMS

### IX.    Claim 2(B)

In Claim 2(B), Chappell alleges that defense counsel rendered ineffective assistance by failing to retain an independent pathologist to assist in preparing a defense to the cruelty aggravating circumstance under A.R.S. § 13-703(F)(6) (West 2007). Chappell raised this claim in his PCR petition and in his subsequent petition for review. (Doc. 42-3 at 7–14, Ex. WWW; Doc. 70-2 at 3, Ex. OOOOO; Doc. 72-6, at 2, Ex. KKKKKK.) The PCR court denied the claim as to both *Strickland* prongs adopting the State's position on the claim. (Doc. 70-2 at 3, Ex. OOOOO.) The State argued that Chappell had not overcome *Strickland's* presumption that counsel had acted reasonably in declining to present testimony from an independent pathologist and that the jury still would have found the cruelty aggravating circumstance even if Chappell had presented such evidence. (Doc. 56, Ex. RRRR at 23–33.) Claim 2(B) is exhausted and subject to review under § 2254(d).

### A. Additional Background

At the guilt phase, Medical Examiner opined that Devon died from drowning as a result of homicide. (R.T. 8/13/07 at 63.) He described that Devon's lungs had hemorrhaged as a result of rapid expansion when Deven inhaled water. (*Id.* at 58–59.) He described Devon's airway and nostrils as being filled with foam. (*Id.* at 59–60.) Dr. Hu opined that a drowning person would remain conscious from 30 seconds to two minutes and would die four or five minutes after losing consciousness. (*Id.* at 62.) At the aggravation phase, Dr. Hu testified that Devon had attempted to breathe underwater and repeated that he would have remained conscious for at least 30 seconds and up to two minutes. (R.T. 8/30/07 at 19–20, 27.) He testified that the lung hemorrhaging reflected that Devon had inhaled a large amount of water quickly and that the foam in his airway formed when the inhaled water mixed with air and protein from the blood in the lungs. (*Id.* at 19, 21–26.) Dr. Hu also testified about a pretrial interview with defense counsel in which he opined that a drowning victim's experience is horrifying because of the inability to breathe, and that it would have been a 10 on a scale of 1 to 10. (*Id.* at 23.)

Defense counsel cross-examined Dr. Hu to clarify that Devon's physical pain a drowning victim experiences was the pain of not being able to breathe. (*Id.* at 30–31.) She questioned Dr. Hu regarding whether a two-year old child would realize that his death was imminent, to which Dr. Hu responded that the question was outside his experience but opined that Devon would have had the instinct to breathe regardless of whether he knew he was about to die. (*Id.* at 31–32.) Defense counsel also questioned Dr. Hu about the absence of bruises or other significant external injuries. (*Id.*) Dr. Hu clarified on redirect that Devon would understand that he was being denied air and would instinctively try to breathe. (*Id.* at 35–36.)

To further support the cruelty factor, the State highlighted guilt-phase testimony of first responders about the amount of foam and water that escaped from Devon's lungs when they attempted CPR, as well as other circumstances of the offense. (*Id.* at 13–17, 49, 50–51.) The State also noted the December 2003 choking incident, during which Devon

experienced having air restricted due to Chappell's actions. (*Id.* 15, 50, 59.) The State also relied on Chappell's own admission that Devon had struggled for his life, and had looked Chappell in the eye as Chappell drowned him. (*Id.* at 15–17, 51, 60.)

In closing argument, defense counsel focused on the absence of evidence to support that Devon knew, when Chappell took him from his apartment, that he was going to his death, and suggested that because of his age he would not have known that he was about to die while being held underwater. (*Id.* at 55–56.) The jury found all three alleged aggravating circumstances in less than 30 minutes. (*Id*. at 64–65.)

Chappell claims that his trial counsel ineffectively assisted him by not hiring an expert to help prepare a defense against especial cruelty. (Doc. 25 at 87-93.) He raised this claim on PCR, which the PCR court denied; he then raised the claim in the Arizona Supreme Court, in which the Arizona Supreme Court denied review. (Doc. 42-3 at 7–14, Ex. WWW; Doc. 70-2 at 3, Ex. OOOOO; Doc. 72-6, Ex. KKKKKK.)

### B.   Merits

As discussed above, this claim was exhausted on PCR and was denied on the merits. Chappell contends that the state court's denial of this claim was contrary to and involved an unreasonable application of clearly established federal law because the PCR court determined that Chappell had not established either *Strickland* prong by a preponderance of the evidence because neither *Strickland*, nor *Williams*, which explicitly rejected the preponderance of the evidence standard to establish the unreliability of a criminal proceeding due to trial counsel's ineffectiveness. (Doc. 87 at 53.) He argues the PCR court unreasonably applied *Strickland* by determining that he had failed to show that "any counsel's performance was deficient under prevailing processional [sic] standards or that he suffered prejudice," without making independent factual findings, or holding an evidentiary hearing, and adopting the State's position. (Doc. 87 at 53–54, quoting PCR Doc. 157 at 3; PR Doc. 14.) Chappell argues that the PCR court erred in dismissing his ineffectiveness claim where defense counsel failed to rebut the State's evidence of aggravation. (Doc. 87 at 54.) He argues that the PCR court failed to consider "all the

~ 66 ~

circumstances" by crediting the State's assertion that defense counsel's decision not to present expert medical evidence during the aggravation phase was strategic and that drowning was undisputedly an "an inherently painful death, both mentally and physically, rather than holding an evidentiary hearing to resolve the parties' conflicting accounts of what happened. (Doc. 87 at 54; PCR R.O.A. 122 at 28.)

Chappell also contends the state courts unreasonably applied *Strickland* by determining that defense counsel had not performed deficiently by failing to investigate and present expert medical evidence in opposition to the State's aggravation case, claiming that Respondents' argument that the decision was strategic was unpersuasive. (Doc. 87 at 54.) He asserts that defense counsel had an obligation to investigate and rebut aggravating circumstances with evidence of their own. (*Id.* at 55.) He claims that whether drowning was painful for the victim was a disputed issue of fact to be decided by the jury. (*Id.*) He contends that had defense counsel consulted with and presented testimony of an expert medical examiner, they would have been prepared to effectively cross-examine Dr. Hu, and to object to his characterization that drowning was horrifying and a 10 on a scale of one to 10. (*Id.*) He contends that an expert medical examiner could have emphasized that defense counsel should focus on when the victim likely lost consciousness, factors affecting the timing of when he lost consciousness, and that the testimony of such expert would not have left the jury with only Dr. Hu's testimony to consider. (*Id.*) Chappell argues that had defense counsel presented such evidence, there was a reasonable probability that the jury would not have found the (F)(6) factor, which would have affected the balance of aggravating and mitigating evidence at the penalty phase. (*Id.* at 55–56.)

The Arizona Supreme Court has characterized the especially cruel aggravating circumstance as concerning the suffering of the victim, *see State v. Murray*, 906 P.2d 542, 570 (Ariz. 1995), physically or mentally, *State v. Martinez*, 189 P.3d 348, 363 (Ariz. 2008). Indeed, it "focuses on the victim's state of mind," *Tucker*, 160 P.3d at 200, throughout "the entire murder transaction and not simply the final act that killed the victim," *State v. Ellison*, 140 P.3d 889, 925 (Ariz. 2006). To be found especially cruel, the defendant must

have known "or should have known that the victim would experience mental anguish or physical pain, and that the victim was conscious during some part of the violence." *Id*. The victim's anguish alone is sufficient to support a finding of especially cruelty. *Id*.

At trial, defense counsel argued that Devon quickly lost consciousness after entering the pool and that, at the age of two, he could not have anticipated his impending death. (R.T. 8/30/07 at 55–56.) Chappell confessed to have forcibly drowned two-year-old Devon and that Devon struggled for his life under water. (Doc. 120-1, Exs. 142 and 150.) Medical examiner, Dr. Hu opined at trial that "not being able to breath[e]" is "a horrifying experience" and a 10 on a scale of 1 to 10. (R.T. 8/30/07 at 23, 30.) Based on this evidence, counsel could have reasonably made a tactical decision not to focus more attention on the details of Devon's death, which could have alienated jurors without persuading them that Devon had not suffered anguish and possibly lose credibility for the defense. *See Gore v. Dugger*, 763 F. Supp. 1110, 1130 (M.D. Fla. 1989) (maintaining credibility before a jury was a reasonable strategic decision).

This Court will not second-guess that decision. Because the state-court record indicates that Chappell's counsel did not perform deficiently, Claim 2(B) will be denied.

**X.      Claim 2(C)**

In Claim 2(C)(1), Chappell alleges that trial counsel insufficiently investigated, developed, and presented neurological evidence that he had brain damage. (Doc. 25 at 93-105.) Chappell concedes that he did not present this claim to the state courts but asserts that it is newly discovered. (*Id*. at 93; Doc. 42-3 at 36–38, Ex. WWW.) During his PCR case, Chappell underwent an MRI and Pet Scan, on which Dr. Wu saw "abnormalities" and determined that "[t]hese findings corroborate[d] the presence of a damaged brain most likely due to head trauma and not substance abuse" and "ma[de Chappell] more vulnerable to have impaired ability to regulate impulses including use of substances [citation omitted] and more likely to develop organic personality disorders [citation omitted], organic psychosis [citation omitted,] and organic mood disorders [citation omitted,] including manic-psychotic reactions to antidepressants." (Doc. 42-3, Ex. WWW, Attach. U). Dr. Wu

~ 68 ~

added that "[t]he impaired ability [to] regulate substance abuse as a result of head trauma also ma[de it] more likely that he w[ould] develop additional complications such as psychosis and mood disorders." (*Id.*) On PCR, based on Dr. Wu's findings, Chappell argued that "[b]ecause evidence of his brain injury provides an explanation for [his] 'impaired ability to regulate impulses[,]' such evidence, had it been combined with evidence of [his] impulsivity, would have made a difference in the outcome of the" penalty phase. (Doc. 42-3 at 37–38, Ex. WWW.)

In response, the State asked the PCR court to reject that evidence and to construe the claim as a claim of ineffective assistance of counsel. (Doc. 56-6 at 73.) The State argued that Dr. Wu's evidence would not have resulted in a life sentence because the MRI and PET scans "in [Chappell's] context" lacked credibility as not generally accepted in the field of psychology to determine personality or mental disorders. (*Id.* at 72.) The State also asserted that Chappell's retained physician opined that he "did *not* suffer from brain damage." (emphasis in original) (*Id.*, citing Ex. R.) Last, the State stressed that Chappell's brain damage that impaired his decision-making ability, would be "minimally mitigating" because Devon's "murder was calculated, premeditated, and well-planned." (*Id.* at 72–73.)

In denying postconviction relief based on the State's arguments, the court noted that Chappell had claimed that his trial counsel did not "investigate and adequately present mental health evidence as mitigation." (Doc. 70-2 at 2–3, Ex. OOOOO.) Chappell did not ask the Arizona Supreme Court to review the denial (*see* Doc. 72-3, Ex. HHHHHH). In other words, with respect to Claim 2(C)(1), he did not—and can no longer—complete a round of appellate review. Claim 2(C)(1) is thus technically exhausted but procedurally defaulted. Chappell asks this Court to excuse the default because of cause and prejudice under *Martinez*. (Doc. 25 at 93.)

Assuming, without deciding, that Chappell's trial counsel should have further investigated Chappell's potential brain damage, Chappell did not suffer prejudice based on the state-court record. Dr. Wu determined that Chappell's MRI and PET scans showed brain abnormalities that would impair Chappell's "ability to regulate impulses." (Doc. 42-

~ 69 ~

3, Ex. WWW, Attach. U). But the trial evidence shows that Chappell did not murder Devon impulsively. The murder was preplanned, strategic, deliberate, and ultimately premeditated. Therefore, evidence of brain damage would have provided minimal mitigating weight, *cf. State v. Prince*, 250 P.3d 1145, 1171, ¶ 113 (Ariz. 2011) (citing *Armstrong*, 189 P.3d 378, 392 (Ariz. 2008)) ("Absent a causal nexus to the crime . . . [the Arizona Supreme Court will] usually give [defendant's poor mental health] little weight."), and thus a reasonable probability does not exist that the jury would not have sentenced Chappell to death—especially in light of the three found aggravating circumstances.

Claim 2(C)(1) will be denied based on the state-court record.

In Claim 2(C)(2), Chappell alleges that defense counsel rendered ineffective assistance by insufficiently investigating and refuting evidence suggesting that Chappell had broken Devon's leg shortly before the choking incident. (Doc. 25 at 105–13.) This specific claim is procedurally defaulted, as the record shows that Chappell did not raise it in state court. *See Casey*, 386 F.3d at 913; *cf. Schneider v. McDaniel*, 674 F.3d 1144, 1152 (9th Cir. 2012) (holding that a later-raised IAC claim for failing to raise one defense does not relate back to an earlier-raised IAC claim for failing to raise a different defense). Chappell, however, argues that the ineffective assistance of PCR counsel by failing to raise the IATC claim excuses the default. (Doc. 25 at 106; Doc. 87 at 62–63.) This argument lacks merit, as the record does not show that his trial counsel performed deficiently.

About a week before the December 2003 choking incident, Devon suffered a broken leg, specifically a spiral fracture while being cared for by Chappell. Defense counsel unsuccessfully sought to exclude evidence of Devon's broken leg. *See Chappell*, 236 P.3d at 1186–87. A teacher at Devon's preschool testified that she saw Chappell carry Devon into the school, place him on a toilet, before leaving. (R.T. 10/22/07 at 74–80, 83.) When the teacher checked on Devon in the bathroom, she saw him standing next to the toilet and pulling up his pants. (*Id*. at 81–82.) But when Devon tried to walk to her, he "couldn't put any weight on his leg" and began "whimpering." (*Id*. at 82–84.) The teacher also saw a bruise on Devon's cheek. (*Id*. at 88.) When Chappell returned to the preschool, the teacher

told him about Devon's injured leg. (*Id*. at 84–86.) Devon could not explain how his leg was injured; Chappell said that Devon had fallen from the toilet, which the teacher doubted because she had not heard him cry in the bathroom. (*Id*. at 85, 101.) Dr. Greyer, who reviewed hospital records concerning Devon's broken leg, also testified. (R.T. 10/18/07 at 48–51.) She testified that Devon had a spiral fracture, which required a "rotational or twisting motion." (*Id*. at 53.) She also testified that Devon's treating physician had seen Devon's facial bruises. (*Id*. at 54.) Dr. Greyer found Chappell's explanation for Devon's broken leg "improbable" because a spiral facture would have been very painful would have likely caused Devon to make "some kind of outburst." (*Id*. at 57–60.) She expressed concern about "repetitive inflicted injury" based upon Devon's multiple injuries while in Chappell's care. (*Id*. at 57–60, 64, 67.)

Defense counsel presented evidence tending to refute that Chappell had broken Devon's leg. Chappell's father testified that Devon had not been limping when Chappell left home to drop him off at the preschool, and Chappell's mother testified that she had seen a bruise on Devon's face a day before he broke his leg. (R.T. 10/17/07, at 112–13; R.T. 10/18/07, at 35–47.) In addition, Chappell had told a detective that he might have accidentally fractured Devon's leg on the way to the preschool when he slid back his own car seat and hit Devon, who sat behind him. (Doc. 120, Tr. Ex. 329 at 33–36.)

Defense counsel, moreover, challenged Kristal's credibility as to her statements that Chappell had broken Devon's leg. (*See, e.g.*, R.T. 10/03/07 at 101−22, testimony that Kristal had stated that Devon was a problem for her relationship with Chappell, suggesting that Kristal was involved in the Devon's murder); R.T. 10/09/07, at 92−115, Kristal's alleged prior neglect of the victim; R.T. 10/10/07 at 77, detective labeled Kristal an investigative lead in the murder investigation because she had lied to detectives many times during the investigation; R.T. 10/24/07 at 58, 112, 136−37, admission by Kristal that she had given Devon "a hard, hard whipping" and that she had placed a pillow over the toddler's face to make him stop crying at night; R.T. 10/29/07 at 135–55, attacking Kristal's character and credibility during rebuttal closing argument to support that jurors

~ 71 ~

should not believe Kristal's accusations against Chappell).

Defense counsel could have reasonably concluded that expert evidence about how Devon suffered a spiral fracture was unlikely to benefit Chappell. Evidence corroborated Kristal's statements to that effect. *See Petty*, 982 F.2d at 1369 (citing cases) (holding that although *Wright*, 497 U.S. 805, bars the use of "extrinsic corroborating evidence to establish the reliability of hearsay at trial, it does not preclude the use of such evidence to [do so] at sentencing"). A teacher at Devon's preschool testified that she saw Chappell carry Devon into the school, place him on a toilet, and then left him in her care. (R.T. 10/22/07 at 74-80, 83.) She checked on Devon in the bathroom and saw him standing next to the toilet and pull up his pants. (*Id*. at 81-82.) Although he tried to walk to her but "couldn't put any weight on his leg" and began "whimpering." (*Id*. at 82–84.) The teacher also observed a bruise on Devon's cheek. (*Id*. at 88.) When Chappell returned, the teacher told him about Devon's injured leg. (*Id*. at 84–86.) Devon could not explain how he had injured it, and Chappell said that he had fallen from the toilet. (*Id*. at 85, 101.) The teacher doubted that Devon had done so, as she did not hear him cry in the bathroom. (*Id*. at 101.)

Dr. Greyer, who reviewed Devon's hospital records of his broken leg, also testified. (R.T. 10/18/07 at 48–51.) The doctor defined Devon's leg injury as a spiral fracture, which required a "rotational or twisting motion." (*Id*. at 53.) She also testified that Devon's treating physician saw Devon's facial bruises. (*Id*. at 54.) Dr. Greyer also found Chappell's explanation for the broken leg "improbable" because the spiral facture would have caused Devon much pain and thus would have likely made "some kind of outburst." (*Id*. at 57–60.) She felt concerned about "repetitive inflicted injury" because Devon had suffered multiple unexplained injuries in Chappell's care. (*Id*. at 57–60, 64, 67.)

Even more, Chappell told the detective that he could have accidentally fractured it by sliding back his own car seat and hitting Devon who sat behind him. (Ex. 329 at 33–36.) Chappell's father also testified that Devon was not limping when Chappell left home to drop him off at day care, and Chappell's mother testified that she saw a bruise on Devon's face a day earlier. (R.T. 10/17/07, at 112–13; R.T. 10/18/07, at 35–47.)

~ 72 ~

Further, counsel could have reasonably made a strategic choice not to attempt to refute Dr. Geyer's testimony about the cause of Devon's spiral fracture and to focus on mitigation. *See United States v. Appoloney*, 761 F.2d 520, 525 (9th Cir. 1985) (quoting *Strickland*, 466 U.S. at 689) (recognizing that "courts are admonished not to 'second-guess' trial strategy"). Chappell fails to establish that PCR counsel's failure to raise the underlying IATC claim is not sufficient to establish cause for the procedural default of that claim.

Claim 2(C)(2) will be denied based on the state-court record.

## XI.    Claim 4(A)

In Claim 4(A), Chappell argues that appellate counsel rendered ineffective assistance by failing to challenge the denial of his motion to withdraw a proposed "uncharged co-conspirator" mitigating circumstance. (Doc. 25 at 119–22.) The denial, he claims, prejudiced him because the admission of Kristal's "unreliable" emails "portray[ed him] as a serial child abuser . . . ." (*Id.* at 122; Doc. 87 at 73.)

### A.    Additional Background

At the penalty phase, Chappell planned to allege as a mitigating circumstance that Kristal was an "uncharged co-perpetrator," and the trial court said that it would then admit Kristal's emails. (ROA 412 at 5–6.) In response, Chappell asked the court if it would remove the emails from evidence if he withdrew his uncharged co-perpetrator mitigating circumstance. (R.T. 9/24/07 at 47.) The court refused because Chappell had raised an uncharged co-perpetrator as a defense at the guilt phase. (*Id.* at 47, 82–83; *see also* R.T. 8/27/07 at 61–78, 85, 91–92, 97–100, 105–11.)

On PCR, Chappell alleged appellate IAC based on appellate counsel's failure to challenge the denial of his motion to withdraw the proposed "uncharged co-conspirator" mitigating circumstance. (Doc. 42-3 at 51–54, Ex. WWW.) He argued that "[t]he sole defense employed by defense counsel at trial regarding [the first-degree murder charge] was that Kristal Shackleford either killed Devon . . . or was somehow involved with Devon's death." (*Id.* at 52.) "Because the jury convicted [him] of Devon's murder, it seems clear that they rejected this defense." (*Id.*) He claimed that by "[n]ot allowing [him] to

withdraw virtually the same defense as the jury had rejected at trial," it would appear to the jury as a strategy aimed at antagonizing them and argued the trial court should have allowed him to withdraw the "'uncharged co-perpetrator' mitigating factor." (*Id*.) Chappell also claimed that the denial of his motion violated his "Fifth Amendment right to due process," and that appellate counsel rendered ineffective assistance by failing to raise the Fifth Amendment claim on direct appeal. (*Id*.)

In response, the State argued that Chappell's appellate counsel had not performed ineffectively because the defense had no right to have the trial court instruct the jury about any specific mitigating circumstance. (Doc. 56-6 at 69–70, Ex. RRRR.) The State further noted that the jury could consider, and the State could rebut, an "uncharged co-perpetrator" mitigating circumstance where the jury had heard evidence of the theory at the guilt phase. (*Id*. at 70.) In reply, Chappell argued that withdrawal of an uncharged co-perpetrator mitigating circumstance would have allowed the jurors to consider the evidence of the uncharged co-perpetrator circumstance but without "antagoniz[ing]" them about it. (Doc. 69-5 at 64–65, Ex. IIIII.)

The PCR court denied Chappell's claim, adopting the State's response, and the Arizona Supreme Court denied review. (Doc. 70-2, Ex. OOOOO at 2; Doc. 72-3 at 19–20, Ex. HHHHHH; Doc. 72-4 at 8-9, 18–19, Ex. IIIIII; Doc. 72-5, Ex. JJJJJJ; Doc. 72-6, Ex. KKKKKK.) Chappell argues that the PCR court's decision was contrary to, or an unreasonable application of, clearly established federal law, and an unreasonable application to the facts. (Doc. 25 at 120–22.) Moreover, he asserts, for the first time, that the denial of his motion to withdraw prejudiced him by admitting Kristal's emails, which he claims were unreliable. (*Id*. at 122; Doc. 87 at 73.) The state-court record belies these assertions.

///

///

///

///

~ 74 ~

## B.    Discussion

The Eighth and Fourteenth Amendments require a sentencer to consider certain mitigating circumstances: "[T]he sentencer, in all but the rarest kind of capital case, [must] not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett*, 438 U.S. at 604 (1978). The Eighth Amendment, as held by the United States Supreme Court, bars a court from precluding juries from considering and giving effect to "'any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.'" *Eddings*, 455 U.S. at 110 (quoting *Lockett*, 438 U.S. at 604); *Penry v. Johnson*, 532 U.S. 782, 797 (2001) (citing *Penry*, 492 U.S. at 319).

The United States Supreme Court's "consistent concern has been that restrictions on the jury's sentencing determination not preclude the jury from being able to give effect to mitigating evidence," *Buchanan v. Angelone*, 522 U.S. 269, 276 (1998), and has never "held that the state must affirmatively structure in a particular way the manner in which juries consider mitigating evidence," *id*. at 276–77 (citing *Tuilaepa v. California*, 512 U.S. 967, 978–79 (1994); *Stephens*, 462 U.S. at 875). At the trial's penalty phase "the state is not confined to submitting specific propositional questions to the jury and may indeed allow the jury unbridled discretion." *Tuilaepa*, 512 U.S. at 978–79; *see also Stephens*, 462 U.S. at 875 (rejecting argument that a scheme permitting a "jury to exercise unbridled discretion in determining whether" to impose a death sentence "after it has found" the defendant eligible for such a sentence is unconstitutional, noting that accepting the argument would require the overruling of *Gregg*). The Court has, in fact, "emphasized the need for a broad inquiry into all relevant mitigating evidence to allow an individualized determination" of whether a defendant should be sentenced to death. *Buchanan*, 522 U.S. at 276.

The trial court did not err in denying Chappell's motion to withdraw an "uncharged co-perpetrator" theory as mitigation where the jury had already heard evidence of Kristal's

~ 75 ~

alleged involvement in Devon's death at the guilt phase. (*See* R.T. 8/27/07 at 61–78, 85, 91–92, 97–100, 105–11.) At the penalty phase, the jury had unbridled discretion to consider, and give effect to, that evidence as mitigation at the penalty phase. Further, the jury was instructed that it could consider evidence from the guilt phase (R.T. 10/25/07 at 8), which Chappell did not challenge.

Chappell misreads *Lockett* as permitting him to prevent a jury from considering admitted evidence as mitigation. In terms of such evidence, the United States Supreme Court has produced a rule of inclusion—not exclusion of mitigation evidence. *See Buchanan*, 522 U.S. at 276. And *Lockett* does not provide that a defendant may bar a jury from considering guilt-phase evidence as mitigation. Chappell's reading of *Lockett* is contrary to cases applying it. *See id.* For these reasons, the trial court's denial of the motion was not contrary to or an unreasonable application of clearly established federal law, and its decision did not involve an unreasonable determination of fact.

Chappell's appellate attorney did not perform deficiently or prejudice Chappell by failing to raise the trial court's denial of the motion as a violation of due process. *See Moormann v. Ryan*, 628 F.3d 1102, 1107 (9th Cir. 2010) ("If trial counsel's performance was not objectively unreasonable or did not prejudice [petitioner], then appellate counsel did not act unreasonably in failing to raise a meritless claim of ineffective assistance of counsel, and [petitioner] was not prejudiced by appellate counsel's omission."); *Turner v. Calderon*, 281 F.3d 851, 872 (9th Cir. 2002) ("A failure to raise untenable issues on appeal does not fall below the *Strickland* standard."); *Wildman v. Johnson*, 261 F.3d 832, 840 (9th Cir. 2001) ("[A]ppellate counsel's failure to raise issues on direct appeal does not constitute ineffective assistance when appeal would not have provided grounds for reversal."); *Boag v. Raines*, 769 F.2d 1341, 1344 (9th Cir. 1985) ("Failure to raise a meritless argument does not constitute ineffective assistance."); *cf. Pollard v. White*, 119 F.3d 1430, 1435 (9th Cir. 1997) ("A hallmark of effective appellate counsel is the ability to weed out claims that have no likelihood of success, instead of throwing in a kitchen sink full of arguments with the hope that some argument will persuade the court."). The Court

also rejects Chappell's challenge to the admission of Kristal's emails at the penalty phase as unreliable, for the reasons discussed in connection with Claims 5 and 6, Claim 4(A) will be denied.

## XII.   Claims 5 and 6

In Claim 5, Chappell alleges that his death sentence was based on unreliable statements and an unsworn declaration in violation of the Confrontation Clause, which was raised and denied on direct appeal. (Doc. 25 at 123–29.) Specifically, he alleges that Kristal's out-of-court statements were improperly admitted as rebuttal to his mitigation evidence.[28] (*Id.*) He contends the admission of the statements was an unreasonable application of clearly established federal law. (*Id.*) In Claim 6, he alleges that the death sentence was based on unreliable out-of-court statements in violation of due process and that this claim was raised and denied on direct appeal. (Doc. 25 at 129–33.) Specifically, he alleges that the admission of Kristal's out-of-court statements violated due process because the statements were unreliable. (*Id.*) He contends that the Arizona Supreme Court's affirmance of their admission was both contrary to, and an unreasonable application of, clearly established federal law and that the state court's decision involved an unreasonable determination of the facts in light of the evidence presented. (*Id.*)

### A.    Additional Background

On December 10 and 18, 2003, in response to the choking incident, Mesa Police Detective Gates interviewed Kristal. (Doc. 120, Tr. Exs. 325 and 327.) Kristal described what she knew, or believed, about the circumstances of the choking incident and the six other times when Devon had bruises or injuries after Chappell had cared for him. (Doc. 120, Ex. 327 at 9–14, 16–20.) Kristal later emailed Chappell about her interview with Gates, in which she described all but one of the six other incidents. (Doc. 120-1 at 41–42,

---

[28] Chappell contends that because Kristal's recorded statements were taken by police during a prior investigation of possible abuse of the victim, the primary purpose in interviewing Kristal was to establish or prove past events potentially relevant to a later prosecution and were therefore testimonial. (Doc. 25 at 134, citing *Davis v. Washington*, 547 U.S. 813, 822 (2006)).

Ex. 135.) In April and May 2004, respectively, the prosecution disclosed Kristal's interview with Gates and her emails to Chappell to the defense. (*See* R.T. 10/24/07 at 87.)

Prior to trial, the prosecution noticed its intent to introduce Rule 404(b) evidence at the guilt phase, namely that Chappell had broken Devon's leg on December 3, 2003; Chappell moved to preclude that evidence. (R.O.A. at 128, 132.) The prosecution withdrew the notice. (R.T. 1/12/07 at 3–4.)

The prosecution also separately moved for admission at the penalty phase of any rebuttal evidence relevant to whether Chappell should be shown leniency, regardless of its relationship to proffered mitigation evidence. (R.O.A. 87, 102, 111.) Following briefing and oral argument, the trial court granted the prosecution's motion. (R.O.A. 131.)

In July 2007, the prosecution asked the court to permit evidence of Devon's "pattern of injuries" as rebuttal at the penalty phase, including evidence of the six incidents at issue in the withdrawn Rule 404(b) notice. (R.O.A. 271 at 4–5.) Defense counsel opposed the motion contending that the admission would violate various constitutional rights, was irrelevant, unreliable, and unduly prejudicial. (R.O.A. 395.) Defense counsel also asserted that before that evidence could be admitted, the prosecution had to prove it by clear and convincing evidence and that the prosecution would have to prove it beyond a reasonable doubt to the jury. (R.O.A. 502.) At oral argument on the motion, the prosecution produced several of Kristal's emails in which she accused Chappell of having previously injured Devon. (Doc. 120, Tr. Ex. 321, 135; R.T. 9/19/07 at 31–56.)

The trial court concluded that the prosecution's proffered evidence was relevant to whether jurors should show Chappell leniency and admitted the evidence for that purpose, with the exception of three incidents: facial bruises observed on December 2, 2003, because Kristal had accepted Chappell's explanation of the bruises; that the victim had been frightened of Chappell in mid-November and claimed that Chappell had choked him with a plastic item because it depended on two witnesses, neither of whom were able to testify; and Devon's December 2, 2003 broken leg, unless the prosecution produced "evidence of a broken tibia at the hospital." (R.O.A. 512 at 5.) The trial court determined that Kristal's

emails were admissible to rebut Chappell's alleged mitigating circumstance that she was an uncharged co-perpetrator in Devon's death and that all the alleged incidents identified by the prosecution and alluded to by Kristal before Devon's death would therefore come into evidence. (*Id.* at 5–6.) It noted that what was inadmissible for one purpose may be admissible for another purpose "to rebut alleged mitigator that Kristal is an uncharged co-perpetrator." (*Id.*)

At trial, the prosecution avowed that Devon had been treated for a broken leg at a local hospital, and the court reversed preclusion of evidence regarding the broken leg for the purpose of whether leniency was warranted. (R.T. 9/24/07 at 43–47.) Chappell, who by that point, had already asserted a defense based upon Kristal being an uncharged co-perpetrator, moved to withdraw the allegation that Kristal was an unindicted perpetrator. (*Id.* at 47–58, 83.) The court affirmed its analysis in its prior minute entry and denied the motion. (*Id.* at 85.)

At the penalty phase, the prosecution introduced Kristal's emails and her police interviews following the choking incident, as well as the testimony from Detective Gates. (Doc. 120, Tr. Ex. 327 at 8–20, R.T. 10/24/07 at 6–23, 42–56, 66.) The prosecution also introduced evidence regarding Devon's broken leg, and a portion of Chappell's December 2003 interview with police, which had been redacted in the guilt phase. (R.T. 10/17/07 at 112–13; R.T. 10/18/07 at 35–47, 48–67; R.T. 10/22/07 at 74–75; Doc. 120, Tr. Ex. 329.) The jury returned a death sentence. *Chappell*, 236 P.3d at 1181, ¶ 7.

On direct appeal, Chappell asserted that the admission of Kristal's statements to police and in her emails as rebuttal violated the Confrontation Clause and due process. *Id.* at 1186–87, ¶¶ 38–41. Chappell acknowledged that the Arizona Supreme Court had rejected claims that the Confrontation Clause applied to penalty phase rebuttal evidence, but asked that it revisit the issue in light of *United States v. Mills*, 446 F.Supp.2d (C.D. Cal. 2006), and several law review articles. *Id.* at 1187, ¶ 40. The Arizona Supreme Court denied the Confrontation Clause aspect of the claim, finding that *Mills* did not conflict with

its decision in *McGill*.[29] *Id.*, ¶ 41 (citing *State v. McGill*, 140 P.3d 930, 943–44 (Ariz. 2006)).

The Arizona Supreme Court also denied the due process aspect of the claim. *Id.* at 1186, ¶¶ 38–39. It explained that Chappell had not claimed that he had lacked notice of, and an opportunity to challenge, Kristal's statements. *Id.* at 1186, ¶ 38. Instead, it noted that Chappell had argued that Kristal's statements "lacked 'sufficient indicia of reliability,'" citing Kristal's lies to police, that she was suspected in Devon's murder, her statements had not been made under oath, and that she had a strong incentive to lie to deflect attention from herself. *Id.* It found that "although Chappell attacked Kristal's credibility, her statements bore sufficient indicia of reliability" where "[t]he State presented direct and circumstantial evidence of Devon's prior injuries, and their surrounding circumstances, including photographs and testimony from lay and expert witnesses, which supported an inference that Chappell was responsible for those injuries and corroborated Kristal's statements." *Id.* at 1187, ¶ 39.

**B.   Merits**

Chappell argues that the Arizona Supreme Court's denial of his Confrontation Clause claim was contrary to, or an unreasonable application of, clearly established federal law, and an unreasonable determination of the facts. (Doc. 25 at 123, 129, and 132.)

A sentencing court may consider reliable information, including hearsay, when sentencing a defendant without violating fundamental fairness or violating the right to confront or cross-examine. *See Williams v. Oklahoma*, 358 U.S. 576, 584 (1959); *Williams v. New York*, 337 U.S. 241, 250–51 (1949) (sentencer's consideration of information

---

[29] The Arizona Supreme Court noted that *Mills* declined to "resolve . . . whether the jury's task of weighing aggravating against mitigating factors" was entitled to Confrontation Clause protection, limiting its holding only to the aggravation phase. 446 F. Supp.2d at 1135 n. 23. The Arizona Supreme Court noted that it had distinguished hearsay used to establish aggravating circumstances from hearsay used as rebuttal evidence in the penalty phase, concluding the former was entitled to Confrontation Clause protection and the latter was not. *Id.*, ¶ 41 (citing *McGill*, 140 P.3d at 942, ¶ 51.

~ 80 ~

supplied by witnesses "with whom the accused had not been confronted" and had no opportunity to cross-examine did not violate Fourteenth Amendment due process); *see also Sivak v. Hardison*, 658 F.3d 898, 927 (9th Cir. 2011). Because Chappell did not have a Sixth Amendment right to confront Kristal at sentencing, his confrontation claim fails. *Williams*, 337 U.S. at 250–51; *see Sivak*, 658 F.3d at 927. And *Williams v. New York* forecloses Chappell's claim that the sentencing court violated his confrontation rights by considering out-of-court statements. *See United States v. Petty*, 982 F.2d 1365, 1367–69 (9th Cir. 1993), *amended by* 992 F.2d 1015 (9th Cir. 1993) (Confrontation Clause does not apply to sentencing proceedings); *United States v. Williams*, 41 F.3d 496, 499–500 (9th Cir. 1994) ("A sentencing judge may consider hearsay evidence without running afoul of the Confrontation Clause."); *accord*, *Gentry v. Sinclair*, 576 F. Supp. 2d 1130, 1174 (W.D. Wash. 2008) (collecting cases), *aff'd,* 705 F.3d 884 (9th Cir. 2013).

Chappell relies on *Crawford v. Washington* as support for his Confrontation Clause claim, but *Crawford* concerned guilt-phase testimony, not sentencing evidence. 541 U.S. 36 (2004); *see United States v. Littlesun*, 444 F.3d 1196, 1199 (9th Cir. 2006); *see also Kansas v. Carr*, 577 U.S. 108, 126 (2016) (declining to review whether the Confrontation Clause entitled a defendant at the penalty phase "to cross-examine witnesses" whose statements, recorded in police reports, were referenced by the prosecution, but stating the statements should be omitted at resentencing). The Arizona Supreme Court's denial of the Confrontation Clause aspect of this claim was neither contrary to, nor an unreasonable application of, clearly established federal law, and Claim 5 will be denied.

Chappell's due process claim fairs no better. The Constitution protects a defendant from a conviction "based on evidence of questionable reliability, by affording the defendant the means to persuade the jury that the evidence is "unworthy of credit." *Perry v. New Hampshire*, 565 U.S. 228, 237 (2012). The means to do so includes the right to counsel, *Gideon v. Wainwright,* 372 U.S. 335, 343–45 (1963); compulsory process, *Taylor v. Illinois,* 484 U.S. 400, 408-09 (1988); and confrontation and cross-examination of witnesses, *Delaware v. Fensterer,* 474 U.S. 15, 18–20 (1985) (per curiam). *Perry*, 565 U.S.

at 237. And "[d]ue process requires that some minimal indicia of reliability accompany a hearsay statement." *United States v. Petty*, 982 F.2d 1365, 1369 (9th Cir. 1993) (citing *Reid*, 911 F.2d at 1464). A defendant, moreover, has a due process right not to be sentenced on the "basis of materially incorrect information." *Id.*

In terms of Chappell's rights to notice and to be heard, the defense was notified well before the guilt phase commenced. (R.T. 10/24/07 at 87; R.O.A. 271 at 4–5.) Although Chappell could not cross-examine Kristal about her statements or testify himself to rebut her statements without waiving his Fifth Amendment rights, defense counsel could and did attack Kristal's credibility at trial. (*See, e.g.*, R.T. 10/03/07 at 101−22, testimony that Kristal had stated that Devon was a problem for her relationship with Chappell, suggesting that Kristal was involved in the Devon's murder; R.T. 10/09/07, at 92−115, Kristal's alleged prior neglect of the victim; R.T. 10/10/07 at 77, labeling Kristal as an investigative lead by detective in terms of the murder investigation because Kristal had lied to detectives many times during the investigation; R.T. 10/24/07 at 58, 112, 136−37, admission by Kristal that she had given Devon "a hard, hard whipping" and that she had placed a pillow over the toddler's face to make him stop crying at night; R.T. 10/29/07 at 135–55, attacking Kristal's character and credibility during her rebuttal closing argument, arguing why the jurors should not believe Kristal's accusations against Chappell). Further, Chappell's father testified that Devon was not limping when Chappell left their home to take him to preschool, and Chappell's mother testified that she saw a bruise on Devon's face a day earlier, suggesting that he broke his leg at the preschool and that the bruise was unrelated to his broken leg. (R.T. 10/17/07, at 112–13; R.T. 10/18/07, at 35–47.) In addition, Chappell provided police with an alternative cause for the broken leg, when Chappell slid back his car seat into Devon. (Doc. 120, Tr. Ex. 329 at 33–36.)

The state courts found that Kristal's hearsay statements to detectives had some indicia of reliability because they were consistent with her emailed statements to Chappell. *See Idaho v. Wright*, 497 U.S. 805, 821 (1990) (finding appropriate to consider "spontaneity and consistent repetition" of hearsay statement in deciding whether the

statement has an indicia of reliability). In addition, other evidence corroborated Kristal's statements about Devon's fractured leg, such as the preschool teacher's testimony, who testified that she saw Chappell carry Devon into the bathroom at the school and place him on the toilet, upon arrival at the preschool. (R.T. 10/22/07 at 74–80, 83.) When she checked on Devon, she found him standing next to the toilet and pulling up his pants, but unable to put weight on his leg and whimpering. (*Id*. at 81–84.) She also saw a bruise on his cheek. (*Id*. at 88.) When she later told Chappell about Devon's leg, and that Devon was unable to explain how he had been injured it, Chappell told her that Devon had fallen from the toilet. (*Id*. at 85, 101.) The teacher doubted Chappell's explanation because she did not hear him cry in the bathroom. (*Id*. at 101.)

As discussed above, Dr. Greyer testified that Devon had a spiral fracture, which required a rotational or twisting motion, and that Devon's treating physician saw a facial bruise (R.T. 10/18/07 at 48–51, 53–54.) Dr. Greyer found Chappell's explanation for the broken leg "improbable" because the spiral facture would have been very painful and likely would have caused "some kind of outburst." (*Id*. at 57–60.) She also expressed concerns for Devon's repeated unexplained injuries while in Chappell's care. (*Id*. at 57–60, 64, 67.)

The evidence described above, taken together, provides indicia of reliability to Kristal's hearsay statements admitted at the penalty phase. The Arizona Supreme Court's denial of this claim was neither contrary to, nor an unreasonable application of, clearly established federal law. Accordingly, Claims 5 and 6 will be denied.

**XIII.  Claim 7**

Chappell claims that the prosecution denied him due process, by committing misconduct in (1) offering irrelevant, inflammatory testimony on, and photographs of, Devon's lung injuries to help show especial cruelty; (2) discussing those injuries in its aggravation-phase closing argument; and (3) urging the jury to consider the "community" in its aggravation- and sentencing-phase closing arguments. (Doc. 25 at 133–36.) Because the record belies these subclaims, the Court will deny Claim 7.

///

~ 83 ~

### 1.    Standard

Courts narrowly review alleged prosecutorial misconduct for habeas relief. *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (citing *Donnelly v. DeChristoforo*, 416 U.S. 637, 642 (1974)). To merit this relief, the misconduct must "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly*, 416 U.S. at 642–43; *see also Smith v. Phillips*, 455 U.S. 209, 219 (1982) (noting that "the touchstone" of this standard is the trial's fairness, not the prosecutor's "culpability"). To that end, the prosecutor's conduct's "effect on the trial as a whole" must be assessed "in context," *see Floyd v. Filson*, 949 F.3d 1128, 1150 (9th Cir. 2020) (citing *United States v. Young*, 470 U.S. 1, 17-20 (1985)); "undesirable or even universally condemned" conduct alone will not suffice, *see Darden*, 477 U.S. at 181. Courts therefore consider the "*Darden* factors":

> the weight of the evidence, the prominence of the comment in the context of the entire trial, whether the prosecution misstated the evidence, whether the judge instructed the jury to disregard the comment, whether the comment was invited by defense counsel in its summation and whether defense counsel had an adequate opportunity to rebut the comment.

*Hein v. Sullivan*, 601 F.3d 897, 914 (9th Cir. 2010). In the end, a denial of due process may warrant relief.

But the inquiry does not end there. The misconduct must also prejudice the petitioner under *Brecht*. *Sechrest v. Ignacio*, 549 F.3d 789, 808 (9th Cir. 2008) (citing *Brecht*, 507 U.S. at 622). Otherwise, the error is presumed harmless. *Id*.

### 2.    The Evidence of and Argument on Devon's Injuries

Medical examiner, Dr. John Hu performed "a full autopsy" of Devon. (R.T. 8/13/07 at 51.) At the trial's guilt phase, without objection, the trial court admitted photos of Devon's lungs from the autopsy, and Dr. Hu used them to testify that Devon's lungs were injured ("lung edema and congestion with subpleural hemorrhage"). (*Id*. at 54–60; Exs. 104–08.) He opined that those injuries showed that Devon had drowned and that persons who drown stay conscious for 30 seconds to two minutes and remain alive for four to five minutes. (R.T. 8/13/07 at 62–63.)

Dr. Hu returned to the stand at the aggravation phase, where he testified that Devon was conscious while trying to breath under water and that he drowned. (R.T. 8/30/07 at 19.) He also described what happens to persons held under water: if they try to hold their breaths, they will do so until their blood-oxygen levels hit a certain point, at which time they will breathe in water, not air. (*Id*. 19–20.) Much water will enter the lungs, and their "mental state" will decline until they lose consciousness. (*Id*. at 20.) He opined they will lose consciousness in 30 seconds to two minutes and die in four to five minutes. (*Id*.) He then returned to the photos of Devon's lungs to describe their injuries. (*Id*. at 21–27; Exs. 102–03, 105–08.) He opined that Devon himself remained conscious under water for 30 seconds to two minutes. (R.T. 8/30/07 at 27.)

On cross- examination, Dr. Hu testified that Devon's death by drowning alone could not prove the manner in which he drowned. (*Id*. at 28–29.) He also testified that an unconscious person could no longer feel pain. (*Id*. at 33.)

After Dr. Hu finished testifying, the court instructed the jurors that they had to decide the facts solely from the guilt- and aggravation-phase evidence and "not to be swayed by mere sentiment, conjecture, sympathy, [or] passion . . . ." (*Id*. at 38.) The court added that statements of counsel was "not evidence." (*Id*. at 39.) Also, the court told the jurors that to find especial cruelty, they would have to find that Devon "consciously suffered physical or mental pain, distress or anguish prior to death . . . for at least some portion of time when the pain and/or anguish was inflicted." (*Id*. at 44.)

In her closing argument, the prosecutor told the jurors they could consider the autopsy photos and Devon's lung injuries. (*Id*. at 48–49.) Chappell's counsel, in closing, used Dr. Hu's testimony to argue that Devon did not consciously suffer physical pain based on Chappell's statement to the press that Devon drowned in less than a minute. (*Id*. at 56–57.) In rebuttal, the prosecutor commented on the weight, hemorrhaging, and bleeding of Devon's lungs. (*Id*. at 59–60.) She argued that Devon suffered physical pain in the first 30 seconds under water by holding his breath and then expanding his lungs by breathing in water. (*Id*. at 60.) She noted that the evidence did not show that Devon instantly lost

~ 85 ~

consciousness in the water; he "fought valiantly for his life." (*Id*. at 61.) She concluded that he suffered physical pain before he died. (*Id*.)

On direct appeal, Devon claimed that the prosecution committed misconduct by offering irrelevant evidence of Devon's injuries and discussing that evidence in its closing arguments, to help prove especial cruelty, because those injuries occurred after Devon became unconscious. *Chappell*, 236 P.3d at 1183, ¶¶ 20–21.

With respect to this claim, the Arizona Supreme Court could not "determine whether the water-inhalation injuries occurred when Devon was conscious." *Id*. at 1183, ¶ 21. Still, assuming that they occurred after he became unconscious, the court could not "conclude that the prosecutor committed misconduct." *Id*. The court explained that Dr. Hu testified about the injuries, without objection, at the trial's guilt phase, and the trial court instructed the jurors that "they could consider everything they had previously heard in deciding whether the ["especially cruel"] aggravator had been proven beyond a reasonable doubt." *Id*. Chappell now argues that this decision contradicted, or involved an unreasonable application of, clearly established federal law, and was an unreasonable determination of the facts in light of the evidence presented. (Doc. 25 at 134.)

Counsel receive "wide latitude" in presenting their closing arguments. *United States v. Gwaltney*, 790 F.2d 1378, (9th Cir. 1986) (citing *United States v. Prantil*, 764 F.2d 548, 555 (9th Cir. 1985)). They may argue how the jury should interpret evidence in the record. *Menendez v. Terhune*, 422 F.3d 1012, 1036–37 (9th Cir. 2005).

Chappell argues that Devon's lung injuries were irrelevant because Chappell did not contest that Devon had drowned. (Doc. 25 at 135-36.) But the prosecution still had the burden to prove that element beyond a reasonable doubt. *See Estelle v. McGuire*, 502 U.S. 62, 69 (1991) (noting that "the prosecution's burden to prove every element of the crime is not relieved by a defendant's tactical decision not to contest an essential element of the offense"); A.R.S. § 13-703(B), (E), and (F); A.R.S. § 13-703(F)(6).

Also, the photographs were relevant because they corroborated Dr. Hu's testimony about his findings from the autopsy. *E.g.*, *Garcia v. v. Garcia*, No. CV 10-6303-SVW (SP),

2013 WL 10889202, at *8 (C.D. Cal. Aug. 16, 2013) (citing *People v. Scheid*, 939 P.2d 748, 757 (Cal. 1997)) (finding photographs relevant "admitted to corroborate witnesses' testimony and the prosecution's theory"); *see also State v. Anderson*, 111 P.3d 369, 382, ¶ 39 (Ariz. 2005) (quoting *State v. Chapple*, 660 P.2d 1208, 1215 (Ariz. 1983), *superseded by statute, as stated in State v. Riley*, 459 P.3d 66, 79, ¶ 7 (Ariz. 2020)) (confirming that "[p]hotographs may be relevant '. . . to corroborate state witnesses . . . and to corroborate the states theory of how and why the homicide was committed'").

That aside, there is evidence that Devon's lung injuries occurred before he became unconscious. Dr. Hu opined and explained why Devon was conscious under water, trying to breath, filing his lungs with water—injuring his lungs. (R.T. 8/30/07 at 19–27.) This evidence allowed the prosecutor to infer that Devon's lung injuries occurred before Devon fell unconscious. And an inference to the contrary did not render the prosecution's inference unreasonable. *Donnelly v. DeChristoforo*, 416 U.S. 637, 643–47 (1974).

Chappell, moreover, had an adequate opportunity to rebut the evidence on cross-examination (R.T. 8/30/07 at 28–33) and in his closing argument (*id*. at 56–57). In fact, his counsel used Dr. Hu's testimony to persuade the jurors that Devon's lung injuries occurred after Devon lost consciousness and did not feel physical pain. (*Id*. at 28–33.)

Besides, the evidence of the lung injuries was cumulative to the evidence admitted without objection at the guilt phase. (*Compare* R.T. 8/13/07 at 48, 51, 54–60, 62–68, 73–78, and Exs. 104–08, *with* R.T. 8/30/07 at 19–27; Exs. 102–03, 105–08.) *E.g.*, *Pursley v. Dretke*, 114 Fed.Appx. 630, 634–35 (5th Cir. 2004) (unpublished) (holding that admission of testimony did not violate the Fourteenth Amendment, in part, because it was cumulative of other testimony offered without objection); *Walker v. Quarterman*, No. H-07-3108, 2009 WL 497155, at **10–11 (S.D. Tex. Feb. 26, 2009) (citing *Pursley*, 114 Fed.Appx. at 634–35). In short, the prosecution did not commit misconduct, let alone misconduct that denied Chappell due process.

To be sure, Chappell did not suffer prejudice. The evidence, as mentioned, was cumulative. *Id*. at *11 (holding that, assuming poem was victim-impact evidence, its

admission was harmless under *Brecht* because it "was cumulative of testimony already before the jury"). And the Arizona Supreme Court affirmed the jury's finding of especial cruelty based solely on evidence of Devon's mental anguish, not physical harm. *See Karis v. Calderon*, 283 F.3d 1117, 1127 (9th Cir. 2002) (finding that Karis was not prejudiced by one's identification of her because there was sufficient evidence without that identification); *see also Chappell*, 236 P.3d at 1181-82, ¶¶ 11-15. Hence, Chappell's first and second subclaims do not warrant relief and are denied.

### 3.    The Prosecutor's Comments on the "Community"

At the end of the trial's guilt phase, the jury convicted Chappell of child abuse when he choked Devon in December 2003 and first-degree murder by forcibly drowning him three months later. *Chappell*, 225 P.3d at 1180-81. The trial court then held the aggravation phase for the jury to determine Chappell's eligibility for a death sentence. *Id*. at 1181. Under A.R.S. § 13-703(B) and (E), the jury could find him eligible only if it found at least one aggravating circumstance under A.R.S. § 13-703(F) beyond a reasonable doubt. The prosecution alleged, as such circumstances, prior serious-offense conviction, especial cruelty, and Devon's young age. *Chappell*, 225 P.3d at 1181.

The trial court instructed the jury of its duty to determine the facts based solely on the evidence from the trial's guilt and aggravation phases and "not to be swayed by . . . public opinion[] or public feeling." (R.T. 8/30/07 at 38.) The court also informed them that the statements of counsel was not evidence. (*Id*. at 39.)

The parties then made their closing arguments. In her rebuttal argument, the prosecutor concluded:

> You have the evidence before you. The State is very confident that you will find that when the community, when the legislature set forth statutory aggravators, those things that make a person eligible for death; that those three that apply in this case, the State is confident you will find each of those three applied to this defendant and that each of those three are proven well beyond a reasonable doubt.

(R.T. 8/30/07 at 62.)

~ 88 ~

After the jury found Chappell eligible for a death sentence and the parties offered evidence at the sentencing phase, the court repeated the instructions noted in the aggravation phase. (R.T.10/25/07 at 8, 10.) The court also informed the jurors that they had to individually determine whether mitigating circumstances existed and whether those circumstances warranted leniency. (*Id.* at 15-17.) Last, the court stated that the jury itself would determine whether to sentence Chappell to death. (*Id.* at 17.)

In her closing and rebuttal argument, Chappell's counsel echoed the court's sentiment on the jurors' individual assessment on mitigating circumstances. (*Id.* at 24-26, 156, 162.) The prosecutor added in hers:

> Someone much smarter than I wrote, Society declares it's attitude towards crimes by the punishment that it gives. We have expression what we feel about a crime by the punishment that we impose. Another way to say that is that the punishment should fit the crime. As you heard through these instructions, punishment should fit the offender, the person who chose to take that life, and that's what we are talking about during this phase these past several weeks of testimony that about mitigation.

(R.T. 10/29/07 at 22.)

On direct appeal, Chappell protested the prosecutor's two comments on the "community" described above. (O.B. at 138.) The court, however, found "neither comment . . . improper" because, "[i]n context, both comments referred to the punishment the legislature ha[d] prescribed for certain crimes[.]" *Chappell*, 236 P.3d at 1184, ¶ 24 (citing *United States v. Monaghan,* 741 F.2d 1434, 1441–42 and n.30 (D.C. Cir.1984)).

Chappell now argues that this decision contradicted, or involved an unreasonable application of, clearly established federal law, and was an unreasonable determination of the facts in light of the evidence presented. (Doc. 25 at 134.)

Although counsel receive "wide latitude" in presenting their closing arguments, *United States v. Gwaltney*, 790 F.2d 1378, (9th Cir. 1986), they may not lead the jury "to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere," *Caldwell*, 472 U.S. at 328-29. Also, "[a] jury sitting in a capital case must be given a clear choice between the death penalty and a life sentence." *Sechrest*, 549 F.3d

at 807 (citing *Coleman v. Calderon*, 150 F.3d 1105, 1118 (9th Cir.), *reversed on other grounds by* 525 U.S. 141 (1998)).

The United States Supreme Court has warned against a prosecutor's "statements designed to appeal to the passions, fears and vulnerabilities of the jury." *United States v. Weatherspoon*, 410 F.3d 1142, 1149 (9th Cir. 2005). "Statements 'clearly designed to encourage the jury to enter a verdict on the basis of emotion rather than fact' are 'irrelevant and improper.'" *United States v. Nobari*, 574 F.3d 1065, 1076 (9th Cir. 2009) (quoting *United States v. Weatherspoon*, 410 F.3d 1142, 1150 (9th Cir. 2005)). For instance, prosecutors "may not urge jurors to convict a criminal defendant in order to protect community values, preserve civil order, or deter future lawbreaking." *United States v. Nobari*, 574 F.3d 1065, 1076 (9th Cir. 2009) (internal quotations removed); *e.g.*, *Floyd v. Filson*, 949 F.3d 1128, 1151 (9th Cir. 2020) (quoting *Zant v. Stephens*, 462 U.S. 862, 879 (1983)) (holding that the prosecution's comment that sentencing the accused to death would "send a message to others in [their] community" improperly "implie[d] that the jury could" handout that sentence "to send a message, rather than making 'an *individualized* determination'").

Chappell protests the prosecutor's comments on "the community" because "this case received considerable local media coverage, the prosecutor was arguing that the jurors risked the wrath of the community if they failed to impose death." (Doc. 25 at 135.) This Court disagrees.

In reviewing the comments in context, the Arizona Supreme Court reasonably found that "both comments referred to the punishment the legislature ha[d] prescribed for certain crimes." *See Chappell*, 236 P.3d at 1184, ¶ 24. The prosecutor did not ask the jury to send a message to the community by sentencing Chappell to death. Nor did she suggest that the jurors would face any sort of consequence from the community if they spared his life. The prosecutor only briefly mentioned that the community, through the legislature, chose punishments to fit the crimes and the criminals, and that the punishment of death fit Chappell and his murder of Devon. *see also Rowland v. Chappell*, 876 F.3d 1174, 1190

(9th Cir. 2017) (reviewing a prosecutor's comments under "AEDPA's highly deferential standard of review" and holding that the comments did not minimize the jury's duty to decide whether to sentence defendant to death).

In addition, the court instructed the jurors, and Chappell's counsel argued, that they had to individually find whether any mitigating circumstances existed and whether those circumstances called for leniency. *See Floyd*, 949 F.3d at 1151 (emphasizing that the trial court had instructed the jury that the comments of counsel were not evidence); *Zapata v. Vasquez*, 788 F.3d 1106, 1123 (9th Cir. 2015) (citing *Donnelly v. DeChristoforo*, 416 U.S. 637, 645 (1974); *Cheney v. Washington*, 614 F.3d 987, 997 (9th Cir. 2010)) ("By contrast, cases that have held prosecutorial misconduct nonprejudicial have pointed to the use of a specific limiting instruction."). In brief, the record shows that the prosecutor did not shift the jury's duty to the community, and Chappell was not prejudiced.

Claim 7 will be denied.[30]

## XIV.   Claim 8

Chappell's jury found, as an aggravating circumstance under A.R.S. § 13-703(F)(6) (West 2007), that Chappell murdered Devon "in an especially . . . cruel . . . manner." *See* § 13-703(F)(6). The factfinder may find the (F)(6) circumstance if it finds that "[t]he defendant committed the offense in an especially heinous, cruel or depraved manner." A.R.S. § 13-703(F)(6). *Chappell*, 225 P.3d at 1181, ¶ 7 (citing A.R.S. § 13-703(F)(6)). This circumstance may be found based on especial cruelty absent a finding that the murder was especially heinous or deprived. *State v. Libberton*, 685 P.2d 1284, 1291 (Ariz. 1984) (citing *State v. Gillies*, 662 P.2d 1007, 1019 (Ariz. 1983).

---

[30] Because Chappell did not "show that any prosecutorial misconduct [had] occurred," the Arizona Supreme Court did not consider whether the "'cumulative effect'" of the incidents of alleged misconduct—even if each incident, alone, did not warrant relief—"'show[ed] that the prosecutor intentionally engaged in improper conduct.'" *Chappell*, 236 P.3d at 1184, ¶ 25 (quoting *State v. Roque*, 141 P.3d 368, 403 (Ariz. 2006), *abrogated on different grounds by State v. Escalante-Orozco*, 386 P.3d at 798 (Ariz. 2017), *abrogated on different grounds by State v. Escalante*, 425 P.3d 1078 (Ariz. 2018); citing *State v. Bockarski*, 189 P.3d 403, 419 (Ariz. 2008)). The Court therefore will follow suit.

Chappell claims the finding of especial cruelty was unconstitutional in five ways (Doc. 25 at 136–46): (1) the jury instruction defining "especially cruel" inadequately narrowed the aggravating circumstance (*id*. at 140-41); (2) insufficient evidence supported the finding (*id*. at 137–40); (3) Dr. Hu testified on the ultimate issue, whether the murder was "especially cruel" (*id*. at 141–43); and the State used (4) Chappell's child-abuse conviction and (5) Devon's age-based helplessness to support finding especial cruelty (*id*. at 143–46). Because the record and precedent of the United States Supreme Court refutes these subclaims, the Court will deny Claim 8.

### A.      Narrowing Instruction

The trial court instructed the jury on the "especially cruel" aggravating circumstance as follows:

> All first degree murders are to some extent cruel. However this aggravating circumstance cannot be found to exist unless the State has proved beyond a reasonable doubt that the murder was especially cruel.
>
> "Especially" means unusually great or significant. Especially cruel. The term "cruel" focuses on the victim's pain and suffering.
>
> The finding [sic] that the murder was committed in an "especially cruel" manner, you must find that the victim consciously suffered physical or mental pain, distress or anguish prior to death.
>
> A murder is especially cruel when there has been infliction of pain and suffering in an especially wanton and insensitive or vindictive manner. The defendant must know or should have known that the victim would suffer.
>
> Victim must be conscious for at least some portion of time when the pain and/or anguish was inflicted. You may not consider the age of the victim in any way in deciding whether the murder was committed in an especially cruel manner.

(R.T. 8/30/07 at 43–44.)

On direct appeal, Chappell claimed that the instruction did not "sufficiently narrow" that aggravating circumstance (O.B. at 31–43), which the Arizona Supreme Court denied on the merits, *Chappell*, 236 P.3d at 1184-85, ¶¶ 26–27. The Arizona Supreme Court acknowledged that, absent more, the circumstance was "unconstitutionally vague on its

face," *id*. at 1184, ¶ 26 (citing *Walton*, 497 U.S. 639), but that narrowing instructions could cure the vagueness, *id*. (citing *State v. Tucker*, 160 P.3d 177, 189 (Ariz. 2007), and *State v. Anderson*, 111 P.3d 369, 394–95, ¶¶ 109–14 (Ariz. 2005)). The state supreme court found the trial court's instruction sufficiently narrowed the circumstance so that it was not unconstitutionally vague. *Id*. at 1184–85, ¶ 27. Chappell argues the Arizona Supreme Court's determination was contrary to, or unreasonably applied, the controlling clearly established federal law, and that the Arizona Supreme Court unreasonably determined the facts in light of the evidence. (Doc. 25 at 140–41.)

Under the Eighth and Fourteenth Amendments, a jury's discretion to "take[] or spare[]" one's life "must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Gregg v. Georgia*, 428 U.S. 153, 189, 200 (1976) (citing *Furman v. Georgia*, 408 U.S. 238 (1972)). To that end, courts must give narrowing instructions to cure facially unconstitutionally vague aggravating circumstances. *Walton*, 497 U.S. at 653.

In *Walton*, the Supreme Court found the jury instructions given for Arizona's "especially cruel" aggravating circumstance—similar to that at issue here—sufficiently did so. *Compare id*. at 653-55 (upholding construction that "'a crime is committed in an especially cruel manner when the perpetrator inflicts mental anguish or physical abuse before the victim's death'" and that "'[m]ental anguish includes a victim's uncertainty as to his ultimate fate'" and "limit[ing] the cruelty circumstance . . . to situations where the suffering of the victim was intended by or foreseeable to the killer"), *with* R.T. 8/30/07 at 43–44. The instructions in Chappell's case further narrowed "especially cruel" by:

- defining the manner and *mens rea* to find Chappell inflicted "pain and suffering";

- requiring Devon to have been "conscious for at least some" part of such infliction; and

- barring "consider[ation of]" the Devon's age "in any way" to find the offense was especially cruel.

(R.T. 8/30/07 at 43–44.) In short, the instructions given to Chappell's jury satisfied *Walton*,

~ 93 ~

and thus the Arizona Supreme Court's decision was neither contrary to, nor unreasonably applied controlling federal law.

Chappell claims the instruction failed to require the jury to find that Devon suffered pain in addition to that inherent in drowning. (Doc. 25 at 140-41.) But he does not cite, and this Court has not found, any holding of the United States Supreme Court that requires such finding by the factfinder. *See Williams*, 529 U.S. at 381 (unable to grant relief if the Supreme Court has not "broken sufficient legal ground" on a constitutional principle advanced by a petitioner). Arizona's construction of "especially cruel" does not require a finding that pain beyond that inherent in the drowning must be found. *See Chappell*, 236 P.3d at 1184-85 (citing cases confirming that the Arizona Supreme Court "has never required" pain "beyond the pain inherent in the manner of death itself"); *see also Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."); *Briceno v. Scribner*, 555 F.3d 1069, 1077 (9th Cir. 2009) (noting that "[f]ederal habeas courts do not review questions of state evidentiary law").

Chappell's first subclaim will be denied.

## B.   Sufficiency of the Evidence

Chappell raised his insufficient evidence subclaim on direct appeal (O.B. at 9–30), which the Arizona Supreme Court denied on the merits, stating:

> During the aggravation phase, the medical examiner, Dr. Hu, testified that Devon likely was conscious for thirty seconds to two minutes while being held underwater. Dr. Hu would not opine whether a two-year-old under those circumstances could understand that he was about to die, but testified that Devon certainly would have understood the need to breathe. In addition, Dr. Hu described at length the physiological reactions that occur during drowning, including hemorrhaging and acute expansion of the lungs and the large quantity of foam produced when inhaled water mixes with air and proteins in the lungs. Dr. Hu also described several post-mortem photographs, previously admitted during the guilt phase, which depicted hemorrhaging of Devon's lungs and foam on his face.
>
> Chappell told reporters during a post-arrest press conference that Devon had struggled while in the pool. Chappell also stated that, hours after the

drowning, he could still remember Devon "looking at [him] straight in the eyes as he was in the water." These facts support a finding that Devon consciously experienced mental anguish before his death. The jurors also could have reasonably inferred from this evidence that Chappell knew or should have known that Devon would suffer. Therefore, sufficient evidence supported the jurors' finding that the murder was especially cruel.

*Chappell*, 236 P.3d at 1182, ¶¶ 12–13. Chappell argues that the Arizona Supreme Court's decision was contrary to, or unreasonably applied, controlling clearly established federal law, and unreasonably determined the facts. (Doc. 25 at 137–40.)

Whether a state court misapplied an aggravating circumstance to the facts of a case is a question of state law. *See Lewis v. Jeffers*, 497 U.S. 764, 780 (1990). Hence, this Court will review the "constitutionally narrowed aggravating circumstance" above "to determin[e] whether the state court's finding was so arbitrary or capricious as to constitute an independent due process or Eighth Amendment violation." *Id*. (citing *Donnelly v. DeChristoforo*, 416 U.S. 637, 642-43 (1974)). To do so, this Court will consider "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements" of the aggravating circumstance "beyond a reasonable doubt." *Jackson*, 443 U.S. at 319 (emphasis in original); *Lewis*, 497 U.S. 764; *see also Miller-El v. Cockrell,* 537 U.S. 322, 340 (2003) (citing § 2254(d)(2)) (reversing only "objectively unreasonable" state-court factual decisions based on the state-court evidence). Thus, this Court must deny Chappell's second subclaim if, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that Chappell murdered Devon in an especially cruel manner.

The Arizona Supreme Court has characterized the especially cruel aggravating circumstance as addressing the suffering of the victim, *see State v. Murray*, 906 P.2d 542, 570 (Ariz. 1995), physically or mentally, *State v. Martinez*, 189 P.3d 348, 363 (Ariz. 2008). Indeed, it "focuses on the victim's state of mind," *Tucker*, 160 P.3d at 200, throughout "the entire murder transaction and not simply the final act that killed the victim," *State v. Ellison*, 140 P.3d 889, 925 (Ariz. 2006). Also, the defendant must have known "or should

~ 95 ~

have known that the victim would experience mental anguish or physical pain and that the victim was conscious during some part of the violence." *Id*. Such anguish alone amply supports an "especially cruel" finding. *Id*. (quotations omitted).

The Arizona Supreme Court found sufficient evidence showed that Devon felt, and that Chappell knew or should have known that Devon felt, such anguish. *Chappell*, 236 P.3d at 1182, ¶¶ 12–13 and ¶ 15 n.4. The evidence, viewed in the light most favorable to the prosecution, is sufficient to support that Devon suffered mental anguish before he died and that Chappell knew, or should have known, that Devon would suffer such anguish. (Ex. 142 at 6–9, 11; R.T. 8/30/07 at 19–27, 30–31, 35–36, reflecting the findings of the Arizona Supreme Court.) Thus, that evidence was sufficient to support that a rational trier of fact could have found that Devon consciously suffered mental anguish before his death and that Chappell knew or should have known that Devon would suffer such anguish. Devon understood the need to breath and thus struggled under water while Chappell forcibly drowned him, while Devon looked into his eyes. To find this evidence sufficient to support an "especially cruel" finding does not result in all murders being "death-eligible." (*See* Doc. 25 at 138.) The Arizona Supreme Court's decision was neither contrary to, nor an unreasonable application of, clearly established federal law, and did not unreasonably determine the facts.

To the extent Chappell disagrees, he simply invites this Court to reweigh the evidence and reassess witness testimony—tasks outside this Court's province. (Doc. 25 at 138-39). He notes that there was no evidence of "external trauma" on Devon and that Dr. Hu questioned whether a two-year-old would understand the mental anguish of drowning, alleging that one could only speculate that Devon tried to hold his breath under water and that his injuries occurred while conscious and that he was likely conscious for no more than 30 seconds "during the drowning." But "28 U.S.C. § 2254(d) gives federal habeas courts no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them." *Marshall v. Longberger*, 459 U.S. 422, 434 (1983); *Jackson,* 443 U.S. at 326 (requiring a court, when "faced with a record of historical facts

which supports conflicting inferences must presume—even if it does not appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution"); *see also Jones v. Wood*, 114 F.3d 1002, 1008 (9th Cir. 1997) (respecting domain of trier of fact to decide credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts by assuming that trier of fact resolved all conflicts in a manner that supports the finding of guilt). Also, Chappell does not cite, and the Court has not found a holding of the United States Supreme Court that specifies that a victim had to have been found to suffer for a minimum length of time. *See Williams*, 529 U.S. at 381.

Chappell's second subclaim will be denied.

**C.    Dr. Hu's Testimony**

At the aggravation phase, Dr. Hu testified and opined that "not being able to breath" is "a horrifying experience" and a 10 on a scale of 1 to 10. (R.T. 8/30/07 at 23, 30.) Chappell claimed, on direct appeal, that Dr. Hu testified on the ultimate issue, whether the murder of Devon was "especially cruel." (O.B. at 92–99.) The Arizona Supreme Court denied this claim on the merits, *Chappell*, 236 P.3d at 1182–83, ¶¶ 16–18, as follows:

> Arizona Rule of Evidence 704 permits expert testimony that "embraces an ultimate issue to be decided by the trier of fact," as long as the opinion "assist[s] the trier of fact to understand the evidence or to determine a fact in issue." Ariz. R. Evid. 704 & cmt. However, "[w]itnesses are not permitted as experts on how juries should decide cases," *id.*, and trial courts should exclude relevant evidence when "its probative value is substantially outweighed by the danger of unfair prejudice," Ariz. R. Evid. 403.
>
> Chappell cites two out-of-state cases in which experts explicitly opined on whether the murder had been committed in the manner of the statutory aggravator. *See State v. Hamilton*, 681 So.2d 1217, 1225–26 (La. 1996) (expert testified murder was "heinous, atrocious or cruel"); *Commonwealth v. Crawley*, 526 A.2d 334, 346–47 (Pa. 1987) (expert defined torture as the production of "conscious pain" and testified that the murders satisfied "the definition of the word torture"). But, here, Dr. Hu merely testified about the experience of drowning and did not opine that Devon's murder was committed in an "especially cruel" manner. His comments neither were improper nor embraced an ultimate issue.

*Id.* at 1182–83, ¶¶ 17–18 (alterations in original). Chappell now argues that this decision was contrary to, or unreasonably applied, controlling Supreme Court law, and unreasonably determined the facts. (Doc. 25 at 141–43.)

Even assuming that Dr. Hu opined on the ultimate issue, Chappell does not cite, and this Court has not found, a holding of the United States Supreme Court barring testimony on ultimate issues before the jury. *See Moses v. Payne,* 555 F.3d 742, 761 (9th Cir. 2009) (holding that "the constitutionality of such testimony is 'an open question in [the Supreme Court's] jurisprudence'") (brackets in original) (quoting *Carey v. Musladin,* 549 U.S. 70, 76 (2006); *Hangarter v. Provident Life & Accident Ins. Co.,* 373 F.3d 998, 1016 (9th Cir. 2004)) (quoting *Mukhtar v. Cal. State Univ., Hayward*, 299 F.3d 1053, 1066 n.10 (9th Cir. 2002), *overruled on different grounds in United States v. Bacon*, 979 F.3d 766 (9th Cir. 2020)) ("'It is well-established . . . that expert testimony concerning an ultimate issue is not per se improper.'").

Chappell also relies on *Godfrey v. Georgia*, in which the United States Supreme Court addressed whether "the Georgia Supreme Court adopted such a broad and vague construction" of Georgia's aggravating circumstance—that the offense "was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim"—that it violated the Eighth and Fourteenth Amendments. 446 U.S. 420, 423 (1980). The Supreme Court held that the aggravating circumstance was not properly narrowed so as not to be unconstitutionally vague but did not consider whether an expert had opined about an ultimate issue in connection with an aggravating circumstance. Thus, *Godfrey* does not support Chappell's argument in this subclaim.

Further, the Arizona Supreme Court denied Chappell's claim based on its reading of a state rule, Arizona Rule of Evidence 704. *Chappell*, 236 P.3d at 1182-83, ¶¶ 17-18 (finding that Dr. Hu's testimony did not violate Rule 704 because he did not state that Chappell had murdered Devon in an especially cruel manner). The court, in effect, interpreted Rule 704 and corresponding case law and tailored improper testimony on ultimate issues to testimony that employs statutory language. This was a decision on state

law, which this Court will not touch. *Estelle*, 502 U.S. at 67-68; *Briceno*, 555 F.3d at 1077.

Chappell's third subclaim will be denied.

### D. Use of Chappell's Child-Abuse Conviction and Devon's Helplessness

At the end of the trial's guilt phase, the jury convicted Chappell of child abuse for choking Devon in December 2003 and first-degree murder by forcibly drowning him three months later. *Chappell*, 225 P.3d at 1180-81. At the aggravation phase, the court instructed the jury that it could only find Chappell death-eligible if it found that the prosecution had proved at least one aggravating circumstance under A.R.S. § 13-703(F) beyond a reasonable doubt. *Id*. at 1181; *see also* A.R.S. § 13-703(B) and (E). The prosecution urged, as aggravating circumstances, that Chappell "ha[d] been . . . convicted of a serious offense" (child abuse), § 13-703(F)(2); he murdered Devon "in an especially . . . cruel . . . manner," § 13-703(F)(6); and at the time of the murder, Chappell "was an adult" and Devon "was under" 15 years old, § 13-703(F)(9). *Id*.

In her opening statement, the prosecutor stated that Chappell's conviction of child abuse for the December 2003 choking incident proved the (F)(2) circumstance. (R.T. 8/30/07 at 11–12.) The prosecutor stated that the fear Devon previously experienced during the choking incident and Devon's inability to breathe while held under water established the (F)(6) circumstance. (*Id*. at 15.) The prosecutor also referred to Devon's youth (e.g., his size, feelings, and age itself) at the time of his murder throughout her opening statement as to the (F)(9) circumstance. (*Id*. at 13–14, 16–17.)

Following opening statements, Dr. Hu testified, prior to the trial court instructing the jury that it could "not consider the age of the victim in any way in deciding whether the murder was committed in a[n] especially cruel manner." (*Id*. at 44.) In her closing and rebuttal argument, the prosecutor argued that the (F)(6) circumstance existed because Devon suffered mental anguish, in part, because of his youth and in part because Chappell had previously choked him. (*Id*. at 50–51, 58, 60.)

The jury found that the prosecution had proven all three alleged aggravating circumstances beyond a reasonable doubt. *Chappell*, 225 P.3d at 1181, ¶ 7. The court then

turned to the trial's penalty phase and instructed the jury that it could not "double count[]" facts in weighing the aggravating circumstances against the mitigating circumstances:

> The State may not rely upon a single fact or aspect of the offense to establish more than one aggravating circumstance. Therefore, if you have found that two or more of the aggravating circumstances were proved beyond a reasonable doubt by a single aspect[] of the offense, such as the age of the victim, you are to consider that fact or aspect of the offense only once. In other words, you shall not consider twice any fact or aspect of the offense.

*Id.*, ¶¶ 49–50 (alteration in original); *see also* A.R.S. § 13-703(E) (requiring the jury to sentence one to death if it finds at least one aggravating circumstance under § 13-703(F) "and then determines that there are no mitigating circumstances sufficiently substantial to call for leniency"). The jury sentenced Chappell to death. *Chappell*, 225 P.3d at 1181, ¶ 7.

On direct appeal, Chappell claimed that the prosecutor erred in using Chappell's child abuse conviction and Devon's age-based helplessness at the time of the murder as a basis for the jury to find the (F)(6) circumstance. (O.B. at 100–07, 110–14.)

The Arizona Supreme Court denied the claim on the merits, finding that the prosecutor had not engaged in misconduct. *Chappell*, 225 P.3d at 1183–84, ¶ 23 and n.5. First, the court summarized the prosecutor's arguments at trial:

> The State argued that Devon experienced mental anguish from being unable to breathe because he had previously experienced that same sensation during the December choking incident. The State also argued that the prior choking incident had made Devon afraid of Chappell and that two-year-old Devon, inexplicably taken from his home in the middle of the night, likely experienced fear and uncertainty from the time he was awoken until his death.

*Id.* at 1184, ¶ 23 n.5. Next, the court rejected Chappell's contention that the prosecutor's comments about the prior choking incident and Devon's age "were improper and inflammatory." *Id.*, ¶ 23. The court stated,

> [a]lthough neither the victim's age nor a defendant's prior conviction is an element of especial cruelty, both facts were relevant here to establish whether Devon experienced mental anguish. Moreover, the jury was specifically instructed the victim's age was not to be "consider[ed] . . . in any way in

deciding whether the murder was committed in an especially cruel manner." *Id*.

The court also rejected Chappell's argument that the prosecutor erred in using the choking incident because such use let the jury weigh the choking incident twice against the mitigating circumstances. *Id*. at 1188, ¶¶ 47–50. In doing so, the court acknowledged that "[a] prior conviction or other fact" may properly help establish two aggravating circumstances "so long as that fact is not weighed 'twice in balancing aggravating and mitigating circumstances.'" *Id*., ¶ 48 (quoting *State v. Velazquez*, 166 P.3d 91, 98, ¶ 21 (Ariz. 2007)). The court then found that "[t]he prosecutor's comments during the aggravation phase did not improperly encourage jurors to base their [especially cruel] finding on the prior choking incident." *Id*., ¶ 49. Last, the court concluded that the trial court had "properly instructed" the jury that it could not "consider twice any fact or aspect of the offense." *Id*., ¶¶ 49–50.

As to his fourth and fifth subclaims, Chappell contends that the prosecutor's use of the prior choking incident and Devon's age-based helplessness were improper. (Doc. 25 at 143–46.) In his fourth subclaim, he argues that the prosecutor let the jury weigh twice, "double count," the prior choking incident against the mitigating circumstances. (*Id*. at 143–45) In his fifth subclaim, he argues that Devon's age-based helplessness was irrelevant to show especial cruelty and was used to inflame the jurors' passions. (*Id*. at 145–46.) The parties agree that the Arizona Supreme Court addressed these claims on the merits but disagree whether Chappell raised these claims as federal issues. (*Id*.; Doc. 33 at 156–58, 162–63.) This Court need not resolve this issue, as the record and United States Supreme Court precedent renders these subclaims without merit.

The fourth subclaim lacks merit because it is not cognizable, *see Gerlaugh v. Stewart*, 129 F.3d 1027, 1044 (9th Cir. 1997) (rejecting a double-counting claim, in part, because it "is a matter of state law and not cognizable in this forum"), and the United States Supreme Court has not barred double counting, *Jones v. United States*, 527 U.S. 373, 398 (1999). Moreover, even if the Supreme Court had barred double-counting, Chappell was

~ 101 ~

not prejudiced where the trial court specifically instructed the jury that it could not double-count, *Chappell*, 236 P.3d at 1188, ¶ 50, and juries are presumed to follow instructions, *see Weeks v. Angelone*, 528 U.S. 225, 234 (2000) (citing *Richardson v. Marsh*, 481 U.S. 200, 211 (1987). This Court will therefore deny Chappell's fourth subclaim.

The fifth subclaim also lacks merit "[b]ecause the Supreme Court has not clearly decided whether the admission of irrelevant or unduly prejudicial evidence" violates due process "sufficient to warrant habeas relief," *Smith v. Allen*, No. 2:16-cv-1015 TLN CKD P, 2022 WL 3219433, at *25 (E.D. Cal. Aug. 8, 2022) (citing *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009)), and Chappell does not otherwise cite a case where the Arizona Supreme Court has found the victim's youth irrelevant to prove especial cruelty. Although he cites *State v. Gretzler*, 659 P.2d 1, 11 (Ariz. 1983), *superseded by statute as stated in State v. Carlson*, 351 P.3d 1079, 1093, ¶ 46 (Ariz. 2015), for the proposition that a victim's age-based helplessness is relevant only to the (F)(6) circumstance in terms of heinousness or depravity, *Gretzler* does not suggest that it is irrelevant to show mental anguish in proving especial cruelty. The trial court's instruction to the jury about Devon's age, however, prohibited such use. *Gretzler* does not. *See Gerlaugh*, 129 F.3d at 1044; *Estelle*, 502 U.S. at 67-68; *Briceno*, 555 F.3d at 1077. Chappell's fifth subclaim, and Claim 8 as a whole will be denied.

## XV. Claim 9, 10, and 11

Chappell claims that the trial court violated his Eighth and Fourteenth Amendment rights by instructing the jurors that if they spared his life, the court could sentence him to life in prison with possible parole after 35 years served (Claim 9) (Doc. 25 at 147–50), by denying his waiver of his right to that life sentence (Claim 10) (*id*. at 150–54), and by not instructing the jurors that if they spared his life and the court gave him a parole-eligible sentence, Chappell would still have to serve a consecutive sentence for Count 2 (Claim 11) (*id*. at 155–57). Chappell exhausted these claims in state court. *See Chappell*, 236 P.3d at 1187, ¶¶ 42–44.

//

### A.   Claim 9

The trial court instructed the jury that it could either sentence Chappell to death or to life in prison and that if it chose life in prison, the court would sentence him to life in prison either with possible "release" after 35 years served or without possible release. (R.T. 10/25/07 at 17.) The court did not reference "parole" (R.T. 10/25/07 at 17), as Chappell was not eligible for parole, *see* A.R.S. § 41-1604.09(I)(1) (West 2008) (applying parole eligibility for one who commits a felony before January 1, 1994).

The Arizona Supreme Court held that the trial court correctly stated A.R.S. § 13-751(A) (West 2008) to the jury and thus the court did not err under *Simmons v. South Carolina*, 512 U.S. 154 (1994).[31] *Chappell*, 236 P.3d at 1187, ¶ 43. In *Simmons*, the United States Supreme Court held that when "a defendant's future dangerousness is at issue, and state law" bars his "release on parole, due process requires that the sentencing jury be informed that [he] is parole ineligible" (a "*Simmons* instruction"). 512 U.S. at 161–64; *see also Cruz v. Arizona*, 598 U.S. 17, 21 (2023); *Ramdass v. Angelone*, 530 U.S. 156, 169 (2000) (plurality opinion) (confirming that *Simmons* applied only when state law *prohibits* the defendant's release on parole). Thus, *Simmons* expressly flows from the opportunity to have a jury informed of the defendant's parole ineligibility. *Simmons*, 512 U.S. at 161 (Blackmun, J., joined by Stevens, Suter, and Ginsburg, JJ.); *id*. at 175 (O'Connor, J., joined by Rehnquist, C.J., and Kennedy, J., concurring in judgment). The instruction at issue itself did not deprive Chappell of such an opportunity. Contrary to Chappell's argument, the court did not state, "parole." At any rate, this Court will not question the Arizona Supreme Court's affirmance of the instruction based on the instruction's adherence to state law, *see Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (recognizing that a state court's reading of state law "binds [this Court]"), and the Court did not unreasonably apply *Simmons* and its progeny because Chappell was release eligible.

Claim 9 will be denied.

---

[31] Arizona Revised Statute section 13-703(A) (West 2005)—section 13-751(A) (West 2008)'s equivalent predecessor—applied when the trial court instructed the jury.

### B.    Claim 10

The trial court denied Chappell's request to obtain a *Simmons* instruction by waiving a life sentence with possible parole. (R.O.A. 98 and 131.) Chappell challenged the trial court's denial of the request. (O.B. at 85.) But he conceded in his reply brief that the Arizona Supreme Court had denied such a challenge in *State v. Dann*, 207 P.3d 604, 625–26 (Ariz. 2009). (R.B. at 131.) The Arizona Supreme Court acknowledged the concession, citing *Dann*, 207 P.3d at 625–26, and denied Chappell's claim. *Chappell*, 236 P.3d at 1187, ¶ 44 n.10.[32] This state-law decision binds this Court. *See Bradshaw*, 546 U.S. at 76.

Claim 10 will be denied.

### C.    Claim 11

The trial court also denied Chappell's request that it instruct the jury that if the jury spared his life and the court sentenced him to life in prison with possible parole, he would still have to serve a consecutive lengthy prison term for Count 2:

> Denying defense motion for jury to be accurately informed that . . . Chappell will not be eligible for parole in this case until he has served at least 52 years or for alternative relief, as contrary to Arizona law. All that is required by law is that the jury be told it must determine whether the defendant will be sentenced to life in prison or death for his conviction of first degree murder; that if their verdict is death the defendant will be sentenced to death; if their verdict is life, the court will sentence defendant to either life without the possibility of release (in this case) until 35 calendar years in prison are served, or "natural life" meaning defendant will never be released from prison. The instructions do that. In this case if the jury verdict is for life the defendant actually will not be released after 35 calendar years are served on Count I, because he must serve a 10 to 24 year consecutive and flat sentence on his Count II conviction for child abuse, a dangerous crime against children. The mitigated term is 10 years, presumptive 17 years and aggravated 24 years and must be served after Count I. The jury thus is being told what the consequences of their verdict will be with respect to Count I only, and in that respect they are not being told an untruth.

The instructions that the jury is not to consider the possible punishment when

---

[32] Contrary to Chappell's claim, the Arizona Supreme Court denied his claim on his proposed waiver instruction on the merits because the court did not suggest that it denied his claim on a procedural ground.

considering guilt/innocence, except as modified for the penalty phase, applies throughout the trial. It is the only sensible rule as in the imaginary future the Count II verdict could be set aside, and if the jury based a ruling on life or death on defendant serving a minimum of 34 years before eligible for release, that circumstance would have changed.

(R.O.A. 401; R.O.A. 412 at 2–3.)

The Arizona Supreme Court affirmed, explaining that Chappell had not proven "his probable sentence" for Count 2 was "relevant to his 'character or record [or] any of the circumstances of the [murder],'" *Chappell*, 236 P.3d at 1187, ¶ 44 (quoting *Lockett v. Ohio*, 438 U.S. 586, 604 (1978)) (alterations by *Chappell*), and "was speculative and subject to possible reversal under a variety of different scenarios," *id*. Chappell claims that the Arizona Supreme Court, in affirming, contradicted or unreasonably applied clearly established federal law and unreasonably determined the facts. (Doc. 25 at 155–57.)

But the United States Supreme Court has not held that a sentence consecutive to a sentence on a capital crime is relevant to a defendant's character, his record, or any circumstance of the capital crime. Further, in *Bates*, the Eleventh Circuit denied the writ of habeas corpus based on a claim congruent to Chappell's. 768 F.3d at 1306. In *Bates*, the Florida Supreme Court also denied that claim based on "conjecture and speculation." *Id*. The Eleventh Circuit found that the court "'had good reason not to extend *Simmons* beyond the circumstances of that case, which included conclusive proof of parole ineligibility under state law at the time of sentencing.'" *Id*. (quoting *Ramdass*, 530 U.S. at 170).

So too here, the Arizona Supreme Court denied Chappell's claim because his sentence for Count 2 was speculative. *Chappell*, 236 P.3d at 1187, ¶ 44. This reasoning was not an unreasonable determination of the facts. For a state appellate court or the United States Supreme Court could reverse the sentence, Chappell could receive executive clemency, or the legislature could annul or modify the sentence. *See Bates*, 768 F.3d at 1306. Thus, the Arizona Supreme Court reasonably determined the facts in finding Chappell's sentence for Count 2 speculative. And for this reason, the Court did not unreasonably apply *Simmons*.

~ 105 ~

Claim 11 will be denied.

## XVI.   Claim 12

Chappell claims the trial court violated his Eighth and Fourteenth Amendment rights to due process, a fair trial, and a fair sentencing by barring him from offering execution-impact evidence as mitigation at sentencing. (Doc. 25 at 157–59.) The parties agree this claim is exhausted. (*Id*. at 157–78; Doc. 33 at 182.)

It is well settled that a capital defendant is entitled to submit any *relevant* mitigating evidence in support of a sentence less than death. *Payne v. Tennessee,* 501 U.S. 808, 822, (1991). The Eighth and Fourteenth Amendments require that a sentencer "'not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.'" *Eddings v. Oklahoma*, 455 U.S. 104, 110 (1982) (quoting *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (plurality opinion)) (emphasis by *Lockett*). But courts may "exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of his offense." *Lockett*, 438 U.S. at 604 n.12.

"Relevant mitigating evidence . . . tends logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value." *McKoy v. North Carolina*, 494 U.S. 433, 440 (1990) (internal quotations omitted). This relevance standard is "low." *Tennard v. Dretke*, 542 U.S. 274, 284–85 (2004) (citing *McKoy*, 494 U.S. at 440). If this standard is met, "'the Eighth Amendment requires that the jury be able to consider and give effect to'" to the capital defendant's mitigating evidence. *Id*. at 285 (quoting *Boyde v. California*, 494 U.S. 370, 377–78 (1990)).

Before trial, Chappell's counsel informed the court and the prosecution that if Chappell was convicted of the murder, they intended to offer evidence that Chappell's execution would adversely impact Chappell's family and friends. (ROA 64 at 2, citing Ariz. Rev. Stat. § 13-703(G) (West 2007)[33]). In response, the prosecution moved to bar

---

[33] Section 13-703(G) (West 2007) required a capital jury to "consider as [a] mitigating circumstance[] . . . any aspect of the defendant's character, propensities or record and any

such evidence as irrelevant to Chappell's character, record, and the offense's circumstances. (R.O.A. at 8.) The prosecution argued that while Chappell's witnesses could tell the jury how Chappell had impacted their lives, they should not be allowed to testify about the impact his execution would have on them. (R.T. 8/11/06 at 19–20.) Chappell's counsel responded that the court should allow such evidence as "indirect character evidence" since the impact of Chappell's execution would stem from his "character and the role" in their lives. (*Id*. at 20–21.)

The trial court granted the prosecution's motion and barred "evidence of any suffering of" or "sentencing recommendation from" Chappell's witnesses. (R.O.A. 127 at 2.) The court ruled Chappell could "introduce[e evidence of] the existence of family ties." (*Id*.) Chappell's counsel then filed an offer of proof, claiming Chappell had a Fifth and Eighth Amendment right to present execution-impact evidence, disclosing statements from Chappell's family, teachers, and coach about the adverse mental, physical, social, and financial impacts his execution would have on them. (R.O.A. 169, 193.)

On direct appeal, the Arizona Supreme Court denied relief on this claim, finding that the trial court had not abused its discretion in granting the motion. *Chappell*, 236 P.3d at 1184, ¶ 30. It stated, "In capital cases, 'the Eighth and Fourteenth Amendments require that the sentencer . . . not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.'" *Id*., ¶ 29 (quoting *Lockett*, 438 U.S. at 604) (cleaned up). But the court noted a trial court could "'exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of his offense.'" *Id*. (quoting *Lockett*, 438 U.S. at 604 n.12). Further, the court cited its prior holding, finding certain execution-impact evidence irrelevant "to mitigation." *Id*., ¶ 30 (citing *State v. Roque*, 141 P.3d 368, 397 (Ariz. 2006), exclusion of "sister's testimony expressing concern for the defendant's family's well-being is

---

of the circumstances of the offense." Ariz. Rev. Stat. § 13-703(G).  In 2008, this provision was transferred and renumbered as § 13-751(G).

'altogether unrelated to defendant, his character, or to the circumstances of the offense' and is therefore not relevant mitigating evidence," quoting *State v. Williams*, 904 P.2d 437, 454 (Ariz. 1995), and citing cases). Chappell argues that the Arizona Supreme Court's decision was contrary to clearly established federal law, as determined by the United States Supreme Court. (Doc. 25 at 157-59.)

As described above, the relevant federal law provided that a state court may properly bar evidence proffered as mitigation that is not relevant to the defendant's character, prior record, or the circumstances of the offense. Chappell's offer of proof did not support that any of his proffered execution-impact evidence was relevant to his own character, prior record, or the offense's circumstances. Instead, the offer of proof only described how his execution would affect others. The United States Supreme Court has not held that the sentencer must consider such evidence that is irrelevant to a defendant's character, prior record, or offense's circumstances. Chappell cites no authority to the contrary. And the Court has found none. *Stenson v. Lambert*, 504 F.3d 873, 892 (9th Cir. 2007) (neither *Lockett* nor any other federal case "require[ed] the admission" of such evidence); *see also United States v. Hager*, 721 F.3d 167, 193–97 (4th Cir. 2013) (no federal cases require the of execution-impact testimony that "goes beyond testimony about the defendant's character, prior record, or the circumstances of the crime") (citing *Stenson*, 504 F.3d at 892).[34]

In short, Chappell has not shown that the trial court's preclusion of execution-impact evidence in his case was contrary to, or involved an unreasonable application of, clearly established federal law. Claim 12 will be denied.

---

[34] Chappell states that in *Sears v. Upton*, 561 U.S. 945, 947–50 (2010), the United States Supreme Court deemed execution-impact evidence relevant mitigating evidence. (Doc. 25 at 158.) The Supreme Court did not do so. *See Sears*, 561 U.S. at 947–50. Rather, in describing the "inadequate mitigation investigation" of Sears's counsel, it noted that the state court had admitted execution-impact evidence. *Id*. at 947–51. The Supreme Court did not discuss whether the evidence was relevant mitigation evidence; it did not apply *Lockett* or mention *Stenson* or *Hager*. *See id*. at 947–50. Thus, *Sears* does not support Chappell's claim.

**XVII. Claims 13 and 14**

Chappell claims that the trial court denied him his Eighth and Fourteenth Amendment rights to due process and a fair sentencing by limiting his allocution at sentencing (Claim 13)[35] and denying the jury's request for a transcript of his allocution (Claim 14). (Doc. 25 at 160–65.) Chappell exhausted these claims. *See Chappell*, 236 P.3d at 1185, 1188–89, ¶¶ 31–33, 51–55.

**A.      Claim 13**

The trial court allowed Chappell to plea for mercy and state mitigating details about himself to the jury but would subject him to cross-examination if he addressed any issue of fact from trial. (R.T. 10/24/07 at 14–16.) The Arizona Supreme Court held that the trial court did not (1) abuse its discretion in doing so, as Chappell's right to allocute did not extend to statements on the alleged mitigators, or (2) deny Chappell due process, as he, in fact, allocuted. *Chappell*, 236 P.3d at 1185, ¶¶ 31–33. Chappell contests these holdings under § 2254(d)(1) and (2). (Doc. 25 at 160–62.)

Fourteenth Amendment due process entitles defendants to a fair sentencing. *Green v. Georgia*, 442 U.S. 95, 97 (1979). And the Eighth and Fourteenth Amendments require that the sentencer must not ignore any relevant mitigator. *Tennard v. Dretke*, 542 U.S. 274, 284–85 (2004) (citing *Boyde v. California*, 494 U.S. 370, 377–78 (1990)); *Eddings*, 455 U.S. at 110 (citing *Lockett*, 438 U.S. at 604 and n.12).

But the United States Supreme Court "has not recognized a constitutional right to allocution." *Troy v. Sec'y, Fla. Dep't of Corr.*, 763 F.3d 1305 (11th Cir. 2014). For instance, in *Hill v. United States*, the Supreme Court left open, whether a defendant has that right. 368 U.S. 424, 428 (1962). And in *McGautha v. United States*, the Supreme Court noted that it has "not directly determined whether or not to what extent the concept of due process of law requires that a criminal defendant wishing to present evidence or argument presumably relevant to the issues involved in sentencing should be permitted to do so."

---

[35] To the extent Chappell argues that the court should not have barred him from allocating on execution-impact evidence, his argument lacks merit. (*See* Section XVI, *supra*.)

402 U.S. 183, 218 n.22 (1971), *judgment vacated on other grounds by Crampton v. Ohio*, 408 U.S. 941 (1972). Other district courts, including the District of Arizona, have continued to confirm that the United States Supreme Court has not recognized a constitutional right to allocution. *See*, *e.g.*, *Garza v. Shinn*, No. CV-14-01901-PHX-SRB, 2021 WL 5850883, at *28–29 (D. Ariz. Dec. 9, 2021); *Rikard v. Harrington*, No. 2:07-CV-01867-JKS, 2009 WL 3367442, at *3 (E.D. Cal. Oct. 19, 2009); *Troy v. Sec'y of Dep't of Corr.*, No. 8:11-CV-796-T30-AEP, 2013 WL 24212, at *25 (M.D. Fla. Jan. 2, 2013).

Chappell, however, notes that the Ninth Circuit recognized a due process right to allocution in *Boardman v. Estelle*, 957 F.2d 1523, 1529-30 (9th Cir. 1992) (Doc. 25 at 161); *see also United States v. Chong*, 104 F.Supp.2d 1232 (D. Haw. 1999) (applying *Boardman* in holding that a defendant has a right to allocute before a sentencing jury in a capital sentencing hearing). Chappell cannot prevail under *Boardman*. First, *Boardman*, concerned the *outright* denial of a request, by a defendant represented by counsel, to allocute. *Boardman*, 957 F.2d at 1530. Whereas, in Chappell's case, the trial court did not bar Chappell from allocating; it only warned that it would subject him to cross-examination if he addressed any issue of fact from trial. (R.T. 10/24/07 at 14–16.) And thus *Boardman* is distinguishable here. Second, the Ninth Circuit issued *Boardman* before AEDPA, and under AEDPA, "clearly established federal law" are the holdings of the United States Supreme Court—not circuit courts of appeals. *Williams*, 529 U.S. at 412; *Rodgers*, 569 U.S. at 64.

Third, the circuits are split on whether a defendant's allocution is a constitutional right. *Compare Boardman*, 957 F.2d 1523; *United States v. Jackson*, 923 F.2d 1494 (11th Cir. 1991) (same); *United States v. Moree*, 928 F.2d 654, 656 (5th Cir. 1991); *with*, *e.g.*, *United States v. Lighty*, 616 F.3d 321, 365 (4th Cir. 2010) (noting its "precedent holding that a defendant does not have a constitutional right to allocution before the jury in a capital sentencing hearing"); *United States v. Li*, 115 F.3d 125, 132-33 (2d Cir. 1997) (acknowledging that the Constitution does not entitle defendants to allocution); *Scrivener v. Tansy*, 68 F.3d 1234, 1240 (10th Cir. 1995) ("A trial court's failure to afford a defendant

the right of allocution raises neither a jurisdictional nor a constitutional error cognizable in habeas."); *United States v. Coffey*, 871 F.2d 39, 40 (6th Cir. 1989) (stating that there is no constitutional right to allocute); *United States v. Fleming*, 849 F.2d 568, 569 (11th Cir. 1988) (citations omitted) ("[T]he right to allocution is not constitutional.").

Last, courts are split on what defendants may state on their own behalf before sentencing. In some capital cases, courts bar defendants from making unsworn statements to the jury, *United States v. Hall*, 152 F.3d 381, 396 (5th Cir. 1998) ("conclud[ing] that a criminal defendant in a capital case does not possess a constitutional right to make an unsworn statement of remorse before the jury that is not subject to cross-examination"), or to make a statement to the jury without cross-examination, *Commonwealth v. Abu-Jamal*, 555 A.2d 846, 857-58 (Pa. 1989). The practice of subjecting defendants who allocute to cross-examination, in fact, varies by jurisdiction. *See* Kimberly A. Thomas, *Beyond Mitigation: Towards a Theory of Allocution*, 75 Fordham L. Rev. 2641, 2648 n.51 (Apr. 2007) (contrasting state statutes). In short, there is no clearly established federal law that guarantees Chappell an unabridged right to allocute.

Chappell, moreover, cannot prevail under *Brecht*, 507 U.S. at 637. In his allocution, Chappell apologized to Devon's family, thanked his own family for their support, described his efforts to improve himself, and asked the jury to spare his life. (R.T. 10/25/07 at 4-5.) At no point—in state court or in this Court—has he offered what he would have added had the trial court not warned him about addressing issues of fact from trial. As a result, he has not shown how that warning actually prejudiced him.

For the reasons discussed, Claim 13 will be denied.

### B. Claim 14

During penalty phase deliberations, the jury asked for a transcript of Chappell's allocution. (R.T. 10/31/07 at 3.) The trial court denied the request and told the jurors to rely on their memory of Chappell's statements. (*Id*. at 5–6.)

The Arizona Supreme Court held that by doing so, the trial court did not deny Chappell his "constitutional rights," as the "jurors heard his allocution, and the mere fact

that they were not given a written transcript during deliberations neither impeded their ability to consider it nor violated Chappell's constitutional rights." *Chappell*, 236 P.3d at 1189, ¶ 55. Chappell argues that in so holding, the Court contradicted or unreasonably applied clearly established federal law and unreasonably determined the facts. (Doc. 25 at 163-65.)

The United States Supreme Court has not clearly held that a capital defendant has a constitutional right to have his allocution read back to the jury. *See, e.g., Sualez v. Jaime*, No. 5:18-cv-00725 DSF (ADS), 2020 WL 3491857, at *4 (C.D. Cal. May 12, 2020); *Gonzalez v. Allison*, No. CV 12-7811 CJC(JC), 2015 WL 5819111, at *18 (C.D. Cal. July 27, 2015) ("[P]etitioner has not identified any Supreme Court decision which clearly establishes that the federal constitution is violated whenever a trial court fails to read back trial testimony requested by a jury."); *see also Morse v. State*, 120 A.3d 1, 15 (Del. 2015) (holding that trial court's denial of the jury's request for a transcript of witness testimony did not "deprive[ defendant] of a substantial right, or . . . cause[] manifest injustice").

Further, as the district court in *Sualez* noted, the Ninth Circuit has held that "a trial court has wide latitude in deciding whether to have testimony requested by the jury read back." 2020 WL 3491857, at *4; *Riley v. Deeds*, 56 F.3d 1117, 1120 (9th Cir. 1995); *see also United States v. Medina Casteneda*, 511 F.3d 1246, 1249 (9th Cir. 2008) (citing *United States v. Nolan*, 700 F.2d 479, 486) ("In light of the district court's great latitude to address requests for readbacks and its recognition of the problems associated with readbacks, we hold that the judge's decision to deny the requested readback was not an abuse of discretion.").

Further, Chappell has not met the *Brecht* test because, after the trial court denied the jury's request for a transcript and told it to rely on its memory, the jury neither informed the trial court that it could not recall his allocution nor renewed its request. *Cf. Holt v. State*, 535 S.E.2d 514, 517–18 (Ga. Ct. App. 2000) (holding that appellant's "allegation that the trial court erred by refusing to read testimony to the jury" lacked merit "because the jury made no such request" and "[i]nstead . . . asked for a copy of the transcript, which, of

course, was not available," and "[w]hen the trial court explained this to the jury, it made no further requests for testimony"). In sum, the record shows that the jury could rely on memory to consider Chappell's allocution.

Claim 14 will be denied.

**XVIII.      Claim 15**

Chappell claims that by denying his request to instruct the jury to consider the total mitigating evidence as a standalone mitigating circumstance with each individual mitigating circumstance, the trial court violated his Eighth and Fourteenth Amendment rights to have the jury fully consider the mitigating evidence and sufficiently instructed on its sentencing discretion and powers. (Doc. 25 at 165–67.)

The parties agree that Chappell fully exhausted this claim by raising it on direct appeal (O.B. at 131–33; Docs. 25 at 165; Doc. 33 at 195–96), which the Arizona Supreme Court denied on the merits, *Chappell*, 236 P.3d at 1188, ¶¶ 45–46. The Court explained that the trial court had met the requested instruction's goal by telling the jurors to consider the mitigating evidence as a whole. *Id*., ¶ 46. This is the last reasoned state-court decision, which Chappell claims contradicts and unreasonably applies clearly established federal law and unreasonably determines the facts in light of the evidence presented. (Doc. 25 at 165–67.)

In reviewing jury instructions on mitigating evidence, this Court will determine "whether there is a reasonable likelihood that the jury . . . applied the challenged instruction[s] in a way that prevent[ed] the consideration of the constitutionally relevant evidence." *Boyde v. California*, 494 U.S. 370, 380 (1990); *see also Buchanan v. Angelone*, 522 U.S. 269, (1998) (reasoning that the "consistent concern has been that restrictions on the jury's sentencing determination not preclude the jury from being able to give effect to mitigating evidence"). Chappell need not "prove that it was more likely than not that the jury was prevented from giving effect to the evidence." *Johnson v. Texas*, 509 U.S. 350, 367 (1993). He must show "more than a mere possibility of such a bar." *Id*. at 367–68 (citing *Boyde*, 494 U.S. at 380).

The Eighth and Fourteenth Amendments assure that the jury "not be precluded from considering, *as a mitigat*[*or*], any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Locket*, 438 U.S. at 604 (emphasis in original); *Eddings*, 455 U.S. at 110; *Johnson*, 509 U.S. at 361. As the Supreme Court clarified in *Johnson*, "*Lockett* and its prodigy" require only that states not bar "the presentation of mitigating evidence" altogether or "limit[] the inquiries to which it is relevant so severely that the evidence could never be part of the sentencing decision at all." 509 U.S. at 361-62 (internal quotations omitted). And, as the Ninth Circuit explained in *Smith v. McCormick*, "the Supreme Court has . . . held that *Lockett* and *Eddings* speak mainly to 'what' mitigating evidence a sentencer must consider rather than 'how' that evidence must be considered." 914 F.2d 1153, 1169 (9th Cir. 1990) (quoting *Saffle v. Parks*, 494 U.S. 484 (1990)). That said, the Ninth Circuit also found it was "*clear* from *Pennsylvania* [*ex rel. Sullivan v. Ashe*, 302 U.S. 51 (1937)], *Woodson*[ *v. North Carolina*, 428 U.S. 280 (1976)], and their progeny, that a sentencer" must "weigh all of the mitigating circumstances 'together.'" *Id*. (emphasis added).

But the United States Supreme Court has never held that courts must instruct juries to consider those circumstances together as a standalone mitigating circumstance with each individual mitigating circumstance. In *Buchanan*, the Supreme Court held that the Court had never adopted a rule that required "a capital jury be instructed on the concept of mitigating evidence generally, or on particular statutory mitigating factors." 522 U.S. at 270, 275. The Court stressed "the need[—in a trial's penalty phase—]for a broad inquiry into all relevant mitigating evidence to allow an individualized determination." *Id*. at 275–76 (citing cases). The Court clarified that states could "shape and structure the jury's consideration of mitigation" as long as the states did "not preclude the jury from giving effect to any relevant mitigating evidence." *Id*. at 276 (citing *Johnson,* 509 U.S. at 362; *Penry v. Lynaugh*, 492 U.S. 302, 326 (1989), *abrogated on other grounds by Atkins v. Virginia*, 536 U.S. 304 (2002); *Franklin,* 487 U.S. at 181).

~ 114 ~

In fact, the Court stated that it had "never gone further and held that the state must affirmatively structure in a particular way the manner in which juries consider mitigating evidence," noting that its decisions have held *"complete jury discretion"* constitutional. *Id*. at 276-77 (citing cases). No clearly established federal law, in short, requires juries to consider all of the mitigating evidence as a standalone mitigating circumstance with each individual mitigating circumstance.

The trial court satisfied the Eighth and Fourteenth Amendments by instructing the jury to consider all the mitigating evidence and to determine whether "the total of the mitigation is sufficiently substantial to call for leniency." (R.T. 9/25/07 at 14–16, 18–20; R.O.A. 516 at 9–10, 12–13.) Moreover, the court defined mitigating circumstances as any circumstances "relevant in determining whether to impose a life sentence, including any aspect of the defendant's character, background, propensities, that is tendencies or inclinations, or record and any of the circumstances of the offense." (RT 9/25/07 at 14–15.) This satisfies the Eighth and Fourteenth Amendments. *See Buchanan*, 522 U.S. at 277 (holding that "[t]he jury instruction . . . did not violate these constitutional principles" because it did not bar "the jury's consideration of any mitigating evidence"); *see also Tuilaepa v. California*, 512 U.S. 967, 976 (1994) (feeling "hard pressed to invalidate a jury instruction that implements what [the United States Supreme Court has] said the law requires"); *Johnson*, 509 U.S. at 368 (quoting *Graham v. Collins*, 506 U.S. 461, 475–76 (1993)) ("As long as the mitigating evidence is within 'the effective reach of the sentencer,' the requirements of the Eighth Amendment are satisfied."); *cf. State v. Reynolds*, 836 A.2d 224, 322 n.123 (Conn. 2003) (noting that the state supreme court's requirement that courts should give jurors a correct written list of each alleged mitigating circumstance, including the cumulative effect of the circumstances, was under "sound policy consideration"—not "constitutional principles"). In sum, "the jury had a meaningful basis to consider" the mitigating evidence as a whole. *See Johnson*, 509 U.S. at 369.

Further, even if the clarity of the instruction alone was in doubt, the context in which the trial court instructed the jury "informed the jury that it could consider" the mitigating

circumstances as a whole. *See Buchanan*, 522 U.S. at 278 (1998) (finding that, in context, the jury was expressly informed "that it could consider mitigating evidence"). In assessing the instructions, this Court does not parse the language of the instructions, "but instead approach[es] the instructions in the same way that the jury would—with a 'commonsense understanding of the instructions in the light of all that has taken place at the trial.'" *Johnson*, 509 U.S. at 368 (quoting *Boyde*, 494 U.S. at 381). Chappell does not allege that any part of counsel's opening or closing remarks could have confused the jury about whether it could consider the mitigating evidence as a whole. And the record otherwise does not support such an allegation. The Court therefore presumes that the jury followed the instructions. *See McKensie v. Risley*, 842 F.2d 1525, 1533 (9th Cir. 1988); *cf. Richardson v. Marsh*, 481 U.S. 200, 206 (1987) (noting the "almost invariable assumption of the law that jurors follow their instructions").[36]

For these reasons, the Arizona Supreme Court's decision was neither contrary to, nor an unreasonable application of clearly established federal law. Nor did the decision involve an unreasonable determination of the facts in light of the evidence presented.

Claim 15 will be denied.

## XIX.  Claim 25

In Claim 25, Chappell argues that the admission of victim-impact evidence (VIE) at the penalty phase violated his Fifth, Sixth, Eighth, and Fourteenth Amendment "rights to due process and a fair and reliable sentencing."[37] (Doc. 25 at 186–90.) He argues that VIE is per se inadmissible and that Devon's grandfather's VIE, as well as the VIE, as a whole,

---

[36] By extension, the record shows that the alleged error did not have a substantial or injurious effect or influence on the verdict. *See Brecht*, 507 U.S. at 637; *cf. State v. Reynolds*, 836 A.2d 224, 322 (Conn. 2003) ("In light of the court's instruction [that the jury should consider the mitigating circumstances as a whole], there is no reasonable possibility that the defendant was prejudiced by the court's failure to include the cumulative effect of the mitigating evidence as an independent mitigating factor in the defendant's written list of mitigating factors.").

[37] Chappell has withdrawn his Sixth Amendment, Confrontation Clause claim. (Doc. 25 at 189–90; Doc. 87 at 133 n.17).

"was so emotionally stirring" that it was "unduly prejudicial" and "rendered the sentencing fundamentally unfair." (*Id.* at 187–89; Doc. 87 at 132–33.)

In *Booth v. Maryland*, the United States Supreme Court held that the introduction of a victim impact statement during the sentencing phase of a capital case violated the Eighth Amendment. 482 U.S. 496, 509 (1987). But, in *Payne v. Tennessee*, the Supreme Court revisited *Booth* and overruled it in part, holding that the Eighth Amendment does not erect a per se barrier to admission of VIE but left intact *Booth*'s prohibition on the admissibility of opinions from the victim's family about the crime, the defendant, or the appropriate sentence. 501 U.S. 808, 827 n. 2 (1991); *see Bosse v. Oklahoma*, 137 S. Ct. 1, 1 (2016) (per curiam) (*Payne* did not reverse *Booth* regarding the non-admissibility of family members' characterizations and opinions about the crime, the defendant, and the appropriate sentence).

On direct appeal, Chappell raised the following claim:

> [VIE] admitted at the penalty phase of the trial violated [Chappell]'s constitutional rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Article 2, §§ 1, 4, 13, 15, 23, 24 of the Arizona Constitution. *Lynn v. Reinstein*, [68 P.3d 412, 417 (Ariz. 2003)].

(O.B. at 142.)[38] The Arizona Supreme Court quoted the claim in the appendix to its order denying relief on direct appeal without discussion. *Chappell*, 236 P.3d at 1190, App. The parties disagree about whether Chappell fairly presented his federal claim to the state courts. As discussed herein, the Court construes the denial of claims quoted in the appendix to the Arizona Supreme Court's denial of relief on direct appeal as a denial of those claims on the merits.

---

[38] In *Lynn*, the Arizona Supreme Court noted that *Payne* removed the per se bar on VIE concerning how a crime had affected others. 68 P.3d at 417, ¶¶ 13-17. But the Arizona Supreme Court did not hold that VIE concerning the day of the crime or VIE, as a whole, rendered a sentencing fundamentally unfair. *See id*. Rather, it affirmed the trial court's prohibition of a victim recommending a sentence to the jury. *Id.*, ¶ 17.

~ 117 ~

Chappell argues that the Arizona Supreme Court's summary denial of the claim was contrary to, or involved an unreasonable application of, clearly established federal law, and was an unreasonable determination of the facts. (Doc. 25 at 188; Doc. 87 at 130.) Chappell argues that *Payne* was wrongly decided to the extent that it held that the admission of VIE did not violate the Eighth Amendment per se, but he cites no intervening United States Supreme Court authority reversing or modifying *Payne's* holding.

### A.    Additional Background

Before the start of the penalty phase, Chappell's counsel reviewed four written statements of the victim's maternal grandfather, step-grandmother, mother, and great aunt who intended to read their statements during the penalty phase. (R.T. 9/25/07 at 45.) Counsel objected to the statements, as a whole, as "overly [and] . . . unfairly prejudicial. (*Id*. at 52–53.) The court overruled the objection. *Id*.

At the start of the penalty phase, the trial court informed the jurors that four of the victim's family members would address them about Devon's "personal characteristics" and how his murder had impacted them but could not opine on or recommend a sentence. (R.T. 9/25/07 at 14–15.) The court instructed the jurors not to consider VIE as an aggravating circumstance or "form final opinions" of the case facts or Chappell's sentence until they "heard and considered" all the evidence, closing arguments, and instructions. (*Id*. at 15, 20.)

Devon's family members thereafter read their respective statements to the jury. Devon's maternal step-grandmother read her statement first. (*Id*. at 64.) In it, she recalled memories of Devon.  She also described how his death had affected her as a mother of young children, as Devon's step-grandmother, and Kristal's stepmother, as well as the effect of Devon's death on Kristal herself. (*Id*. at 64–67.) The next day, Devon's great aunt read her statement telling the jury that Devon and his mother, Kristal, had lived with her, her husband, and their children for a time. (R.T. 9/26/07 at 27–28.) She recalled her memories of that time, shared a photo of her daughter, Devon, and Kristal covered in finger paint, and described how Devon's death had affected her and her family. (*Id*. at 27–37.)

~ 118 ~

In his statement, Devon's maternal grandfather recalled his memories of Devon, (*id.* at 37–40) and described learning that Devon was missing, that he had been found, and that he had died:

> I remember getting the phone calls of finding out that Devon was missing and that they couldn't find him. I went to be with Kristal and to help her look for her son and when I got there, the officer had already found him in the pool. They kept saying that they were trying to revive him and that they would let us know. I remember the feeling that maybe he was gone but I didn't want to believe it. You never think that something like this is going to happen to your family. It was only something you hear on TV.
>
> I remember going to the hospital and waiting there for what seemed like forever. We were waiting for someone to come out and say he's okay but it didn't turn out like that. The reality hit hard when they took us into a cold looking room and closed the door and told us that they did everything they could do but they couldn't save him.

(*Id.* at 38.) He described how Devon's death had affected him as Kristal's father, as the father of young children, and as Devon's grandfather. (*Id.* at 38–41.) Devon's mother, Kristal, spoke last, sharing memories, and a few photographs, of Devon, and describing Devon's character and how his life, and death, continued to constantly affect her. (*Id.* at 41–52.)

After making an opening statement, Chappell's counsel presented Chappell's case in mitigation and called more than 45 witnesses, including familial and mental-health witnesses. (*See* R.T. 9/25/07, 9/27/07, 10/01/07, 10/02/07, 10/03/07, 10/04/07, 10/09/07, 10/10/07, 10/11/07, 10/15/07, 10/16/07, 10/17/07, 10/18/07.) Following the close of evidence and issuance of jury instructions, the jury sentenced Chappell to death.

B.    Analysis

The Arizona Supreme Court's denial of relief on direct appeal was neither contrary to, nor an unreasonable application of, clearly established federal law, or an unreasonable determination of the facts in light of the evidence. (Doc. 25 at 188; Doc. 87 at 130.) Devon's family members did not opine about the crime. At most, Chappell's grandfather described the effect of unfolding events upon him. And none of Devon's family members

opined about Chappell or about an appropriate sentence for Chappell. The United States Supreme Court acknowledged that the quantity and character of VIE could, taken together, violate a defendant's due process rights. *See Payne*, 501 U.S. at 825; *Higgs v. United States*, 711 F.Supp.2d 479, 527 (D. Md. 2010) (citing *Payne*, 501 U.S. at 825) (recognizing this mechanism for relief). But the totality of the VIE in Chappell's case did not violate his due process rights or unduly prejudice him at sentencing. Claim 25 will be denied.

Chappell did not specifically challenge Devon's grandfather's VIE or the specific VIE as a whole on direct appeal. As a result, the Court finds both challenges technically exhausted but procedurally defaulted. Contrary to Chappell's assertion, his appellate counsel did not render ineffective assistance by failing to present the unexhausted portions of his federal claim on direct appeal, because clearly established federal law did not support relief on such portions. Further, appellate counsel could have reasonably believed that the statements at issue did not characterize or opine on the crime. *Compare with McGill v. Ryan*, No. CV-12-01149-PHX-JJT, 2019 WL 160732, at *24 (D. Ariz. Jan. 10, 2019) (finding VIE of family member that she "could not believe how [murder victim] looked after the fire and recalled that he was bandaged from head to toe" and "described her reaction to the gruesome autopsy photos of her brother, telling the jurors that she 'couldn't believe that a human person could do that to another person'" "were arguably comments about McGill and the crime").

To the extent the grandfather may have characterized or opined on the crime, his statement did not have a "substantial and injurious effect or influence in determining" Chappell's sentence. *Brecht*, 507 U.S. at 637; *see Floyd v. Filson*, 949 F.3d 1128, 1149 (9th Cir. 2020) (applying harmless-error review to admission of mother's victim-impact statement); *Hooper v. Mullin*, 314 F.3d 1162, 1174 (10th Cir. 2002) (applying harmless-error review to admission of improper victim-impact statement).

The grandfather briefly spoke about the time he learned Devon was missing and quickly shifted to how that impacted him. (R.T. 09/26/07 at 38.) *See United States v. Mitchell*, 502 F.3d 931, 990 (9th Cir. 2007) (finding family member's statement an

~ 120 ~

"inadmissible opinion about Mitchell's crime" that was not prejudicial because the statement "was brief, isolated, and could not have had more than a marginal impact on the jury"). Besides, the jury already knew that Devon was missing, that the police found him in a pool, and that Devon drowned. Chappell, moreover, does not protest any other particular statement of the grandfather. *See McGill*, 2019 WL 160732, at *24 (finding that victim's statement on "her brother's condition after the burning," in context, did not have a substantial and injurious effect or influence on sentencing, as the jury knew the crime's nature and had viewed photos of the body, the surviving victim did not recommend a sentence "or otherwise attack McGill," and "[t]he bulk of her statement" was permissible).

Further, only four members of Devon's family spoke, their statements were relatively brief (R.T. 9/25/07 at 64–67; R.T. 9/26/07 at 27–52), and Chappell made his case in mitigation—having more than 45 witnesses testify (*see* R.T. 9/25/07, 9/27/07, 10/01/07, 10/02/07, 10/03/07, 10/04/07, 10/09/07, 10/10/07, 10/11/07, 10/15/07, 10/16/07, 10/17/07, 10/18/07). *See Garza v. Shinn*, No. CV-14-01901-PHX-SRB, 2021 WL 5850883, at *31 (D. Ariz. Dec. 9, 2021) (finding no substantial and injurious effect or influence on the jury, as only two victims gave statements, the statements "were relatively brief," and "[i]mmediately after the statements, Garza" offered his case in mitigation, which included 27 witnesses). Further, the trial court instructed the jury not to "form final opinions" on the facts of the case or sentence until it "heard and considered" all the evidence, closing arguments, and instructions (R.T. 9/25/07 at 20)—which the jurors are presumed to have followed, *Greer v. Miller*, 483 U.S. 756, 766 n.8 (1987).

Thus, even if the grandfather's statements at issue should not have been admitted, the error was harmless. *See Lockett v. Trammell*, 711 F.3d 1218, 1239–40 (10th Cir. 2013) (finding error harmless where jury was correctly instructed that its sentencing decision was "limited to a moral inquiry into the culpability of the defendant, not an emotional response to the evidence"); *Welch v. Workman*, 630 F.3d 980, 997, 999 (10th Cir. 2011) (admission of unconstitutional victim-impact statements vividly and emotionally describing the crimes was harmless error where jury was properly instructed); *United States v. Bernard*, 299 F.3d

467, 481 (5th Cir. 2002) ("[A]ny prejudice that did result from the statements was mitigated by the district court's instructions to the jurors not to be swayed by passion, prejudice or sympathy.").

By extension, Chappell's appellate counsel did not ineffectively assist Chappell by not contesting the admission of the statements at issue on direct appeal. And thus this argument is procedurally defaulted and barred.

Nor did counsel ineffectively assist Chappell by not contesting the VIE as a whole on direct appeal. In *Payne*, the Supreme Court reassured that if the VIE presented "is so unduly prejudicial that it renders the trial fundamentally unfair, the Fourteenth Amendment's Due Process Clause provides a mechanism for relief." 501 U.S. at 825; *Higgs v. United States*, 711 F.Supp.2d 479, 527 (D. Md. 2010) (citing *Payne*, 501 U.S. at 825) (recognizing this mechanism for relief).

The burden to show such prejudice is "quite high." *Id*. (citing *United States v. Barnette*, 211 F.3d 803, 818–19 (4th Cir. 2000); *United States v. McVeigh*, 153 F.3d 1166, 1218-22 (10th Cir. 1998), *overruled on other grounds by* 184 F.3d 1206 (10th Cir. 1999)). "[T]here is nothing unfair about allowing the jury to bear in mind [the specific] harm [caused by the defendant] at the same time as it considers the mitigating evidence introduced by the defendant." *Payne*, 501 U.S. at 825–26; *see also Williams v. Chrans*, 945 F.2d 926, 947 (7th Cir. 1991) (holding that the prosecution "should not be required to present victim impact evidence that [is] devoid of all passion," explaining that "[s]uch sterile prosecution of heinous crimes cannot be expected, let alone required"). Indeed, "[i]t would be fundamentally unfair to shield a defendant from testimony describing the full effects of an outrageous crime." *McVeigh*, 153 F.3d at 1221; *see United States v. Whitten*, 610 F.3d 168, 190–91 (2d Cir. 2010) (stating that "[i]t cannot be expected that victim impact testimony will be cool and dispassionate," explaining that "[s]ome deaths cause more suffering than others," and "[t]he only way to ensure against victim impacts caused by one's murder of a well-loved human being is to take care to murder no one at all"); *Sullivan v. Nevins*, No. 2:05-cv-00448-MMD-NJK, 2014 WL 3778611, at *12 (D. Nev.

July 31, 2014) (finding that the victims' statements, in a case where the murder victim was young, "certainly did not render Sullivan's sentencing fundamentally unfair," in part, because "[t]hose statements reflected the victims' quite understandable emotional reaction to Sullivan's crimes"); *Gentry v. Sinclair*, 576 F.Supp.2d 1130, 1165 (W.D. Wash. 2008) (holding that state-court decision, finding victim-impact testimony not unduly prejudicial, did not violate § 2254(d)(1) or (2) even though there was "no doubt that the jury was moved by testimony concerning the void created by [murder victim]'s tragic loss, given the jury's knowledge of the nature of Cassie's death").

Here, the VIE was not unduly prejudicial based on few members of Devon's family who spoke, the briefness of their statements, and the quick glimpse of Devon's life that they gave, revealing his interests and personality. *See United States v. Mikhel*, 889 F.3d 1003, 1052 (9th Cir. 2018) (quoting *Payne*, 501 U.S. at 822–23) (noting that VIE "gives a 'quick glimpse' of the victim's life and of his 'uniqueness as an individual human being'").

The childhood photographs of Devon that his mother and great aunt presented to the jury did not render the VIE, as a whole, unduly prejudicial. They presented only a few photographs and did not display them with music. Moreover, none of the photographs showed Devon's body after police found him in the pool. Instead, they briefly illustrated moments of Devon's childhood, and helped humanize him. *See Castillo v. Gittere*, No. 2:04-cv-00868-RCJ-GWF, 2019 WL 189821, at *30 (D. Nev. Jan. 14, 2019) (holding that admission of photograph of murder victim and her granddaughter at the granddaughter's graduation as VIE did not approach a due process violation). In light of the foregoing, and the trial court's instructions, the VIE at Chappell's trial was not unduly prejudicial.

For the reasons discussed, appellate counsel did not render ineffective assistance on direct appeal, and PCR counsel did not render ineffective assistance by failing to raise an appellate IATC claim on this basis. *See Turner*, 281 F.3d at 872; *Wildman*, 261 F.3d at 840; *Boag*, 769 F.2d at 1344; *cf. Pollard*, 119 F.3d at 1435.

Claim 25 will be denied.

//

~ 123 ~

**XX.   Claim 32**

In Claim 32, Chappell alleges that his trial counsel, and the trial court violated his Sixth Amendment right to a public trial and to a meaningful appeal, by failing to ensure that all bench conferences were recorded. (Doc. 25 at 217–19.) Chappell acknowledges this claim is technically exhausted but procedurally defaulted. (*Id*. at 217.) He argues the procedural default should be excused under *Martinez*, although he does not expressly allege that trial counsel rendered ineffective assistance by failing to ensure all bench conferences were recorded, he claims trial counsel nevertheless violated his Sixth Amendment rights. (*Id*. at 217–19.) The Court construes this claim as asserting an IATC claim.

**A.       Right to a Public Trial**

The Sixth Amendment grants the accused the right to a public trial, U.S. Const. amend VI—a right "personal to the accused," *Gannett Co. v. DePasquale*, 443 U.S. 368, 379-80 (1979) (citation omitted). The United States Supreme Court has described the what this right aims to do: for the accused's "benefit . . . [,] that the public may see he is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions . . . ." *Waller v. Georgia*, 467 U.S. 39, 46 (1984) (cleaned up).  It also "encourages witnesses to come forward and discourages perjury." *Id*. (citing cases).

*Waller* does not suggest that Chappell was denied that right based on the unrecorded bench and chamber conferences. *See id.* at 43–50. The concerns mentioned in *Waller* do not exist in failing to record those conferences. Such exchanges between the court and counsel on legal or administrative matters "do not hinder the objectives which the Court in *Waller* observed were fostered by public trials." *United States v. Norris*, 780 F.2d 1207, 1210 (5th Cir. 1986); *see also Rovinsky*, 722 F.2d 197, 201 (5th Cir. 1984) ("Sidebar conferences in which the defendant's counsel participates without objection do not violate the right to a public trial.").

In fact, they do not serve a fact-finding purpose. *Norris*, 780 at 1210. What is more, "[a] routine evidentiary ruling is rarely determinative of the accused's guilt or innocence."

*Id*. at 1210. And such rulings "ordinarily pose no threat of judicial, prosecutorial or public abuse that a public trial is designed to protect against." *Id*. at 1210–11. Chappell has not shown otherwise. In short, the court did not violate Chappell's Sixth Amendment right to a public trial. *Cf. United States v. Cavallo*, 790 F.3d 1202, 1231 n.18 (11th Cir. 2015) (summarily finding defendant's argument that district court erred "by holding sidebar conferences in violation of [d]efendants' right to a public trial" lacked merit).

### B.    Right to a Meaningful Appeal

*Griffin v. Illinois*, 351 U.S. 12 (1956), "is the watershed of [the United States Supreme Court's] transcript decisions." *Mayor v. City of Chicago*, 404 U.S. 189, 193 (1971). *Griffin* holds that due process and equal protection assures that "[d]estitute defendants" receive "as adequate appellate review as" those who can afford the transcripts. 351 U.S. at 17, 19. To that end, the state must supply "an indigent defendant" with the transcripts "needed for an effective defense or appeal." *Britt v. North Carolina*, 404 U.S. 226, 433 (1971); *see also United States v. Carrillo*, 902 F.2d 1405, 1409 (9th Cir. 1990) (citing *Hardy v. United States*, 375 U.S. 277, 279–82 (1964)) ("A criminal defendant has a right to a record on appeal which includes a complete transcript of the proceedings at trial."). This need depends on the transcript's value on appeal to the accused and "the availability of alternative devices that would fulfill the same functions as a transcript." *Britt*, 404 U.S. at 433-34.

In light of those two factors, Chappell must show that the omissions from the transcripts prejudiced him. *Madera v. Risley*, 885 F.2d 646, 648-49 (9th Cir. 1989); *see also Scott v. Elo*, 302 F.3d 598, 604 (6th Cir. 2002) (applying this burden to federal habeas cases); *White v. State of Florida Dep't of Corrections*, 939 F.2d 912, 914 (11th Cir. 1991) (same).

Chappell has not shown prejudice. He asserts that "[t]he omissions from the trial court record deprived [him] of a meaningful appeal because it was impossible for the Arizona Supreme Court to conduct its independent review of the death sentence with so many proceedings unrecorded." (Doc. 25 at 219.) But he does not explain why the court

~ 125 ~

could not have effectively performed that review without them or that the omitted portions would have justified relief. *See Madera*, 885 F.2d at 648 (denoting that a petitioner must state a "tenable theory" about the appealable error that would have been found but for the absent transcript); *Scott*, 302 F.3d at 605 (finding no prejudice where Scott merely asserted "gross speculation of error" in the transcript's missing part). For that reason, Chappell has failed to show prejudice.

Claim 32 will be denied as inexcusably procedurally defaulted.

## CHALLENGES TO THE DEATH PENALTY

## XXI.  Claim 16

Chappell claims that the death penalty violates the Eighth Amendment. (Doc. 25 at 167–70.) He asserts that it is cruel because it is unreliably and arbitrarily imposed resulting in the sentencing and execution of innocent persons or such imposition is influenced by improper considerations, including race, geographic location of the crime, and the gender of the victim or defendant. (*Id*. at 168–69.) He contends that it is also unusual, as the number of death sentences and executions have "plummeted" nationally in the past two decades, due to repeals and moratoria, such that only a few counties in a few states impose death sentences. (*Id*. at 169–70.) He further argues that capital punishment no longer serves a penological goal. (*Id*. at 170.)

The United States Supreme Court has held that capital punishment does not, *per se*, violate the Eighth Amendment. *Gregg v. Georgia*, 428 U.S. 153, 169 and 187 (1976); *see Glossip v. Gross*, 576 U.S. 863, 881 (2015) (same); *United States v. Fell*, 224 F.Supp.3d 327, 358 (D. Vt. 2016) ("*Gregg* is still the law of the land."). The Eighth Amendment "draw[s] its meaning from . . . evolving standards of decency." *Roper v. Simmons*, 543 U.S. 551, 594 (2005) (O'Connor, J. dissenting) (quoting *Trop v. Dulles*, 356 U.S. at 101 (1958) (plurality opinion)). Nevertheless, it is the Supreme Court's prerogative alone to overrule its precedents. *State Oil Co. v. Khan*, 522 U.S. 3, 20 (1997). The Supreme Court has not overruled capital punishment based upon the factors cited by Chappell. Accordingly, in light of *Gregg* and its progeny, the Court will deny Claim 16 as without merit.

**XXII. Claim 17**

Chappell alleges that Arizona's death-penalty scheme is unconstitutional in two ways. First, he alleges that it violates the Eighth Amendment because it does not allow full consideration of a mitigating circumstance unless it is supported by a preponderance of the evidence under § 13-703(C) of the Arizona Revised Statutes (2003). (Doc. 25 at 171–73.) Second, he alleges the Arizona scheme violates the Fifth and Eighth Amendments because it does not require the Arizona Supreme Court to conduct a comparative proportionality review. (*Id*. at 172–73.) Chappell claims the Arizona Supreme Court's denial of this claim on the merits was contrary to, or unreasonably applied, clearly established federal law and that it unreasonably determined the facts. (Doc. 87 at 108) (citing *Chappell*, 236 P.3d at 1190).

As to his allegation that the court unreasonably determined the facts, he appears to challenge the sufficiency of the fact-finding process, which limited consideration of mitigating circumstances to those shown by a preponderance of the evidence and by the Arizona Supreme Court's abandonment comparative proportionality review of a death sentence. Chappell alleges that at the time of the crime, he was 21 years old, whose brain was still developing and that he had a brain impairment that impacted his ability to make reasoned decisions, which caused him act impulsively. (Doc. 25 at 182.)

The United States Supreme Court has upheld Arizona's requirement that a mitigating circumstance be supported by a preponderance of the evidence. *See Walton*, 497 U.S. at 649–51; *see Kansas v. Marsh*, 548 U.S. 163, 173 (2006) (same). For the reasons discussed in connection with Claim 21, comparative proportionality review is not constitutionally required. The Court will deny Claim 17 as meritless.

**XXIII.    Claim 18**

Chappell alleges Arizona's death-penalty scheme violates the Eighth Amendment by giving the prosecutor "unbridled" discretion to seek a death sentence, resulting in "arbitrary and capricious charging decisions" and inconsistent treatment of similar cases. (Doc. 25 at 173-75.)

The Supreme Court has observed that the discretionary stages of a criminal case, including a prosecutor's decision whether to seek a death sentence, are not determinative of the constitutionality of a death sentence. *Gregg*, 428 U.S. at 199 & n.50; *see Jurek v. Texas*, 428 U.S. 262, 274 (1976); *Proffitt v. Florida*, 428 U.S. 242, 254 (1976); *see also Smith v. Stewart*, 140 F.3d 1263, 1272 (9th Cir. 1998) (upholding Arizona's death penalty scheme despite prosecutor's discretion whether to seek a death sentence). Absent citation to contrary controlling authority, the Arizona Supreme Court's denial of this claim was neither contrary to, nor an unreasonable application of, clearly established federal law. Claim 18 will be denied.

## XXIV.        Claim 21

Chappell alleges that the absence of a proportionality review under Arizona's death-penalty scheme violates Fourteenth Amendment due process and equal protection and the Eighth Amendment. (Doc. 25 at 178–80.) However, there is no federal constitutional right to proportionality review of a death sentence. *McCleskey v. Kemp*, 481 U.S. 279, 306 (1987) (citing *Pulley v. Harris*, 465 U.S. 37, 43 (1984)); *see Allen v. Woodford*, 395 F.3d 979, 1018–19 (9th Cir. 2005). The "substantive right to be free from a disproportionate sentence" is protected by the application of "adequately narrowed aggravating circumstance[s]." *Ceja v. Stewart*, 97 F.3d 1246, 1252 (9th Cir. 1996). Claim 21 will be denied as without merit.

## XXV.        Claim 22

Chappell argues that the Arizona sentencing scheme violates the Fifth, Eighth, and Fourteenth Amendments. First, he alleges that the scheme does not require that the jury find proven aggravating circumstances outweigh proven mitigating circumstances beyond a reasonable doubt. (Doc. 25 at 190). Second, he alleges that the Arizona scheme fails to specify the burden of persuasion on the parties or require the trial court to instruct the jury about how to weigh the aggravating and mitigating circumstances.[39] (*Id.*)

---

[39] Under the Arizona capital sentencing scheme, to impose a death sentence a jury must find that the State has proven any aggravating circumstance beyond a reasonable doubt and

Chappell cites *Kansas v. Marsh* in support of this claim. In *Marsh*, the United States Supreme Court compared the Kansas death penalty statute to Arizona's, finding the Kansas statute was analogous except that the Kansas statute required the state to bear the burden of proving that aggravating circumstances were not outweighed by mitigating circumstances beyond a reasonable doubt. 548 U.S. 163, 173 (2006). Chappell asserts that the Supreme Court upheld the Kansas statute for that reason, arguing it implicitly disfavored the differences between the two statutes. In *Marsh*, the Court evaluated the constitutionality of the Kansas death penalty statute. It did not find Arizona's statute— which it has previously upheld in relevant part, *see Walton*, 497 U.S. 639—was therefore unconstitutional because it did not require that aggravating circumstances outweigh mitigating circumstances beyond a reasonable doubt or did not impose a specified burden of proof on the parties.

More generally, the United States Supreme Court has not held that the Constitution requires a jury to find that proven aggravating circumstances outweigh proven mitigating circumstances beyond a reasonable doubt or specified a standard for weighing them. *See Marsh*, 548 U.S. at 175 (citing *Franklin v. Lynaugh*, 487 U.S. 164, 179 (1988)). To the contrary, the Supreme Court has held that a "capital sentencer need not be instructed how to weigh" any fact in deciding the sentence. *Tuilaepa v. California*, 512 U.S. 967, 979 (1994); *see also Stephens*, 462 U.S. at 875 n.13 ("specific standards for balancing aggravating against mitigating circumstances are not constitutionally required"); *see also Smith v. Stewart*, 140 F.3d 1263, 1272 (9th Cir. 1998) (rejecting the same claim raised by Chappell here).

Chappell suggests that *Hurst v. Florida*, 577 U.S. 92 (2016), requires that the sentencer find the aggravating circumstances outweigh the mitigating circumstances beyond a reasonable doubt. (Doc. 87 at 123–24.) In *Hurst*, the Supreme Court held that the

that the aggravating circumstances outweigh the mitigating circumstances, which the defendant must prove by a preponderance of the evidence. Ariz. Rev. Stat. § 13-703(C) & (E).

jury, not the judge, must find the evidence supports each alleged aggravator beyond a reasonable doubt. 577 U.S. 92. The Court did not require that the jury find that aggravating circumstances outweigh the mitigating circumstances beyond a reasonable doubt. *See id*. Further, the Supreme Court has held that the sentencer has "unbridled discretion" in the weighing process. *See Stephens*, 462 U.S. at 875.

Chappell also alleges that Arizona's death-penalty scheme does not place a burden of proof on the state's rebuttal evidence to proven mitigators and asserts that State rebuttal evidence constitutes "additional" aggravating evidence with which to outweigh mitigators established by a preponderance of the evidence. (Doc. 25 at 182–83.) Chappell seemingly argues that the State should not be able to attempt to rebut mitigating evidence. But in the adversary system, each party is entitled to challenge the evidence presented by the other. And thus allowing a State to attempt to rebut a defendant's mitigating evidence does not add "additional" aggravating evidence. Instead, it requires that a defendant carefully consider whether proffered mitigating evidence opens the door to damaging rebuttal evidence. The United States Supreme Court has not held that this practice is unconstitutional. Moreover, the "penalty phase"—when mitigation evidence is considered—the sentencer has "unbridled discretion" in deciding whether to sentence a defendant to death after finding the defendant eligible for a death sentence. *Stephens*, 462 U.S. at 875. Chappell has not shown that the state court's denial of this claim is contrary to, or an unreasonable application of, clearly established federal law. The Court will deny Claim 22.

**XXVI.     Claim 23**

Chappell alleges that Arizona's death-penalty scheme violates the Eighth Amendment by failing to provide objective standards to the sentencer in weighing the aggravators against the mitigators. (Doc. 25 at 183–84.) As discussed above, the United States Supreme Court has never held that the Constitution requires a particular method for weighing the factors. *Marsh*, 548 U.S. at 175. Rather, it has held that the sentencer has "unbridled discretion" in deciding whether to sentence a defendant to death after it has

found the defendant eligible for capital punishment. *Stephens*, 462 U.S. at 875. Chappell has not shown that the state court's denial of this claim is contrary to, or an unreasonable application of, clearly established federal law. The Court will deny Claim 23.

**XXVII.    Claim 24**

Chappell alleges that Arizona's death-penalty scheme violates the Eighth Amendment by insufficiently channeling the sentencer's discretion. (Doc. 25 at 184–86.) He alleges that § 13-1105(A) (2003) of the Arizona Revised Statutes broadly defined the conduct constituting first-degree murder such that it encompassed the majority of murders and effectively relied on Arizona's statutory aggravating circumstances under § 13-703(F) (2003) (amended and renumbered § 13-751) (2012)), to narrow the defendants eligible for a death sentence for first-degree murder). Chappell further alleges that Arizona's statutory aggravating circumstances "sweep so expansively that they do not meaningfully separate out a group of offenders whose crimes are so egregious that they are eligible for the death penalty," from those whose crimes are not so egregious.[40]  (*Id*. at 185–86.)

---

[40] Aggravating circumstances under former § 13-703(F) (2003) were:

(1)    a prior conviction for which a sentence of life imprisonment or death could have been imposed under Arizona law;

(2)    a previous conviction for a serious offense, whether preparatory or completed, as set forth in § 13-703(H), and including convictions for serious offenses committed on the same occasion as the homicide, or not committed on the same occasion but consolidated for trial with the homicide;

(3)    knowingly creating a grave risk of death to another person or persons in addition to the person murdered during the commission of the offense;

(4)    procuring the commission of the offense by payment, or promise of payment, of anything of pecuniary value;

(5)    committing the offense as consideration for the receipt or expectation of receipt of anything of pecuniary value;

(6)    committing the offense in an especially heinous, cruel or depraved manner;

To pass constitutional muster, a State's capital sentencing scheme must "genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others" found guilty of a capital offense. *Stephens*, 462 U.S. at 877. A State's death penalty scheme must provide an "objective, evenhanded and substantively rational way" to determine whether a defendant is eligible for the death penalty. *Id.* at 879. Defining specific "aggravating circumstances" is the accepted "means of genuinely narrowing the class of death-eligible persons and thereby channeling the [sentencer's] discretion." *Lowenfield v. Phelps*, 484 U.S. 231, 244 (1988). The ultimate purpose of statutory aggravating circumstances is to direct, and limit, sentencing discretion and minimize the risk of arbitrary and capricious infliction of the death penalty.

Subject to the constitutional requirement that a state's death-penalty scheme define the class of defendants eligible for capital punishment in a non-arbitrary manner, states are free to determine the aggravating circumstances that define that class of defendants. "[T]he presence of aggravating circumstances serves the purpose of limiting the class of death-eligible defendants" and "the requirement of individualized sentencing in capital cases" by allowing the sentencer to consider all relevant mitigating evidence. *Blystone v. Pennsylvania,* 494 U.S. 299, 306–07 (1990). Thus, a state capital sentencing scheme must

(7)    committing the offense while in custody of, or on authorized or unauthorized release from, state department of corrections, law enforcement agency, or a county or city jail, or on probation for a felony;

(8)    conviction of one or more other homicides committed during the commission of the offense;

(9)    the defendant was an adult when the offense was committed, or was tried as an adult, and the murdered person was less than 15, or more than 70, years old; and

(10)   the murdered person was an on-duty peace officer killed in the course of performing the officer's official duties and the defendant knew, or should have known, that the murdered person was a peace officer.

(1) rationally narrow the class of death-eligible defendants; and (2) permit the sentencer to render a reasoned individualized sentencing determination based upon the death-eligible defendant's record, personal characteristics, and the circumstances of his crime. *Marsh*, 548 U.S. at 173–74.

At relevant times, Arizona law provided that a person commits first-degree murder if, intending or knowing his conduct will cause death, he causes the death of another with premeditation, he commits or attempts to commit one or more specified felonies, e.g., felony murder,[41] or he intends or knows his conduct will cause death to a law enforcement officer in the line of duty. Ariz. Rev. Stat. § 13-1105(A) (2002). A person convicted of first-degree murder is eligible for a death sentence if a jury unanimously finds at least one aggravating circumstance proven beyond a reasonable doubt. Ariz. Rev. Stat. § 13-703(A) (2003) (amended and renumbered as § 13-751) (2012). If a jury unanimously finds at least one aggravating circumstance beyond a reasonable doubt, it must then determine that there are "no mitigating circumstances sufficiently substantial to call for leniency," before imposing a death sentence.[42] Ariz. Rev. Stat. § 13-703(E) (2003) (amended and renumbered § 13-751(E) (2012)).

Arizona's capital sentencing scheme both genuinely narrowed the class of first-degree murderers eligible for a death sentence by requiring a jury to unanimously find at least one aggravating circumstance proven beyond a reasonable doubt, and by permitting a jury to render a reasoned individualized sentence based on a death-eligible defendant's record, personal characteristics, and the circumstances of his crime. Consequently, the

---

[41] First-degree felony murder under A.R.S. § 13-1105(A)(2) required no mental state other than that required for the commission of enumerated felony involved. Ariz. Rev. Stat. 13-1105(B) (2002).

[42] Mitigating circumstances had to be proven by a preponderance of the evidence and could be presented regardless of admissibility under the rules governing admission of evidence at criminal trials, and jurors did not have to agree unanimously that a mitigating circumstance had been so proven, and each juror could consider any mitigating circumstance found by that juror in determining the appropriate penalty. Ariz. Rev. Stat. § 13-703(C) (2003).

Arizona Supreme Court's denial of this claim was neither contrary to, nor involved an unreasonable application of clearly established federal law. Further, Chappell has not alleged or shown that the denial of this claim by the Arizona Supreme Court was based on an unreasonable determination of the facts in light of the evidence presented in state court.

The Court will deny Claim 24.

**XXVIII.      Claim 26**

Chappell alleges that execution by lethal injection is cruel and unusual, citing numerous instances of ad hoc changes to Arizona's lethal execution protocol and failure or inability to comply with the protocol, and alleges that his sentence, if carried out, will violate his Eighth and Fourteenth Amendment rights. (Doc. 25 at 190–97.) Respondents argue that the United States Supreme Court has never invalidated lethal injection, or any state's lethal-injection protocol, and that the claim is premature, where "there is no certainty that the current protocols will be in place when a warrant for [Chappell's] execution is issued." (Doc. 33 at 240–41 & n.142.)

The Arizona Supreme Court denied this claim on direct appeal. *Chappell*, 236 P.3d at 1191, App. at 14. These rulings were not contrary to or an unreasonable application of clearly established federal law. *See, e.g., Baze*, 553 U.S. at 50. The Ninth Circuit has concluded that Arizona's lethal injection protocol does not violate the Eighth Amendment. *See Dickens v. Brewer*, 631 F.3d 1139 (9th Cir. 2011). Further, in *Nance v. Ward*, the United States Supreme Court indicated that such claims may be raised in a separate civil rights case under 42 U.S.C. § 1983, applying the standard described in *Bucklew v. Precythe*, 587 U.S. 119 (2019). *See Nance v. Ward*, 597 U.S. 159, 169 (2022) (where litigant challenges only execution method, § 1983 is the appropriate vehicle).

Chappell speculates, based on the last decade of Arizona's execution protocols, that the Arizona protocol in place if, and when, he is executed will violate the Eighth Amendment. To the extent that Chappell alleges that the protocol for his execution will violate the Eighth Amendment, his claim is both speculative and premature. *See Baze*, 553 U.S. at 50 (citing *Helling v. McKinney*, 509 U.S. 25, 33 (1993)). The Court will deny Claim

26 without prejudice.

**XXIX.      Claim 27**

Chappell also alleges that Arizona's death-penalty scheme violates the Eighth Amendment by requiring the jury to sentence a defendant to death if one aggravator is found beyond a reasonable doubt but no mitigator is found by a preponderance of the evidence. (Doc. 25 at 197–98.)

As described above, in Arizona, a jury must first find at least one aggravator beyond a reasonable doubt and that no mitigators "sufficiently substantial to call for leniency" exist before it can impose a death sentence. Ariz. Rev. Stat. § 13-751(E). The United States Supreme Court has found Arizona's scheme, in relevant part, constitutional. *See Jeffers*, 497 U.S. at 774–77; *Walton*, 497 U.S. at 649–56; *see also Smith*, 140 F.3d at 1272.

Chappell nonetheless implies that Arizona's requirement that he must prove mitigators by a preponderance of the evidence is unconstitutional because it allegedly bars the jury from considering any aspect of his character or record that could support a non-death sentence. (Doc. 25 at 198.) The same claim was raised in *Walton*, which the Supreme Court rejected. *Walton*, 497 U.S. at 649-51. While the Court described the Arizona scheme in *Marsh*, it did not overrule the relevant holding in *Walton*, which still controls, 548 U.S. at 173; *see also United States v. Mitchell*, 502 F.3d 931, 993 (9th Cir. 2007). Chappell has not shown that the state court's denial of this claim was contrary to, or an unreasonable application of, clearly established federal law.

The Court will deny Claim 27.

**XXX.       Claim 28**

Chappell claims that the Eighth Amendment bars the execution of those who, like Chappell, committed the capital crime at 21 years old. (Doc. 25 at 199–203.) To support this claim, he cites a study that concludes that in terms of one's impulse control, planning, and thinking ahead, the brain continues to develop after the age of 21. (*Id*. at 201–02.) For that reason, he argues that executing one whose brain has not fully developed does not serve the penological purpose of retribution or deterrence. (*Id*. at 202.) He adds that "his

~ 135 ~

brain impairment made his behavior more similar to that of a juvenile than that of an adult." (Doc. 25 at 202–03.) To support this whole claim, he cites *Atkins*, which held that the Eighth Amendment bars the execution of the intellectually disabled, 536 U.S. 304, and *Roper*, which held that the Eighth Amendment bars the execution of those who committed the crime under the age of eighteen, 543 U.S. 551. He also cites *Eddings*, 455 U.S. at 115, which states that "youth is more than a chronological fact." (Doc. 25 at 202.)

In *Roper*, the United States Supreme Court flatly held that "[t]he Eighth and Fourteenth Amendments forbid imposition of the death penalty on offenders who were under the age of 18 when their crimes were committed." 543 U.S. at 578. *Roper*, in sum, categorically bans executing juveniles in the same way that *Atkins* categorically bans executing the intellectually disabled. *Id*. at 564, 567; *see also Hall v. Florida*, 572 U.S. 701, 708 (2014) (noting, in discussing *Roper* and *Atkins*, that "[t]he Eighth Amendment prohibits certain punishments as a categorical matter"). As a result, neither *Roper* nor *Atkins* extend to Chappell. Claim 28 therefore lacks merit, under § 2254(d), or otherwise.

**XXXI.    Claim 31**

Chappell claims that his death sentence violates the Eighth Amendment under *Atkins* because the frontal lobe of his brain is impaired. (Doc. 25 at 262–65.) He concedes that the claim is technically exhausted but procedurally defaulted, as he did not raise it in state court. (Doc. 87 at 148.) Nonetheless, he asks this Court to excuse the default based on cause and prejudice. (*Id*. at 149.) He contends that PCR counsel rendered ineffective assistance by failing to allege that appellate counsel rendered ineffective assistance by failing to raise this Eighth Amendment claim on direct appeal. (*Id*.) As discussed herein, the ineffective assistance of PCR counsel can only establish cause to excuse an IATC claim under *Martinez*. Accordingly, the ineffective assistance of PCR counsel does not establish cause to excuse the procedural default of this claim. *Davila*, 582 U.S. at 529–31. Consequently, the default is not excused and Claim 31 will be denied.

**EVIDENTIARY DEVELOPMENT**

Chappell requests evidentiary development with respect to Claims 1, 2(A)(1),

2(A)(2), 2(A)(3), 2(C)(1), 2(C)(2), 3, 16, 17-29, 30, and 31. (Doc. 105.) He seeks discovery, an evidentiary hearing, and expansion of the record under Rules 6, 7, and 8 of the Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254. (*Id.*) Chappell seeks evidentiary development in support of his claims and/or to support cause for the procedural default of claims under *Martinez.*

## I.    Exhausted Claims

Claims 2(A)(1) and (3), 2(C)(1), 16, 17 (in part), 18 through 28, and 29 (in part) were raised and denied on the merits in state court. This Court's "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Pinholster*, 563 U.S. at 181; *see Gulbrandson,* 738 F.3d at 993 & n.6 ("explaining that for claims that were adjudicated on the merits in state court, petitioners can rely only on the record before the state court in order to satisfy the requirements of § 2254(d)" and noting this "evidentiary limitation" also applies to claims under § 2254(d)(2)).

Chappell contends that the claims satisfy § 2254(d) based on the state-court record and evidentiary development is necessary for the Court to conduct *de novo* review. As set forth above, however, the Court has found that the state court denials of the claims were not unreasonable under 28 U.S.C. § 2254(d). Because they do not satisfy § 2254(d)(1) or (2) based on the state court record, the Court is precluded from considering new evidence in support of the claims. *See Stokley v. Ryan*, 659 F.3d 802, 809 (9th Cir. 2011) (citing *Pinholster*, 563 U.S. at. 185). "Under these circumstances, there is no reason to hold an evidentiary hearing or expand the record and no good cause exists to authorize discovery." *Johnson v. Thornell*, No. CV-18-00889-PHX-MTL, 2025 WL 3204780, at *132 (D. Ariz. Nov. 17, 2025), citing *Sully v. Ayers*, 725 F.3d 1057, 1075 (9th Cir. 2013), ("[A]n evidentiary hearing is pointless once the district court has determined that § 2254(d) precludes habeas relief.").

## II.    Procedurally Defaulted Claims

The remaining claims for which Chappell seeks evidentiary development—Claims 1, 2(A)(2), 2(C)(2), 3, 17 (in part), 29 (in part), 30, and 31—were not presented in state

~ 137 ~

court. As Chappell notes, the restrictions of *Pinholster* do not apply when there has been no state court adjudication of a claim on the merits. (Doc. 105 at 14.) He cites *Dickens*, 740 F.3d at 1320, 1321, for the proposition that a petitioner may present new evidence in support of a new claim or to support a cause-and-prejudice argument under *Martinez* for a claim's default because *Pinholster* applies only to claims previously adjudicated on the merits in State court proceedings. (*Id*.)

For unexhausted claims, the Court's "'discretion . . . to consider new evidence' . . . is . . . cabined by the requirement in § 2254(e)(2) that the petitioner must have attempted 'to develop the factual basis of [the] claim in State court.'" *Stokley*, 659 F.3d at 808 (quoting *Pinholster*, 563 U.S. at 186).

Under § 2254(e)(2), a federal court may not hold an evidentiary hearing unless it first determines that the petitioner exercised diligence in trying to develop the factual basis of the claim in state court. *See Michael*, 529 U.S. at 432. If the failure to develop a claim's factual basis is attributable to the petitioner, the court may hold a hearing only if the claim relies on (1) "a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable" or (2) "a factual predicate that could not have been previously discovered through the exercise of due diligence." 28 U.S.C. § 2254(e)(2). In addition, "the facts underlying the claim [must] be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable fact finder would have found the [petitioner] guilty of the underlying offense." *Id.*

Section 2254(e)(2) limits a petitioner's ability to present new evidence through a Rule 7 motion to the same extent that it limits the availability of an evidentiary hearing. *See Cooper-Smith v. Palmateer*, 397 F.3d 1236, 1241 (9th Cir. 2005), *overruled on other grounds by Daire v. Lattimore*, 812 F.3d 766 (9th Cir. 2016) (en banc); *Holland v. Jackson*, 542 U.S. 649, 652–53 (2004) (per curiam). Accordingly, a petitioner who seeks to introduce new affidavits and other documents never presented in state court must demonstrate diligence in developing the factual basis in state court or satisfy the requirements of § 2254(e)(2).

~ 138 ~

Chappell contends that the failure to develop the factual basis of these claims resulted from the ineffective assistance of PCR counsel. This argument is foreclosed by the United States Supreme Court's recent decision in *Ramirez*, which held that "under § 2254(e)(2) a federal habeas court may not conduct an evidentiary hearing or otherwise consider evidence beyond the state-court record based on ineffective assistance of state postconviction counsel." *Ramirez*, 596 U.S. at 382.

According to *Ramirez*, a petitioner is at fault when PCR counsel is negligent in developing the record, and therefore "a federal court may order an evidentiary or otherwise expand the state-court record only if the prisoner can satisfy § 2254(e)(2)'s stringent requirements." *Id.* at 384.

Chappell has not met those standards. The claims for which he seeks evidentiary development do not rely on a new, retroactive rule of constitutional law. Nor do they rely on a factual predicate that could not have been discovered previously through due diligence. The evidence Chappell seeks to develop, consisting largely of additional information from previous counsel and defense team members, mental health experts, and family members and acquaintances, existed during the state court proceedings, so there is no new factual predicate under § 2254(e)(2). Finally, the facts underlying the claims are insufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable juror would have found Chappell guilty of the murders or sentenced him to death. *See id.*

Chappell is not entitled to evidentiary development.

### CERTIFICATE OF APPEALABILITY

Pursuant to Rule 22(b) of the Federal Rules of Appellate Procedure, a petitioner cannot take an appeal unless a certificate of appealability ("COA") has been issued by an appropriate judicial officer. Rule 11(a) of the Rules Governing Section 2254 Cases provides that the district judge must either issue or deny a certificate of appealability when it enters a final order adverse to the applicant. If a certificate is issued, the court must state the specific issue or issues that satisfy 28 U.S.C. § 2253(c)(2).

Under § 2253(c)(2), a certificate of appealability may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." This showing can be established by demonstrating that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner" or that the issues were "adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)). For procedural rulings, a certificate of appealability will issue only if reasonable jurists could debate whether the petition states a valid claim of the denial of a constitutional right and whether the court's procedural ruling was correct. *Id.* The Court finds that reasonable jurists could debate its resolution of Claim 2(A)(4), alleging ineffective assistance of trial counsel.

## CONCLUSION

The Court has considered Chappell's claims and has determined that none warrant a writ of habeas corpus. Accordingly,

**IT IS ORDERED denying** Chappell's Petition for Writ of Habeas Corpus. The Clerk of Court shall enter judgment accordingly.

**IT IS FURTHER ORDERED granting in part** and **denying in part** Chappell's Notice of Request for Evidentiary Development, **adding** solely Exhibits 1 through 3 from the Notice to the Court's record.

**IT IS FURTHER ORDERED granting** a certificate of appealability as to Claim 2(A)(4) and **denying** a certificate of appealability as to the rest of Chappell's claims.

**IT IS FURTHER ORDERED** that the Clerk of Court forward a courtesy copy of this Order to the Clerk of the Arizona Supreme Court, 1501 West Washington Street, Phoenix, Arizona 85007-3329.

Dated this 6th day of March, 2026.

Honorable Steven P. Logan
United States District Judge

~ 140 ~